**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x

FILB CO-INVESTMENTS LLC,            :

                            :    Civ. Act. No.  12 - CU - 5183

                Plaintiff,    :

                            :

        -against-               :    **COMPLAINT**

                            :

UNITED COMMUNITY BANKS, INC.,       :

                            :

               Defendant.    :

-------------------------------------------------------------------- x

        Plaintiff FILB Co-Investments LLC ("FILBCI"), as and for its Complaint against United

Community Banks, Inc. ("UCBI"), alleges as follows based on personal knowledge as to itself

and its own acts and on information and belief as to all other matters. Plaintiff believes that the

information-and-belief allegations have evidentiary support or are likely to have evidentiary

support after a reasonable opportunity for further investigation or discovery.

### SUMMARY OF THE ACTION

      1.      This action arises from UCBI's breach and repudiation of the plain and

unambiguous terms of an April 1, 2010, Securities Purchase Agreement, as amended June 11,

2010 (the "SPA") between Fletcher International, Ltd. ("Fletcher") and UCBI. The SPA is

annexed as **Exhibit 1** to this Complaint. Plaintiff FILBCI is the assignee of Fletcher's rights

under the SPA.

      2.      **FILBCI's Contractual Rights.** The SPA grants FILBCI, as Fletcher's assignee,

the following contractual rights, among others:

           a.    Series C Acquisition Rights. The right to purchase up to 65,000 shares of UCBI

               Series C Convertible Preferred Stock (the "Series C Preferred Stock") from UCBI

               from time to time, in whole or in part, prior to expiration of the contractually-

1

defined "Investment Period," at a purchase price of $1,000 per share, up to an aggregate investment of $65 million (SPA §1(a)) (the "Series C Acquisition Rights"). By UCBI's reckoning, the Investment Period expires at 11:59 p.m. on July 3, 2012.

b. Series C Redemption Rights. The right to redeem the Series C Preferred Stock on one or more occasions ("Series C Redemption") into a specified number of shares of UCBI Common stock or Common Stock Equivalent Junior Preferred Stock ("Junior Preferred Stock"), plus fractional shares to be paid out in cash, determined by a formula (the "Redemption Formula") expressly set out in the Certificate of Rights and Preferences of Series C Convertible Preferred Stock (the "Series C Certificate"), which is annexed to the SPA as Annex B and with which UCBI is contractually bound under the SPA to comply (SPA at Annex B § 6(b)(i-ii) (Redemption Formula); SPA § 9(e) and (1)(e)(xvi) (covenant)) (the "Series C Redemption Rights").

c. Warrant Rights. An "Additional Warrant Amount" — equal to the amount in excess of $30 million invested by FILBCI in Series C Preferred Stock — to acquire UCBI Junior Preferred Stock in a quantity determined by a formula expressly set out in the Warrants to Purchase Shares of Common Stock of United Community Banks, Inc. (the "Warrants") (annexed as **Exhibit 2**), with which UBCI is contractually bound under the SPA to comply (SPA § 9(e)) (the "Warrant Rights").

3.    **UCBI's Breaches and Repudiation.** UCBI has breached and repudiated, and continues to breach and repudiate, its express contractual obligation to comply with the

Redemption Formula and to deliver the contractually-specified number of Common shares to FILBCI upon exercise by FILBCI of its Series C Redemption Rights. UCBI's breach and repudiation has prevented — and threatens to permanently and irreparably derail — FILBCI from exercising all of its Series C Acquisition Rights, Series C Redemption Rights, and Warrant Rights under the SPA.

4. **Contractual Redemption Formula.** The Redemption Formula specifies the number of shares of Common stock that UCBI must deliver to FILBCI at any Series C Redemption. It provides, in relevant part, that "shares of Series C Preferred Stock shall be redeemed into that number of shares ... equal to (A) the aggregate Stated Value of such shares divided by (B) the Redemption Price." (SPA at Annex B § 6(b)(ii)). Any fractional shares are to be paid in cash (the "Fractional Share Payment"). (Series C Certificate § 6(d)).

5. The "Stated Value" of a share of Series C Preferred Stock is defined as $1,000 plus any unpaid dividends. (SPA at Annex B § 2).

6. The "Redemption Price" is defined as $5.25, subject to inapplicable adjustments. (*Id.*).

7. Applying this Redemption Formula, each share of Series C Preferred Stock is to be redeemed into 190 shares of Common stock ($1,000/$5.25), and all of the 65,000 shares of Series C Preferred Stock for which FILBCI has Series C Acquisition Rights are to be redeemed into 12,380,952 shares of Common stock (65,000 x ($1,000/$5.25)), in each case subject to certain dividend adjustments.

8. **Adjustment for Forward Stock Splits Only.** The SPA, in various contexts, contemplates and addresses the possibility of stock splits by UCBI (*e.g.*, SPA §§ 1(e)(viii), 19(q)). With respect to the Series C Redemption Rights, the parties agreed to permit adjustment

of the Redemption Formula for *forward* stock splits by UCBI only, but <u>not</u> for any *reverse* stock split:

> Notwithstanding anything herein to the contrary, if the Company at any time *subdivides* (by any stock split, stock dividend, recapitalization, reorganization, reclassification or otherwise) the shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock *into a greater number of shares*, then, after the date of record for effecting each such subdivision, all measurements and references herein related to share *prices for such securities will be proportionately decreased* and all references to share *numbers* for such securities herein *will be proportionately increased*.

SPA § 19(q) and Annex B § 8 (italics added), SPA § 9(e) and (1)(e)(xvi) (UBCI's covenant to comply with Annex B)). Elsewhere, the SPA contemplates that a different metric is subject to "adjustment for stock splits" of any type, regardless of whether they are forward or reverse (SPA § 1(e)(viii)), making it clear that the limitation of SPA § 19(q) and Annex B § 8 to forward stock splits was intentional.

9. **UCBI's Reverse Stock Split**. In June 2011, UCBI effectuated a 5-for-1 reverse stock split (the "Reverse Stock Split"), in which each share of UCBI Common stock was reclassified into one-fifth (1/5) of a share of Common stock (so that each five shares of common stock were reclassified into one share). UCBI thereby reclassified its Common shares into a *lesser* number of shares, not the *greater* number of shares that would trigger alteration of the Redemption Formula under the SPA set forth above.

10. **UCBI Repudiates Its Obligations**. In connection with and following the Reverse Stock Split, UCBI has unilaterally repudiated its obligations under the SPA by, among other things, disclaiming its obligation to perform according to its express terms. UCBI has publicly stated that, upon exercise of the Series C Redemption Rights: (A) the Redemption Price is $26.25 (*i.e.*, five times the $5.25 Redemption Price expressly stated in SPA Annex B); and (B) the 65,000 shares of Series C Preferred Stock are convertible into 2,476,191 Common shares —

approximately one-fifth of the 12,380,952 Common shares specified in the Redemption Formula. UCBI's unsanctioned adjustment for the Reverse Stock Split (A) finds no authority in the language of the SPA or SPA Annex B and (B) is barred by black letter New York law, which governs the SPA. (*See* SPA § 19(c) (New York law governs); *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 738 N.Y.S.2d 658 (2001)).

11.     UCBI purported to unilaterally abrogate FILBCI's contractual Series C Redemption Rights by issuing a self-styled "Supplemental Certificate of Rights and Preferences" (annexed as **Exhibit 3**) that included language adjusting for reverse stock splits. This "Supplemental Certificate" is a unilateral, material and unauthorized amendment of UCBI's obligations under the SPA that materially changes the terms of the Series C Redemption Rights that it provides. The SPA expressly bars such unilateral action by providing that it may not be "amended, modified or supplemented in any and all respects" other than by a written instrument signed by both parties "expressly stating that such instrument is intended to amend, modify or supplement this Agreement." (SPA § 19(i)). No such instrument adjusting for reverse stock splits was ever executed.

12.     Further, the express terms of the SPA require UCBI to adhere to its affirmative covenant that it *"will comply* with the terms and conditions of the Series C Certificate" — which is "the Certificate of Rights and Preferences of Series C Convertible Preferred Stock of [UCBI] attached … as Annex B" to the SPA. (SPA §§ 9(e), 1(e)(xvi) (emphasis added)). Annex B, like § 19(q) of the SPA, by its terms permits no adjustment for reverse splits. (SPA at Annex B § 8; SPA § 19(q)). UCBI's effort to abrogate that covenant by self-help — unilateral action unauthorized by the SPA — is invalid under governing New York law and constitutes a clear repudiation of UCBI's contractual obligations under the SPA.

13. **UCBI Further Repudiates Its Obligations Under the SPA**. On June 25, 2012, FILBCI delivered a letter to UCBI stating that UCBI had publicly repudiated its contractual obligations under the SPA. This letter demanded immediate assurances from UCBI that it would perform its obligations by, *inter alia*, "(1) delivering to FILBCI 65,000 shares of Series C Preferred stock upon receipt of an Investment Notice under Annex A to the SPA and payment of $65,000,000; and (2) redeeming the 65,000 shares of Series C Preferred into 12,380,952 shares of Common Stock, plus a cash fractional share payment under the SPA, upon receipt of a Redemption Notice under Annex H to the SPA." (The "Demand for Assurance") (annexed as **Exhibit 4**). On June 29, 2012, UCBI responded by refusing to give the assurances requested and, instead, reaffirmed its breach and repudiation of its contractual obligations by expressly disclaiming any obligation to redeem Series C Preferred stock at the contractually specified Redemption Price of $5.25: "we will honor any valid investment notice received . . . at the current $26.25 Redemption Price[.]" (Annexed as **Exhibit 5**, at 3.**)**

14. **UCBI Breaches Its Obligations to Deliver and Redeem the Series C Preferred Stock.** On June 25, 2012, FILBCI served an Investment Notice in the form and manner provided for under the SPA, seeking to acquire 76 Shares of Series C Preferred Stock. (*See* **Exhibit 6**.) On June 29, 2012, FILBCI followed with payment for the 76 Shares, satisfied all conditions under the SPA, and provided a Redemption Notice requiring redemption of the 76 Series C Preferred shares into 14,476 Common shares. (*See* **Exhibits 7 and 8**.) On June 29, 2012, UCBI refused to deliver the Series C Preferred shares, as required, stating that it did not believe it was under any obligation to consummate the transaction. (*See* **Exhibit 9**.) UCBI's response breached and expressly repudiated its contractual obligations.

15.     FILBCI stood ready, willing and able to exercise the full extent of its rights under the SPA in the event UCBI provided the assurances requested in the June 25, 2012 letter and/or complied with its contractual obligations in connection with the June 2012 acquisition and redemption of the 76 shares of Series C Preferred Stock. UCBI has breached the SPA and unequivocally repudiated its contractual obligations to FILBCI including, *inter alia,* its obligation to deliver the number of shares called for by the Redemption Formula upon any exercise of the Series C Redemption Rights.

16.     **Relief Sought.** Through this action, FILBCI seeks declaratory relief, specific enforcement of its contractual rights and damages arising from UCBI's repudiation and breaches of its contractual obligations, among other relief set out below.

## THE PARTIES

17.     Plaintiff FILBCI is a limited liability company organized under the laws of the State of Delaware. None of FILBCI's members is a citizen of the State of Georgia. FILBCI is the assignee of Fletcher's rights under the SPA pursuant to a Subscription Agreement dated as of February 13, 2012, between Fletcher and FILBCI, and a Cross Receipt executed February 22, 2012 (together, the "Assignment Agreements") (copies of which are annexed as **Exhibits 10 and 11**). Specifically, under the Assignment Agreements, Fletcher assigned to FILBCI:

    a.  The right to purchase shares of Series C convertible preferred stock for an aggregate purchase price of Sixty-Five Million Dollars and all associated rights and obligations under such agreement and such amendment....

    b.  Warrants with respect to the Additional Warrant Amount, as such terms are defined in the Warrants to Purchase Shares of Common Stock of United Community Banks, Inc., as amended by the Amendment to Warrants to Purchase Shares of Common Stock of United Community Banks, Inc....

c. An amount of $606,667 owed to FILBCI by UCBI due to a Registration Failure, as defined in the Securities Purchase Agreement, accruing over a period of 28 days….

18.     UCBI is a corporation organized under the laws of the State of Georgia with its principal place of business in Blairsville, Georgia.  UCBI is a citizen of the State of Georgia.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because the action is between citizens of different states and the matter in controversy exceeds $75,000.00.

20.     Personal jurisdiction and venue are proper under Section 19(c) of the SPA, which provides, as relevant here, that:

> [E]ach of the parties hereto hereby submits to the exclusive jurisdiction of any state or federal court in New York City, New York and any court hearing any appeal therefore, over any suit, action or proceeding against it arising out of or based upon this Agreement (a 'Related Proceeding'). Each of the parties hereto hereby waives any objection to any Related Proceeding in such courts whether on the grounds of venue, residence or domicile or on the ground that the Related Proceeding has been brought in an inconvenient forum.

## FACTUAL ALLEGATIONS

### The SPA

21.     On April 1, 2010, UCBI and Fletcher entered into the SPA.  The SPA is a valid, binding and enforceable agreement.

22.     Fletcher has duly assigned to FILBCI the rights at issue in this litigation under the Assignment Agreements.

23.     This assignment is expressly permitted by § 19(b) of the SPA.

24.     The SPA is governed by New York law.  (SPA §19(c)).

25.    UCBI agreed, in Section 19(f) of the SPA, to the specific enforcement of its

obligations under the SPA:

> Fletcher and the Company stipulate that the remedies at law of the parties
> hereto in the event of any default or threatened default by either party in
> the performance of or compliance with any of the terms of this
> Agreement, the Series C Certificate, the Junior Preferred Certificate and
> the Warrant are not and will not be adequate and that, to the fullest extent
> permitted by law, such terms may be specifically enforced by a decree for
> the specific performance of any agreement contained herein or by an
> injunction against a violation of any of the terms hereof or otherwise.

## FILBCI's Series C Acquisition Rights

26.    Section 1(a) of the SPA grants FILBCI (as Fletcher's assignee) the right to acquire

"from time to time, in whole or in part" 65,000 shares of Series C Preferred Stock from UCBI,

with par value $1.00, at a purchase price of $1,000 per share, for an aggregate investment

commitment of $65 million.

27.    Under the SPA, these Series C Acquisition Rights must be exercised during the

"Investment Period" or they are irretrievably lost, and a penalty then accrues equal to 5% of the

unpaid portion of the $65 million investment commitment, subject to certain conditions.  (SPA

§§ 1(a), 15(b)).

28.    Section 1(a) of the SPA permits FILBCI to purchase Series C Preferred Stock by

delivering to UCBI an Investment Notice at any time before the end of the Investment Period.

The original end of the Investment Period was May 26, 2012, the second anniversary of the

Stockholder Consent Date.  (SPA §§ 1(a), 6(a)).

29.    In UCBI's 2011 Form 10-K filed with the Securities and Exchange Commission

("SEC"), UCBI contends that the date within which all investments must be made before

imposition of the 5% penalty — which, under the SPA, is the end of the Investment Period (SPA

§ 15(b)) — is July 3, 2012, not May 26, 2012. Upon information and belief, the Investment Period does not end on July 3, 2012.

30.     Upon information and belief, based upon the Assignment Agreements, the Investment Period has been extended due to a 28-day "Registration Failure" by UCBI. Under Section 1(b)(i) of the SPA, the Investment Period is extended by one business day for each business day that a Registration Statement is not effective and available for the issuance of any Series C Preferred Stock or Warrants over a period of more than 7 days.

31.     Under the Assignment Agreements, UCBI remains obligated to pay $606,667 to FILBCI due to its Registration Failure under Section 5(f) of the SPA. Pursuant to Section 5(f) of the SPA, the period of UCBI's Registration Failure continues until all amounts due and owing are paid (*i.e.*, the Registration Failure "shall be deemed to be continuing unless and until timely payment has been made…" (SPA § 5(f)). The Investment Period is extended by the period of UCBI's entire continuing Registration Failure — *i.e.*, well beyond July 3, 2012. There is therefore a live controversy between the parties not only with respect to FILBCI's Series C Redemption Rights but also as to the precise date of expiration of the Investment Period.

**FILBCI's Series C Redemption Rights**

32.     The SPA annexes, incorporates and specifically binds UCBI to adhere to the terms of SPA Annex B. Section 9 of the SPA provides:

> [UCBI] covenants and agrees with Fletcher as follows:…(e) The Company <u>will comply with the terms and conditions of the Series C Certificate</u>, the Junior Preferred Certificate and the Warrant.

[Emphasis added.]

33.     Section 1(e)(xvi) of the SPA states that "'Series C Certificate' means the Certificate of Rights and Preferences of Series C Convertible Preferred Stock of [UCBI] attached hereto as Annex B." (Emphasis added).

34.     SPA Annex B provides for redemption of Series C Preferred Stock "on one or more occasions" through delivery of a Redemption Notice in the form attached as Annex H to the SPA. (SPA at Annex B § 6(b), Annex H). Upon redemption, UCBI is obligated to deliver a specific number of UCBI Common shares equal to the aggregate "Stated Value" of the Series C Preferred Stock being redeemed divided by the "Redemption Price." Section 6(b) of Annex B states, in pertinent part:

> (i) . . . [A] Holder of Series C Preferred Stock may at the option of the Holder require the Company to redeem any or all shares of Series C Preferred Stock held by such Holder for Common Stock and/or Common Stock Equivalent Junior Preferred Stock on one or more occasions by delivering an optional redemption notice (a "Redemption Notice") to the Company substantially in the form attached as Annex H to the Agreement. . . .
>
> (ii) . . . [S]uch shares of Series C Preferred Stock shall be redeemed into that number of shares of Common Stock and/or number of one-hundredths (1/100th) of a share of Common Stock Equivalent Junior Preferred Stock equal to (a) the aggregate Stated Value of such shares divided by (b) the Redemption Price (the "Redemption Stock Amount"). . . .

35.     "Redemption Price" is defined in Section 2 of SPA Annex B as follows: "'Redemption Price' means Five Dollars and Twenty-Five Cents ($5.25), subject to adjustment as set forth herein." (SPA at Annex B § 2).

36.     "Stated Value" is defined in Section 2 of SPA Annex B, in relevant part, as follows: "'Stated Value' is an amount equal to One Thousand Dollars ($1,000) per share of Series C Preferred Stock plus [certain unpaid dividends]." (*Id.*).

37.     Each share of Series C Preferred Stock is therefore redeemable for 190 shares of Common stock (or 1/100th shares of Junior Preferred Stock), plus a Fractional Share Payment, and the full 65,000 shares of Series C Preferred Stock are redeemable for 12,380,952 shares, plus a Fractional Share Payment, subject to dividend-related adjustments.

38.     Neither the SPA nor SPA Annex B contains any exception or adjustment to this Redemption Formula for reverse stock splits of UCBI Common stock.  On the contrary, both documents expressly contemplate adjustments for *forward* stock splits, but make no allowance for *reverse* stock splits:

> Notwithstanding anything herein to the contrary, if the Company at any time *subdivides* (by any stock split, stock dividend, recapitalization, reorganization, reclassification or otherwise) the shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock *into a greater number of shares*, then, after the date of record for effecting each such subdivision, all measurements and references herein related to *share prices* for such securities will be proportionately *decreased* and all references to *share numbers* for such securities herein will be proportionally *increased*.

(SPA § 19(q) and SPA at Annex B § 8 (italics added)).

39.     This clear, express reference to *forward* but not *reverse* stock splits stands in stark contrast to other explicit references in the SPA — and in UCBI's then-current Certificate of Designation for the Junior Preferred Stock — to both kinds of stock splits, without distinction. (*See* SPA § 1(e)(viii) ("Daily Market Price" computation "subject…to adjustment for stock splits" without distinguishing forward from reverse splits); Certificate of Designation of Common Stock Equivalent Junior Preferred Stock (annexed as **Exhibit 12**) at § II(b) (adjustment to conversion rate of Junior Preferred Stock into common stock to account for reverse and forward splits).

40.     Under governing New York law, the parties' agreement is enforceable according to its terms, and the Courts will not impose an unwritten adjustment for the Reverse Stock Split.

**FILBCI's Warrant Rights**

41.     Under SPA § 1(d), on April 5, 2010, UCBI also issued $65 million of Warrants carrying with them the right to purchase shares of UCBI's Junior Preferred Stock. The Warrants are divided into two tranches: (A) a $30 million "Initial Warrant Amount," which Fletcher has retained for itself; and (B) up to $35 million in an "Additional Warrant Amount," which Fletcher assigned to FLBCI in the Assignment Agreements. See **Exhibit 2** (documentation for Warrants).

42.     The extent of the Additional Warrant Amount is determined "on a dollar for dollar basis by the aggregate dollar amount of the Series C [Preferred Stock] purchased under the [SPA] in excess of Thirty Million Dollars ($30,000,000)." (Warrants § 1.1(a)).

43.     The Warrants entitle FILBCI to delivery of UCBI Junior Preferred Stock in an amount determined by the formula set forth in Section 1.5(a) of the Warrants, at a Warrant Exercise Price of $6.02 per 1/100th share of Junior Preferred Stock. (Warrants §§ 1.1(a), 1.5(a)).

**UCBI's Reverse Stock Split and Unilateral Attempts To Change the Terms of the SPA**

44.     On June 21, 2011, UCBI disclosed that it had undertaken a 5-for-1 Reverse Stock Split effective June 17, 2011. Under the Reverse Stock Split, each share of UCBI Common stock was reclassified into 1/5 of a share (*i.e.*, every 5 shares of Common stock became 1 share).

45.     No provision of the SPA allows for any adjustment to the Redemption Formula under the SPA for reverse stock splits. The SPA and SPA Annex B expressly contemplated stock splits, but provide for adjustment only where the split resulted in a "greater number of shares" — not the *lesser* number of shares that resulted from UCBI's Reverse Stock Split.

46.     FILBCI's written consent is unquestionably required to amend, modify or supplement the SPA. Section 19(i) of the SPA states:

> This Agreement may be amended, modified or supplemented in any and all respects, but *only by a written instrument signed by Fletcher and the Company expressly stating that such instrument is intended to amend, modify or supplement this Agreement.*

[Italics added.]

47.     Neither Plaintiff nor Fletcher has signed an instrument intended to amend, modify or supplement the SPA to adjust for reverse stock splits or absolving UCBI of its covenants under it.

48.     Knowing this, UCBI attempted to do through the back door what the SPA clearly bars it from doing through the front door: UCBI unilaterally issued a "Supplemental Certificate of Rights and Preferences" that purports to materially reduce UCBI's obligations under the SPA.

49.     That "Supplemental Certificate" states in part:

> Pursuant to the authority vested in the Board of Directors (the "Board") by the Restated Articles of Incorporation of United Community Banks, Inc. (the "Corporation"), as amended (the "Articles of Incorporation"), the Board does hereby supplement the Certificate of Rights and Preferences of Series C Convertible Preferred Stock of United Community Banks, Inc. (the "Certificate") by adding the following thereto:
>
> > For purposes of clarification, if the Company at any time subdivides or combines (by, as applicable, any stock split, reverse stock split, stock dividend, other reclassification, recapitalization, reorganization or otherwise) the shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock into a greater or lesser number of shares, as the case may be, then, after the date of record for effecting each such transaction, all measurements and references herein related to Conversion Price and Redemption Price will be proportionately decreased or increased, respectively, and all references to share numbers for such securities herein will be proportionately increased or decreased, respectively, to reflect the effect of any such transaction.
> >
> > In addition, notwithstanding anything in the Certificate to the contrary, if the Company at any time combines (by any reverse

stock split, recapitalization, reorganization, reclassification or otherwise) the shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock into a smaller number of shares, then, after the date of record for effecting each such transaction, all measurements and references herein related to share prices for such securities will be proportionately increased and all references to share numbers for such securities herein will be proportionately decreased.

See **Exhibit 3** [Emphasis added].

50.     The SPA specifically provides for amendment "only by written instrument" signed by both parties "expressly stating that such instrument is intended to amend, modify or supplement" the SPA. (SPA § 19(i)). There is no such amendment signed by all parties. UCBI's "Supplemental Certificate" was a brazen, unilateral attempt to materially change the terms of the deal embodied in the SPA — without obtaining the necessary written consent to do so — and constitutes a repudiation of UCBI's obligations under the SPA.

51.     In a series of public disclosures that followed, UCBI compounded its repudiation by proclaiming a <u>completely different</u> Redemption Price than the one to which it is bound under the SPA and a <u>completely different</u> number of redemption shares than the number derived from the Redemption Formula.

52.     UCBI's Post-Effective Amendment No. 1 to Form S-1 filed with the SEC on January 17, 2012, for example, states that:

The Series C Preferred Stock is convertible by Fletcher at any time into Common Stock, or Junior Preferred Stock, at <u>$26.25 per share</u> of Common Stock or one-hundredth of a share of Junior Preferred Stock.

[Emphasis added.]

53.     The actual Redemption Price set out in SPA Annex B — which UCBI contractually covenanted that it "will comply with" — is $5.25, <u>one fifth</u> the amount that UCBI now claims. (SPA at Annex B § 2; SPA § 9(e)).

15

54.     UCBI's Annual Report on 10-K filed with the SEC on March 14, 2012, asserts that "2,476,191 shares [are] issuable upon conversion of the [Series C Preferred Stock]." (Emphasis added).  This number is predicated on UCBI's unauthorized amendment of the SPA.

55.     The actual number of shares UCBI must deliver under the Redemption Formula — another term that UCBI contractually covenanted that it "will comply with" — is 12,380,952, five times the number of shares that UCBI now claims.   (SPA at Annex B § 6(b)(ii), 2; SPA §9(e)).

**UCBI's Breach and Repudiation of FILBCI's Series C Redemption Rights**

56.     Immediately prior to the commencement of this action, UCBI again breached its contractual obligations to FILBCI and, again, unequivocally repudiated its contractual obligation to deliver Common shares called for by the Redemption Formula.

57.     On June 25, 2012, FILBCI delivered the Demand for Assurance to UCBI.  (*See* **Exhibit 4)**.  On June 29, 2012, UCBI delivered a letter to FILBCI stating that UCBI had  no obligation to redeem Series C Preferred Stock at the contractually-specified Redemption Price of $5.25. (*See* **Exhibit 5**).

58.     On June 25, 2012, FILBCI served an Investment Notice on UCBI, in the form prescribed by Annex A to the SPA, to acquire 76 shares of Series C Preferred Stock.  (*See* **Exhibit 6)**.  On June 29, 2012, pursuant to SPA §§ 3 and 13, FILBCI wired payment of $76,000 to UCBI and satisfied all other conditions under the SPA to acquire the requested shares.  (See **Exhibit 7**).

59.     On June 29, 2012, FILBCI served a Preferred Stock Redemption Notice on UCBI in the form prescribed by Annex H to the SPA, directing UCBI to deliver 14,476 Common shares at a Redemption Price of $5.25.  This is the precise number of Common shares

determined by the Redemption Formula and the precise Redemption Price set out in SPA Annex B. (*See* **Exhibit 8**).

60.    On June 29, 2012, UCBI informed FILBCI that UCBI would return any wired funds and would not deliver the 76 shares of Series C Preferred Stock.  UCBI stated that it did not believe it was under any obligation to consummate the transaction proposed by FILBCI, which included redemption of 76 shares of Series C Preferred Stock into 14,476 shares of Common stock.  (*See* **Exhibit 9**).

61.    FILBCI fully complied with the procedures and conditions in the SPA and SPA Annex B.

62.    FILBCI was ready, willing and able to exercise its Series C Acquisition Rights, Series C Redemption Rights and Warrant Rights in full had UCBI not breached, refused to perform and repudiated its contractual obligations to FILBCI.  FILBCI remains ready, willing and able to do so.

**Right To Indemnity, Interest and Attorney Fees Incurred in This Action**

63.    Section 15(a) of the SPA provides that, subject to certain conditions, upon failure of UCBI to deliver the shares required under the SPA and SPA Annex B, UCBI "shall (without limitation to [FILB's] other remedies at law or in equity)":

> (i) indemnify and hold [FILBCI] harmless against any loss, claim or damages arising from or as a result of such failure by [UCBI] (regardless of whether any of the foregoing results from any third-party claim or otherwise); and
>
> (ii) reimburse [FILBCI] for all of its reasonable out-of-pocket expenses (which includes fees and expenses of its counsel) incurred by Fletcher in connection with this Agreement, the Series C Certificate, the Junior Preferred Certificate, the Warrant and the transactions contemplated herein and therein (regardless of whether any of the foregoing results from a third-party claim or otherwise).

64. Section 9 of SPA Annex B similarly provides that upon UCBI's failure to deliver shares under SPA Annex B, subject to certain conditions, UCBI:

> shall (without limitation to the Holder's other remedies at law or in equity): (i) indemnify and hold the Holder harmless against any loss, claim or damage arising from or as a result of such failure by the Company (regardless of whether any of the foregoing results form a third-party claim or otherwise) and (ii) reimburse the Holder for all of its reasonable out-of-pocket expenses (which includes fees and expenses of its counsel) incurred by the Holder in connection herewith and the transactions contemplated herein (regardless of whether any of the foregoing results from a third-party claim or otherwise).

65. In addition to other available remedies, Section 19(e) of the SPA provides FILBCI a contractual right to interest as follows:

> Without prejudice to other rights or remedies hereunder, *interest shall be due* on any amount that is due pursuant to this Agreement or the Warrant and has not been paid when due (or the cash equivalent of Preferred Stock which the Company fails to deliver as required by the terms of this Agreement or of Common Shares or Common Stock equivalent Preferred Stock which the Company fails to deliver pursuant to this Agreement, the Series C Certificate, the Junior Preferred Certificate or the Warrant) . . . *at the lower of (i) twelve percent (12%) or (ii) the prime rate...plus nine percent (9%). . . .*

[Italics added.]

## CAUSES OF ACTION

### Count I: Declaratory Judgment
### (Series C Redemption Rights)

66. Plaintiff repeats and re-alleges all of the foregoing allegations as if fully set forth in this paragraph.

67. An actual and ripe controversy exists concerning the parties' rights and obligations under the SPA, including SPA Annex B and the Warrants.

68. UCBI is contractually obligated under Section 9(e) of the SPA to "comply with the terms and conditions of the Series C Certificate [*i.e.,* SPA Annex B]. . . ."

69. UCBI is contractually obligated under Section 6(b) of SPA Annex B to redeem each share of Series C Preferred Stock into "that number of shares of Common Stock and/or number of one-hundredths (1/100[th]) of a share of Common Stock Equivalent Junior Preferred Stock equal to (a) the aggregate Stated Value of such shares divided by (b) the Redemption Price."

70. Under Section 2 of SPA Annex B, the Stated Value is $1,000 per share, with adjustments for dividends, and the Redemption Price is $5.25.

71. UCBI, through its words and actions, has unequivocally disclaimed its contractual obligation to redeem the shares of Series C Preferred Stock as set forth in the SPA.

72. Plaintiff is entitled to an Order and Judgment declaring that UCBI is obligated to redeem all Series C Preferred Stock in accordance with the Redemption Formula, resulting in the delivery to FILBCI of 190 shares of Common stock and a Fractional Share Payment, for each share of Series C Preferred Stock redeemed and 12,380,952 shares of Common stock and a Fractional Share Payment, upon redemption of all 65,000 shares of Series C Preferred Stock (subject only to any applicable adjustments for unpaid dividends as set forth in SPA Annex B).

## Count II: Declaratory Judgment
## (Expiration of Investment Period)

73. Plaintiff repeats and re-alleges all of the foregoing allegations as if fully set forth in this paragraph.

74. The Investment Period under Sections 1(a) and 1(b) of the SPA is extended by one business day for each business day of a Registration Failure.

75. Upon information and belief, based upon the Assignment Agreements, UCBI has had a Registration Failure and has not paid the amounts due under Section 5(f) of the SPA.

76.     Under Section 5(f) of the SPA, UCBI's "Registration Failure shall be deemed to be continuing unless and until timely payment has been made under . . . Section 5(f)."

77.     Therefore, the Registration Failure is continuing — and the Investment Period continues to be extended — absent full payment by UCBI of all amounts due under Section 5(f) of the SPA, with accrued interest.

78.     In public filings with the SEC, UCBI has stated that July 3, 2012 is the date by which the Series C Acquisition Rights must be exercised without penalty, which, under Section 15(b) of the SPA, is the last day of the Investment Period.

79.     An actual and ripe controversy exists between the parties concerning the date of expiration of the Investment Period under the SPA.

80.     Plaintiff is entitled to an Order and Judgment fixing and determining the date of expiration of the Investment Period.

**Count III: Breach of Contract
(Series C Redemption)**

81.     Plaintiff repeats and re-alleges all of the foregoing allegations as if fully set forth in this paragraph.

82.     The SPA is a valid, binding and enforceable contract.

83.     FILBCI is a valid assignee to Fletcher's contractual rights.

84.     UCBI breached its contractual obligations to FILBCI, as set forth more fully in this Complaint.

85.     Plaintiff is entitled to an Order and Judgment directing UCBI to specifically perform its contractual obligations, as contemplated and provided by Section 19(f) of the SPA.

86.     Plaintiff is entitled to an Order and Judgment directing UCBI to indemnify FILBCI for its losses and damages arising from or as a result of its contractual breach, including

its attorneys' fees incurred in the prosecution of this action, as contemplated and provided by Section 15(a)(i) of the SPA and Section 9 of SPA Annex B.

87.      Plaintiff is entitled to an Order and Judgment directing UCBI to reimburse FILBCI for all of its costs and expenses, including attorneys' fees and expenses, incurred by FILBCI, as contemplated and provided by Section 15(a)(i) of the SPA and Section 9 of SPA Annex B.

88.      Plaintiff is entitled to an Order and Judgment awarding all interest due under Section 19(e) of the SPA.

### Count IV: Breach of Contract
### (Anticipatory Repudiation)

89.      Plaintiff repeats and re-alleges all of the foregoing allegations as if fully set forth in this paragraph.

90.      The SPA is a valid, binding and enforceable contract.

91.      FILBCI is a valid assignee to Fletcher's contractual rights.

92.      UCBI has repudiated its contractual obligations to FILBCI, as set forth more fully in this Complaint.

93.      UCBI is contractually obligated under Section 9(e) of the SPA to "comply with the terms and conditions of the Series C Certificate [*i.e.,* SPA Annex B]...."

94.      UCBI is contractually obligated under Section 6(b) of SPA Annex B to redeem each share of Series C Preferred Stock into "that number of shares of Common Stock and/or number of one-hundredths (1/100th) of a share of Common Stock Equivalent Junior Preferred Stock equal to (a) the aggregate Stated Value of such shares divided by (b) the Redemption Price."

95. Under Section 2 of SPA Annex B, the Stated Value is $1,000 per share, with adjustments for dividends, and the Redemption Price is $5.25.

96. UCBI, through its words, actions and conduct, has repudiated its obligation to redeem the shares of Series C Preferred Stock.

97. UCBI has repudiated its express contractual obligation to redeem the 65,000 shares of Series C Preferred Stock utilizing the Redemption Price.

98. UCBI has repudiated its express contractual obligation to redeem the 65,000 shares of Series C Preferred Stock for 12,380,952 shares of UCBI Common stock and a Fractional Share Payment.

99. UCBI has declined and refused to convert shares of Series C Preferred Stock as provided in the Redemption Formula.

100. UCBI has unilaterally attempted to alter the terms of the SPA and SPA Annex B without consent or authorization.

101. UCBI refused to provide assurances in response to the Demand for Assurance stating, *inter alia*, that it will not perform its obligations under the SPA, including its obligation to deliver the number of shares called for by the Redemption Formula on any exercise of the Series C Redemption Rights.

102. As a consequence of UCBI's contractual breaches as set forth herein, FILBCI has suffered damages including, but not limited to, the loss and destruction of the value of Plaintiffs' Series C Acquisition Rights and the loss of Plaintiffs' Series C Redemption Rights and Warrant Rights.

103. Plaintiff is entitled to an Order and Judgment of this Court awarding the full amount of its damages in an amount to be determined at trial.

104. Plaintiff is entitled to an Order and Judgment directing UCBI to specifically perform its contractual obligations, as contemplated and provided by Section 19(f) of the SPA.

105. Plaintiff is entitled to an Order and Judgment directing UCBI to indemnify FILBCI for its losses and damages arising from or as a result of its contractual breach, as contemplated and provided by Section 15(a)(i) of the SPA and Section 9 of SPA Annex B.

106. Plaintiff is entitled to an Order and Judgment directing UCBI to reimburse FILBCI for all of its costs and expenses, including attorneys' fees and expenses, incurred by FILBCI, as contemplated and provided by Section 15(a)(i) of the SPA and Section 9 of SPA Annex B.

107. Plaintiff is entitled to an Order and Judgment awarding all interest due under Section 19(e) of the SPA.

### Count V: Breach of Contract
### (Registration Failure)

108. Plaintiff repeats and re-alleges all of the foregoing allegations as if fully set forth in this paragraph.

109. The SPA is a valid, binding and enforceable contract.

110. In the event of a Registration Failure, Section 5(f) of the SPA obligates UCBI to pay an amount to FILBCI in accordance with a formula set forth in Section 5(f) of the SPA.

111. Upon information and belief, based upon the Assignment Agreements, a Registration Failure has occurred within the meaning of the SPA.

112. As a result of this Registration Failure, UCBI is obligated to pay FILBCI, as Fletcher's assignee, $606,667 due under Section 5(f) of the SPA.

113. UCBI has not paid FILBCI the $606,667 owed, as required by Section 5(f) of the SPA, in breach of its contractual obligations.

114.   Plaintiff is entitled to an Order and Judgment of this Court awarding the full amount of its damages in an amount to be determined at trial.

115.   Plaintiff is entitled to an Order and Judgment directing UCBI to reimburse FILBCI for all of its costs and expenses, including attorneys' fees and expenses, incurred by FILBCI, as contemplated and provided by Section 15(a)(i) of the SPA and Section 9 of SPA Annex B.

116.   Plaintiff is entitled to an Order and Judgment awarding all interest due under Section 19(e) of the SPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter an Order and Judgment:

A.    Declaring that UCBI is obligated to redeem all Series C Preferred Stock in accordance with the Redemption Formula, resulting in the delivery to FILBCI of 190 shares of Common stock for each share of Series C Preferred Stock redeemed and 12,380,952 shares of Common stock, plus a Fractional Share Payment, upon redemption of all 65,000 shares of Series C Preferred Stock (subject only to any applicable adjustments for unpaid dividends as set forth in SPA Annex B);

B.    Fixing and determining the date of expiration of the Investment Period;

C.    Directing UCBI to specifically perform its contractual obligation to deliver to FILBCI 14,476 shares of UCBI Common stock in connection with FILBCI's June 2012 Preferred Stock Redemption Notice;

D.    Awarding damages in an amount to be determined at trial;

E.    Awarding FILBCI $606,667 pursuant to Section 5(f) of the SPA;

24

F.      Awarding FILBCI interest pursuant to the SPA and indemnity for its losses and damages, and reimbursement for its costs and expenses, including attorneys' fees and expenses incurred in this action; and

G.      Granting such other, further and different relief as the Court may deem just and proper.

Dated:  New York, New York
        July 3, 2012

GREGORY P. JOSEPH LAW OFFICES LLC

By: _____
        Gregory P. Joseph (GJ-1210)
        (gjoseph@josephnyc.com)
        Douglas J. Pepe (DP-1230) (dpepe@josephnyc.com)
        Samuel N. Fraidin (SF-1209) (sfraidin@josephnyc.com)
        Jeffrey H. Zaiger (JZ-1208) (jzaiger@josephnyc.com)
        485 Lexington Avenue
        New York, NY 10017
        Telephone: (212) 407-1200

        *Attorneys for Plaintiff FILB Co-Investments LLC*

700415

# Exhibit 1

## SECURITIES PURCHASE AGREEMENT

This Securities Purchase Agreement (this "Agreement") dated as of April 1, 2010 is entered into by and between United Community Banks, Inc., a corporation organized under the laws of Georgia (together with its successors, the "Company"), and Fletcher International, Ltd., a company domiciled in Bermuda (together with its successors, "Fletcher").

The parties hereto agree as follows:

1.    Purchase and Sale.  In consideration of and upon the basis of the representations, warranties and agreements and subject to the terms and conditions set forth in this Agreement:

(a)    Subject to satisfaction or, if applicable, waiver of the relevant conditions set forth in Sections 12 and 13 hereof and subject to the provisions of Section 6(a) hereof, Fletcher agrees to purchase from the Company, and the Company agrees to issue and sell to Fletcher (each an "Investment"), from time to time, in whole or in part, Sixty-Five Thousand (65,000) shares of the Company's Series C convertible preferred stock, par value One Dollar ($1.00) per share (the "Preferred Stock"), at a purchase price of One Thousand Dollars ($1,000) per share (the "Investment Price") for an aggregate purchase price of Sixty-Five Million Dollars ($65,000,000) (the "Aggregate Investment Commitment").  To effect any Investment, Fletcher shall deliver a written notice substantially in the form attached hereto as Annex A (an "Investment Notice") to the Company from time to time during the period commencing on and including the date of this Agreement and ending no later than 11:59 p.m. New York City time on the date that is the two year anniversary of the Stockholder Consent Date (as defined below), subject to extension as set forth herein (the "Investment Period").  Subject to satisfaction or, if applicable, waiver of the relevant conditions set forth in Sections 12 and 13 hereof, the closing of each Investment (each, a "Closing") shall take place at 9:30 a.m. New York City time on the date that is three (3) Business Days (as defined below) following and excluding the date of delivery of the Investment Notice or on such other date as Fletcher and the Company shall mutually agree (each such date and time being referred to herein as a "Closing Date").  Subject to the provisions of Sections 1(c) and 10(b) hereof, on or prior to the expiration of the Investment Period, Fletcher shall have consummated Investments in an aggregate amount equal to the Aggregate Investment Commitment.  For the avoidance of doubt, subject to the provisions of Sections 1(c) and 10(b) hereof, the Aggregate Investment Commitment shall be reduced on a dollar-for-dollar basis by the Investment Amount (as defined below) paid on each Investment.

(b)    The Investment Period shall be extended by one (1) Business Day for each Business Day:

(i)    that the Registration Statement (as defined below) is not effective and available for the issuance of any Preferred Stock or Warrants for a period of more than seven (7) days (each, a "Registration Failure"); or

(ii)    at any time after the One Year Anniversary Date (as defined below) but before the date that is sixty (60) days before the expiration of the Investment Period, occurring during the period (x) commencing on the earlier of the day on which the

Company restates or announces its intention to restate any portion of the Company Financial Statements (as defined below), and (y) ending on the date on which the Company files quarterly or annual financial statements that constitute a Restatement (as defined below) on a Form 10-K, Form 10-Q, Form 8-K or any other filing with the United States Securities and Exchange Commission (the "SEC") (and if the Company makes multiple filings of a Restatement with the SEC, the last of such dates) (the "Restatement Filing Date").

If (i) the Company restates or announces its intention to restate any portion of the Company Financial Statements (as defined below) less than sixty (60) days before the expiration of the Investment Period, (ii) the Company has restated or announced its intention to restate any portion of the Company Financial Statements and the Restatement Filing Date is not at least sixty (60) days before the expiration of the Investment Period, or (iii) the Company fails to maintain the effectiveness and availability of the Registration Statement for the issuance of all Preferred Stock and Warrants issuable under this Agreement, then the Investment Period shall be extended to a date that is at least sixty (60) days after the later of the Restatement Filing Date or the remediation of the failure described in clause (iii) of this paragraph.

(c)     If the conditions set forth in Section 12 hereof are not satisfied or waived on or prior to 9:30 a.m. New York City time on the relevant Investment Closing Date or if the Company fails to perform its obligations on any Investment Closing Date (including delivery of all shares of Preferred Stock issuable on such date) for any reason other than Fletcher's failure to satisfy the conditions required by Section 13 hereof, then in addition to all remedies available to Fletcher at law or in equity, Fletcher may, at its sole option, and at any time, withdraw the Investment Notice by written notice to the Company and, after such withdrawal, shall have no further obligations with respect to such Investment Notice.  Upon any such withdrawal, the Aggregate Investment Commitment shall be reduced on a dollar-per-dollar basis by the Investment Amount (as defined below) set forth in the withdrawn Investment Notice.

(d)     In addition, upon receipt of the Deposit (as defined in the Asset Purchase and Sale Agreement, defined below), the Company will issue to Fletcher a warrant (the "Warrant") evidencing rights to purchase from the Company, subject to the terms and conditions set forth in the Warrant, securities as set forth therein. Fletcher shall have the right to exercise rights under the Warrant in the manner, and subject to the terms, specified in the Warrant.

(e)     As used herein,

(i)     the term "Articles of Incorporation" means the Restated Articles of Incorporation of the Company, as amended;

(ii)     the term "Business Day" means any day on which the Common Stock may be traded on Nasdaq (as defined below) or, if not admitted for trading on Nasdaq, on any day other than a Saturday, Sunday or holiday on which banks in New York City are required or permitted to be closed;

US2008 1122394.15

(iii)    the term "<u>Common Stock Equivalent Junior Preferred Stock</u>" means a new class of non-voting preferred stock, par value One Dollar ($1.00) per share, of the Company to be created pursuant to the Junior Preferred Certificate;

(iv)    the term "<u>Common Stock Equivalent Junior Preferred Shares</u>" means the shares of Common Stock Equivalent Junior Preferred Stock issuable upon conversion or redemption of, or as a dividend under, the Preferred Stock, upon exercise of the Warrant, and all other Common Stock Equivalent Junior Preferred Stock issuable under this Agreement, the Series C Certificate, the Junior Preferred Certificate or the Warrant;

(v)    the term "<u>Common Shares</u>" means the shares of Common Stock issuable upon conversion or redemption of, or as a dividend under, the Preferred Stock, upon exercise of the Warrant, the shares of Common Stock issuable upon conversion of the Common Stock Equivalent Junior Preferred Stock and all other Common Stock issuable under this Agreement, the Series C Certificate, the Junior Preferred Certificate or the Warrant;

(vi)    the term "<u>Common Stock</u>" means the Company's common stock, par value One Dollar ($1.00) per share;

(vii)    the term "<u>Company Financial Statements</u>" means all financial statements (including the notes thereto) filed by the Company with the SEC (other than pursuant to Form 8-K);

(viii)    the term "<u>Daily Market Price</u>" means, on any date, the amount per share of the Common Stock (or, for purposes of determining the Daily Market Price of the common stock of an Acquiring Person or its Parent (each as defined below), the common stock of such Acquiring Person or its Parent), equal to (A) the daily volume-weighted average price of one share of Common Stock (or the common stock of an Acquiring Person or its Parent), calculated to the nearest ten thousandth (i.e., four decimal places (.xxxx)), on Nasdaq or, if no sale takes place on such date, the average of the closing bid and asked prices, calculated to the nearest ten thousandth (i.e., four decimal places (.xxxx)), on Nasdaq thereof on such date, in each case as reported by Bloomberg, L.P. (or by such other Person as Fletcher and the Company may agree), or (B) if such Common Stock (or the common stock of an Acquiring Person or its Parent) is not then listed or admitted to trading on Nasdaq, the higher of (x) the book value per share thereof as determined by any firm of independent public accountants of recognized standing selected by the Company and reasonably acceptable to Fletcher as of the last calendar day of the most recent month ending before the date as of which the determination is to be made and (y) the fair market value per share thereof determined in good faith by an independent, nationally recognized appraisal firm selected by Fletcher and reasonably acceptable to the Company (whose fees and expenses shall be borne by the Company), subject in each case to adjustment for stock splits, recombinations, stock dividends and the like;

(ix)    the term "<u>Investment Amount</u>" means, with respect to any Investment, the aggregate amount paid, deemed to be paid, or to be paid by Fletcher on the relevant Closing Date;

3

(x)     the term "Investment Securities" means the Preferred Stock, the Warrant and all Common Shares and Common Stock Equivalent Junior Preferred Shares;

(xi)     "Junior Preferred Certificate" means the Certificate of Designation of the Common Stock Equivalent Junior Preferred Stock of the Company, attached hereto as Annex J.

(xii)     the term "Material Adverse Effect" means any material adverse effect with respect to (A) the business, properties, assets, operations, results of operations, revenues or condition, financial or otherwise, of the Company and its subsidiaries taken as a whole, (B) the legality, validity or enforceability of the Agreement, the Series C Certificate, the Junior Preferred Certificate, the Warrant, the Registration Statement or the Prospectus (as defined below), or (C) the Company's ability to perform fully on a timely basis its obligations under the Agreement, the Certificate of Rights and Preferences or the Warrant;

(xiii)    the term "Nasdaq" means the Nasdaq Global Select Market, but if the Nasdaq Global Select Market is not then the principal U.S. trading market for the Common Stock, then "Nasdaq" shall be deemed to mean the principal U.S. national securities exchange (as defined in the Securities Exchange Act of 1934, as amended (the "Exchange Act")) on which the Common Stock, or such other applicable common stock, is then traded, or if such Common Stock, or such other applicable common stock, is not then listed or admitted to trading on any national securities exchange, then the OTC Bulletin Board or other trading market that is then the principal market on which such stock is then traded;

(xiv)     the term "Parent" means, as to any Acquiring Person, any Person that (A) controls the Acquiring Person directly or indirectly through one or more intermediaries, (B) is required to include the Acquiring Person in the consolidated financial statements contained in such Parent's Annual Report on Form 10-K (if the Parent is required to file such a report) or would be required to so include the Acquiring Person in such Parent's consolidated financial statements if they were prepared in accordance with U.S. generally accepted accounting principals and (C) is not itself included in the consolidated financial statements of any other Person (other than its consolidated subsidiaries).

(xv)     the term "Person" means an individual or a corporation, partnership, trust, incorporated or unincorporated association, limited liability company, joint venture, joint stock company, government (or an agency or political subdivision thereof) or other entity of any kind.

(xvi)     the term "Series C Certificate " means the Certificate of Rights and Preferences of Series C Convertible Preferred Stock of the Company attached hereto as Annex B;

2.     Asset Purchases.

Concurrently with the execution of this Agreement, the Company and an affiliate of Fletcher have executed that certain Asset Purchase and Sale Agreement providing for the

4

Company's sale of certain assets to Fletcher or its affiliates (the "Asset Purchase and Sale Agreement").

3. Closings. Unless otherwise agreed by the parties, each Closing shall take place via facsimile on each Closing Date in the manner set forth below.  At each Closing, the following deliveries shall be made:

(a) Preferred Stock.  The Company shall deliver to Fletcher, at the Company's expense, that number of shares of Preferred Stock specified in the relevant Investment Notice.  Such shares shall be issued in the name of and delivered to Fletcher and registered by the Company in its stockholder register in the name of Fletcher or as otherwise instructed by Fletcher in writing.

(b) Purchase Price.  Fletcher shall cause to be wire transferred to the Company, in accordance with the wire instructions set forth in Annex E hereto, the Investment Amount set forth in the Investment Notice in immediately available United States funds.

(c) Closing Documents.  The closing documents required by Sections 12 and 13 shall be delivered to Fletcher and the Company, respectively.

The deliveries specified in this Section 3 shall be deemed to occur simultaneously as part of a single transaction, and no delivery shall be deemed to have been made until all such deliveries have been made.

4. Representations and Warranties of the Company.  The Company hereby represents and warrants to Fletcher on the date hereof, on each Closing Date, on each Warrant Closing Date (as defined in the Warrant) and on each Conversion Closing Date and Redemption Closing Date (each as defined in the Certificate of Rights and Preferences) as follows:

(a) The Company has duly authorized the sale and issuance of all Investment Securities issuable under this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant (the "Offering").  The Offering has been registered under the Securities Act of 1933, as amended (the "Securities Act") pursuant to the Company's Registration Statement on S-3/A (Registration No. 333-159958) and Registration Statement on S-3 filed as of the date hereof, each as amended or replaced (together, the "Registration Statement").

(b) The Company has been duly incorporated and is validly existing in good standing under the laws of the state of Georgia.  The Company is duly registered as a bank holding company under the Bank Holding Company Act of 1956, as amended (the "BHCA").  Each of the subsidiaries of the Company that is a bank has been duly organized and is validly existing in good standing under all applicable laws.

(c) Except as otherwise contemplated by this Agreement and the requirement that the Company obtain Stockholder Consent, the execution, delivery and performance of this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant (including the authorization, sale, issuance and delivery of the Investment Securities

5

issuable hereunder and thereunder) have been duly authorized by all requisite corporate action and no further consent or authorization of the Company, its Board of Directors or its stockholders is required.

(d)     This Agreement has been duly executed and delivered by the Company and, when this Agreement is duly authorized, executed and delivered by Fletcher, will be a valid and binding agreement enforceable against the Company in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity. The issuance of the Investment Securities is not and will not be subject to any preemptive right or rights of first refusal that have not been properly waived or complied with.

(e)     Except as otherwise contemplated by this Agreement and the requirement that the Company obtain Stockholder Consent (as defined below) and designate the Common Stock Equivalent Junior Preferred Stock, the Company has full corporate power and authority necessary to (i) own and operate its properties and assets, execute and deliver this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant, (ii) perform its obligations hereunder and under the Series C Certificate, the Junior Preferred Certificate and the Warrant (including, but not limited to, the issuance of the Investment Securities issuable hereunder and under the Series C Certificate, the Junior Preferred Certificate and the Warrant) and (iii) carry on its business as presently conducted and as presently proposed to be conducted. The Company and its subsidiaries are duly licensed, qualified and authorized to do business and are in good standing as foreign corporations in all jurisdictions in which the nature of their activities and of their properties (both owned and leased) makes such licensing, qualification or authorization necessary, except where the failure to do so would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect.

(f)     No consent, approval, authorization or order of any court, governmental agency or other body is required for execution and delivery by the Company of this Agreement or the performance by the Company of any of its obligations hereunder and under the Series C Certificate, the Junior Preferred Certificate and the Warrant.

(g)     Except as otherwise contemplated by this Agreement and the requirement that the Company obtain the Stockholder Consent, neither the execution and delivery by the Company of this Agreement, the Series C Certificate, the Junior Preferred Certificate or the Warrant nor the performance by the Company of any of its obligations hereunder or under the Series C Certificate, the Junior Preferred Certificate or the Warrant:

(i)     violates, conflicts with, results in a breach of, or constitutes a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to constitute a default) or creates any rights in respect of any Person under (A) the articles of incorporation or by-laws (or other comparable documents) of the Company or any of its subsidiaries, (B) any decree, judgment, order, law, treaty, rule, regulation or determination of any court, governmental agency or body, or arbitrator having jurisdiction over the Company or any of its subsidiaries or any of their respective properties or assets, (C) the terms of any bond, debenture, indenture, credit agreement, note or any other evidence of indebtedness, or any

6

agreement, stock option or other similar plan, lease, mortgage, deed of trust or other instrument to which the Company or any of its subsidiaries is a party, by which the Company or any of its subsidiaries is bound, or to which any of the properties or assets of the Company or any of its subsidiaries is subject, (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company or any of its subsidiaries is a party or (E) any rule or regulation of the Financial Industry Regulatory Authority, Inc. (successor entity to National Association of Securities Dealers, Inc.) ("FINRA") or Nasdaq; or

        (ii)    results in the creation or imposition of any lien, charge or encumbrance upon any Investment Securities or upon any of the properties or assets of the Company or any of its subsidiaries.

        (h)    When issued to Fletcher against payment therefor, the Investment Securities issuable hereunder or under the Series C Certificate, the Junior Preferred Certificate or the Warrant:

        (i)    will have been duly and validly authorized, duly and validly issued, fully paid and non-assessable;

        (ii)    will be free and clear of any security interests, liens, claims or other encumbrances; and

        (iii)    will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company.

        (i)    The Company satisfies all continued listing criteria of the Nasdaq Global Select Market, the Nasdaq Global Market or the New York Stock Exchange. There is no present set of facts or circumstances that will (with the passage of time or the giving of notice or both or neither) cause the Common Stock to be delisted from such market. All Common Shares will, when issued, be duly listed and admitted for trading on all of the markets where shares of Common Stock are traded, including the Nasdaq Global Select Market.

        (j)    There is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company or any of its affiliates that would affect the execution by the Company of, or the performance by the Company of its obligations under, this Agreement, the Series C Certificate, the Junior Preferred Certificate or the Warrant.

        (k)    <u>Reports</u>

        (i)    Since January 1, 2008, none of the Company's filings with the SEC under the Securities Act or under Section 13 or 15(d) of the Exchange Act, including the financial statements, schedules, exhibits and results of the Company's operations and cash flow contained therein (each an "SEC Filing"), contained any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. Since January 1, 2008, there has not been any pending or, to the best knowledge of the Company, threatened action, suit,

proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company or any of its subsidiaries that will or is reasonably likely to result in a Material Adverse Effect, except as disclosed in the Company's SEC Filings on or before the date immediately prior to and excluding the date hereof.  Since the date of the Company's most recent SEC Filing, there has not been, and the Company is not aware of, any development or condition that is reasonably likely to result in, any material change in the condition, financial or otherwise, or in the business affairs, assets, revenues, operations or prospects of the Company and its subsidiaries, whether or not arising in the ordinary course of business.  The Company's SEC Filings made before and excluding the date hereof fully disclose all material information concerning the Company and its subsidiaries required by all statutes and applicable rules and regulations of the SEC.

(ii)       Since January 1, 2008, the Company and each of its subsidiaries has timely filed all material reports, registrations, documents, filings, statements and submissions, together with any amendments thereto, that it was required to file with any governmental entity, including, without limitation, (A) the Federal Reserve Board, (B) the Federal Deposit Insurance Corporation (the "FDIC") and (C) and other federal, state or local authority regulating financial institutions (the foregoing collectively, the "Company Reports") and has paid all material fees and assessments due and payable in connection therewith.  As of their respective filing dates, the Company Reports complied in all material respects with all statutes and applicable rules and regulations of the applicable governmental entities.  To the knowledge of the Company, as of the date of this Agreement, there are no outstanding material comments of any governmental entity with respect to any Company Report.  The Company Reports were complete and accurate in all material respects as of their respective dates, or the dates of their respective amendments.  Except for normal examinations conducted by a governmental entity in the regular course of the business of the Company and its subsidiaries, no governmental entity has initiated any proceeding or, to the knowledge of the Company, investigation into the business or operations of the Company or any of its subsidiaries  since January 1, 2008.  There is no material unresolved violation, criticism or exception by any governmental entity with respect to any report or statement relating to any examinations of the Company or any of its subsidiaries.  The deposit accounts of each subsidiary of the Company that is a bank are insured to the fullest extent permitted by law by the Deposit Insurance Fund, which is administered by the FDIC, all premiums and assessments required to be paid in connection therewith have been paid when due and no proceedings for the termination or revocation of such insurance are pending or, to the knowledge of the Company, threatened.

(l)       Immediately prior to the first Closing Date, the authorized capital stock of the Company consists of One Hundred Million (100,000,000) shares of Common Stock, par value $1.00 per share and Ten Million (10,000,000) shares of preferred stock, of which 287,411 shares are designated Series A Non-Cumulative Preferred Stock, par value $1.00 per share ("Series A Preferred Stock"), and 180,000 shares are designated Fixed Rate Cumulative Perpetual Preferred Stock, Series B, par value $1.00 per share ("Series B Preferred Stock").  As of March 22, 2010, (i) 94,174,096 shares of Common Stock are issued and outstanding and (A) 5,365,082 shares of Common Stock are currently reserved and subject to issuance upon the exercise of outstanding stock options, warrants or other convertible rights, (B) 262,002 shares of Common Stock are currently reserved and subject to issuance under the Company's deferred

8

compensation plan, and (C) 145,502 shares of Common Stock are currently reserved and subject to issuance upon vesting of restricted stock and restricted stock units (ii) no shares of Common Stock are held in the treasury of the Company, (iii) 21,700 shares of Series A Preferred Stock are issued, and outstanding and (iv) 180,000 shares of Series B Preferred Stock are issued and outstanding.  All of the outstanding shares of Common Stock and Series A Preferred Stock and Series B Preferred Stock are, and all shares of capital stock which may be issued pursuant to outstanding stock options, warrants or other convertible rights will be, when issued and paid for in accordance with the respective terms thereof, duly authorized, validly issued, fully paid and non-assessable, free of any preemptive rights in respect thereof and issued in compliance with all applicable state and federal laws concerning issuance of securities.  As of the date hereof, except as set forth above, and except for shares of Common Stock or other securities issued upon conversion, exchange, exercise or purchase associated with the securities, options, warrants, rights and other instruments referenced above, no shares of capital stock or other voting securities of the Company were outstanding, no equity equivalents, interests in the ownership or earnings of the Company or other similar rights were outstanding, and there were no existing options, warrants, calls, subscriptions or other rights or agreements or commitments relating to the capital stock of the Company or any of its subsidiaries or obligating the Company or any of its subsidiaries to issue, transfer, sell or redeem any shares of capital stock, or other equity interest in, the Company or any of its subsidiaries or obligating the Company or any of its subsidiaries to grant, extend or enter into any such option, warrant, call, subscription or other right, agreement or commitment.

    (m) <u>Solvency</u>.  The consolidated balance sheet of the Company dated as of December 31, 2009, and the consolidated statement of income, the consolidated statement of changes in shareholders' equity and the consolidated statement of cash flows of the Company for the year ended December 31, 2009 and the notes thereto, as included in the Company's SEC Filings, present fairly, in all material respects, the financial position of the Company as of the date thereof and for the period covered thereby.  The Company has not incurred debt, and does not intend to incur debt, beyond its ability to pay such debt as it matures.  For purposes of this paragraph, "debt" means any liability on a claim, and "claim" means (x) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (y) a right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.  With respect to any such contingent liabilities, such liabilities are computed at the amount which, in light of all the facts and circumstances existing at the time, represents the amount which can reasonably be expected to become an actual or matured liability.

    (n) <u>Equivalent Value</u>.  As of each Closing Date, under the terms of this Agreement, the Company is receiving fair consideration from Fletcher for the agreements, covenants, representations and warranties made by the Company to Fletcher.

    (o) <u>No Non-Public Information</u>.  Fletcher has not requested from the Company, and the Company has not furnished to Fletcher, any material non-public information concerning the Company or its subsidiaries.

9

(p)    Restatement Notices.  As of each Closing Date and each closing under the Warrant, as applicable, the Company has provided Fletcher with all Restatement Notices (as defined below) required to be delivered following a Restatement (as defined below).

(q)    Application of Takeover Protections.  There is no control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Company's charter documents or the laws of its state of incorporation that is or would become applicable to Fletcher as a result of Fletcher and the Company fulfilling their obligations or exercising their rights under this Agreement, the Series C Certificate, the Junior Preferred Certificate or the Warrant, including, without limitation, as a result of the Company's issuance of the Preferred Stock, Common Stock and Common Stock Equivalent Junior Preferred Stock issuable hereunder and thereunder and Fletcher's ownership of the Preferred Stock, Common Stock and Common Stock Equivalent Junior Preferred Stock issuable hereunder and thereunder.

(r)    Backdating of Options.  The exercise price of each Company option has been no less than the fair market value of a share of Common Stock as determined on the date of grant of such Company option.  All grants of Company options were validly issued and properly approved by the Board of Directors of the Company (or a duly authorized committee or subcommittee thereof) in material compliance with all applicable legal requirements and recorded on the Company's financial statements in accordance with U.S. generally accepted accounting principles, and no such grants involved any "back dating," "forward dating" or similar practices with respect to the effective date of grant.

(s)    Regulatory Permits.  The Company possesses all material certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct its business.  The Company is not in violation of any material judgment, decree or order or any statute, ordinance, rule or regulation applicable to it.

(t)    Foreign Corrupt Practices.  Neither the Company nor any director, officer, agent, employee or other Person acting on behalf of the Company has, in the course of its actions for, or on behalf of, the Company (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

(u)    Sarbanes-Oxley Act.  The Company is in compliance in all material respects with any and all applicable requirements of the Sarbanes-Oxley Act of 2002 that are effective as of the date hereof, and any and all applicable rules and regulations promulgated by the SEC thereunder that are effective as of the date hereof.

(v)    Transactions With Affiliates.  Except as disclosed in the Company's SEC Filings, and other than the grant of stock options and restricted and non-

10

restricted stock grants disclosed that are required to be publicly disclosed, none of the officers, directors or employees of the Company is presently a party to any transaction with the Company (other than for ordinary course services as employees, officers or directors) required to be disclosed pursuant to Regulation S-K Item 404, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such officer, director or employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any such officer, director, or employee has a substantial interest or is an officer, director, trustee or partner, which such transaction would be required to be disclosed.

(w)     <u>Insurance</u>.  The Company is insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which the Company is engaged.

(x)     <u>Employee Relations</u>.  The Company is not a party to any collective bargaining agreement.  The Company is in compliance with all federal, state, local and foreign laws and regulations respecting labor, employment and employment practices and benefits, terms and conditions of employment and wages and hours, except where failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.

(y)     <u>Intellectual Property Rights</u>.  Except as disclosed in the Company's SEC Filings or as would not reasonably be expected to result in a Material Adverse Effect: (i) the Company owns or possesses adequate rights or licenses to use all trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, trade secrets and other intellectual property rights ("<u>Intellectual Property Rights</u>") necessary to conduct its business as now conducted; (ii) the Company does not have any knowledge of any infringement by the Company of Intellectual Property Rights of others, nor does the Company have reason to believe that the Company has infringed or would infringe on the Intellectual Property Rights of others; (iii) there is no claim, action or proceeding against the Company regarding its Intellectual Property Rights; (iv) the Company has no knowledge of any infringement or improper use by any third party of any of the Company's Intellectual Property Rights; and (v) the Company has taken reasonable security measures to protect the secrecy, confidentiality and value of all of its Intellectual Property Rights. Notwithstanding anything in this Section 4(y) to the contrary, the Company may consummate a spin-off or enter into partnership, license and collaboration agreements and other similar arrangements.

(z)     <u>Environmental Laws</u>.  The Company (i) is in compliance with any and all Environmental Laws (as hereinafter defined), (ii) has received all permits, licenses or other approvals required of it under applicable Environmental Laws to conduct its respective businesses and (iii) is in compliance with all terms and conditions of any such permit, license or approval, where, in each of the foregoing clauses (i) - (iii), the failure to so comply could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. The term "<u>Environmental Laws</u>" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants,

11

contaminants, or toxic or hazardous substances or wastes (collectively, "Hazardous Materials") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered into, promulgated or approved thereunder.

(aa)     Investment Company.  The Company is not, and is not an affiliate of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(bb)     Tax Status.  Except as would not have a Material Adverse Effect, the Company (i) has made or filed all foreign, federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and (iii) has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply.

(cc)     Internal Accounting and Disclosure Controls.  The Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset and liability accountability, (iii) access to assets or incurrence of liabilities is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets and liabilities is compared with the existing assets and liabilities at reasonable intervals and appropriate action is taken with respect to any difference. The Company maintains "disclosure controls and procedures" (as such term is defined in Rule 13a-15 under the Exchange Act) that are effective in ensuring that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the SEC, including, without limitation, controls and procedures designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including its principal executive officer or officers and its principal financial officer or officers, as appropriate, to allow timely decisions regarding required disclosure.

(dd)     Off Balance Sheet Arrangements.  There is no transaction, arrangement, or other relationship between the Company and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in the Company's SEC Filings and is not so disclosed or that otherwise would have a Material Adverse Effect.

(ee)     Subsidiaries.  As of the Closing Date, the Company has no directly held subsidiary other than those listed on Exhibit 21 to the Company's Annual Report on Form

10−K for the year ended December 31, 2009. The Company is the beneficial owner (and the Company or a subsidiary is the record owner) of all of the equity interests in the Company's subsidiaries and holds such equity interests free and clear of all encumbrances except as are imposed by applicable securities laws.

(ff)  <u>Finders' Fees</u>. Except for Sandler O'Neill & Partners, L.P., whose fees will be paid by the Company, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of the Company or any of its affiliates who might be entitled to any fee or commission from the Company or any of its affiliates in connection with the transactions contemplated hereby.

(gg)  <u>Placement Agent's Fees</u>. The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or brokers' commissions, in each case payable to third parties retained by the Company, relating to or arising out of the Offering pursuant to this Agreement. The Company shall pay, and hold Fletcher harmless against, any liability, loss or expense (including, without limitation, reasonable attorney's fees and out-of-pocket expenses) arising in connection with any such claim for fees arising out of the Offering pursuant to this Agreement.

(hh)  <u>No Integrated Offering</u>. Neither the Company, nor any Person acting on its behalf, has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause the Offering to be integrated with prior offerings by the Company for purposes of the Securities Act or the rules and regulations of FINRA or Nasdaq.

(ii)  <u>Transfer Taxes</u>. All stock transfer or other taxes (other than income or similar taxes) which are required to be paid in connection with the Offering will be, or will have been, fully paid or provided for by the Company, and all laws imposing such taxes will be or will have been complied with.

(jj)  <u>Manipulation of Price</u>. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the Offering or (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases for the Offering.

(kk)  <u>Anti-dilution Provisions</u>. Except as provided in Section 13(B) of that certain Warrant to Purchase Common Stock of the Company, issued December 5, 2008, to the United States Department of the Treasury, there is no anti-dilution provision under any agreement to which the Company is party or to which any assets of the Company are subject that is or would become effective as a result of Fletcher and the Company fulfilling their obligations or exercising their rights under this Agreement, the Certificate of Rights and Preferences and the Warrant, including, without limitation, as a result of the Company's issuance or Fletcher's ownership of the Preferred Stock or Warrant issuable hereunder or any Common Shares or Common Stock Equivalent Junior Preferred Shares.

US2008 1122394.15

5.     Registration Provisions.

(a)     The Company will keep the Registration Statement continuously effective (unless under applicable law it or any other registration statement filed pursuant to this Agreement expires, in which case the Company will prepare and file a replacement registration statement and use its reasonable best efforts to cause such replacement registration statement to be declared or become effective and to thereafter keep it continually effective) for so long as any Investment Securities continue to be issuable hereunder or under the Certificate of Rights and Preferences or the Warrant.  In the event that the Company fails to maintain the effectiveness and availability of the Registration Statement at any time during the period described above, the Company will promptly provide notice thereof to Fletcher.

(b)     The Company will prepare and file with the SEC such amendments and supplements to, or replacements of, the Registration Statement and the prospectus used in connection with the Registration Statement (as so amended and supplemented from time to time, the "Prospectus" ) as may be necessary to comply with the provisions of the Securities Act with respect to the issuance of all Investment Securities issuable to Fletcher hereunder or under the Certificate of Rights and Preferences or the Warrant.

(c)     The Company will cause all Common Shares to be listed on the Nasdaq Global Select Market, Nasdaq Global Market or the New York Stock Exchange and each other securities exchange or quotation service on which similar securities issued by the Company are listed or qualified in the future.

(d)     The Company will provide a transfer agent for all Common Shares and Common Stock Equivalent Junior Preferred Shares and a CUSIP number for all Common Shares and Common Stock Equivalent Junior Preferred Shares.

(e)     The Company will otherwise comply with all applicable rules and regulations of the SEC, FINRA and Nasdaq.

(f)     In addition to any other remedies available to Fletcher under this Agreement, under the Series C Certificate, under the Junior Preferred Certificate, under the Warrant or at law or equity, if there is a Registration Failure, then the Company shall pay to Fletcher an amount equal to the Registration Failure Percentage multiplied by the Registration Failure Amount with respect to each thirty (30)-day period or part thereof during which a Registration Failure shall have occurred or be continuing.  Separate payment shall be due for each such thirty (30)-day period and no credit shall be given for any payment made in any prior period.  For the avoidance of doubt, the parties agree and acknowledge that the only thirty (30)-day period for which the payments in this Section 5(f) shall be pro rated is the first thirty (30)-day period, and the full amount of the payment for any thirty (30)-day period described above shall become due if the Registration Failure continues on the first day of each such thirty (30)-day period (i.e., for a Registration Failure continuing on day 31, 61, 91, 121, 151, etc.).  The Registration Failure shall be deemed to be continuing unless and until timely payment has been made under this Section 5(f). The payments described above shall be made by wire transfer of immediately available funds no later than five (5) days after and excluding the earlier of (x) the

14

date on which the Registration Failure shall have been cured and (y) the last day of each thirty (30)-day period after the occurrence of a Registration Failure. For purposes of this Section 5(f), the term "Registration Failure Percentage" means the amount set forth in the following table:

| Number of Days During Which a Registration Failure Shall Have Occurred or Been Continuing | Registration Failure Percentage |
|---|---|
| 1-30 | 1/30 of 1.00% per day |
| 31 | 1.00% |
| 61 | 2.00% |
| 91 | 2.00% |
| 121 | 3.00% |
| 151 | 3.00% |
| 181 | 4.00% |
| 211 | 4.00% |
| Thereafter | The registration failure percentage shall increase by 1.00% upon each successive 60-day period (i.e., on days 271, 331, 391, etc.). |

For purposes of this Section 5(f), the term "Registration Failure Amount" means the Aggregate Investment Commitment as of the date of the Registration Failure.

      (g)      The Company shall not grant any right of registration under the Securities Act relating to any of its securities to any Person other than Fletcher if such rights would reasonably be expected to cause the Company to fail to honor any rights of Fletcher under this Agreement.

      6.      Limits With Respect to Shares Held or Shares Issuable.

      (a)      The Company and its board of directors shall call a stockholders' meeting for the purpose of voting on (i) the approval of the issuance of all Investment Securities issued or issuable under this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant and (ii) an increase in the authorized Common Stock to 300,000,000 shares (the "Stockholder Consent"), which meeting shall be held on or before June 30, 2010, and shall otherwise use its best efforts (including engaging Georgeson Shareholder Services or another nationally-recognized proxy solicitor) to obtain the Stockholder Consent on or before June 30, 2010 (the date on which the Stockholder Consent is obtained is referred to herein as the "Stockholder Consent Date"), including by (x) soliciting proxies to vote for the Stockholder

16

Consent, (y) recommending to the Company's stockholders that such stockholders give the Stockholder Consent and (z) not withdrawing such recommendation. Until the Stockholder Consent is obtained, the Company shall not effect any conversion or redemption of the Preferred Stock or any exercise of the Warrant, and Fletcher shall not have the right to convert or redeem any portion of the Preferred Stock or exercise any portion of the Warrant to the extent such conversion, redemption or exercise would result in issuances under this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant of an aggregate number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock (measured on an as converted basis) in excess of nineteen and ninety-nine one-hundredths percent (19.99%) of the shares of Common Stock outstanding as of the date hereof, except that in the event of a Change of Control (as hereinafter defined), the total number of shares of common stock of the Acquiring Person issued or issuable hereunder shall not exceed a number equal to nineteen and ninety-nine one-hundredths percent (19.99%) of the outstanding common stock (or other, most widely-held class of security) of the Acquiring Person.

(b)     The Company shall not effect any conversion or redemption of the Preferred Stock or any exercise of the Warrant, and Fletcher shall not have the right to convert or redeem any portion of the Preferred Stock or exercise any portion of the Warrant, to the extent the number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock beneficially owned (calculated in accordance with Rule 13d-3 promulgated under the Exchange Act) by Fletcher immediately following such conversion, redemption or exercise would exceed nine and nine tenths percent (9.90%) of the aggregate number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock  (measured on an as converted basis) outstanding after giving effect to such conversion, redemption or exercise (the "<u>Maximum Number</u>").  Unless expressly waived in writing by Fletcher, the Company shall deliver to Fletcher on or before the tenth (10th) day of each calendar month commencing with the month of April 2010 a notice (an "<u>Outstanding Share Notice</u>") stating the aggregate number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock outstanding as of the last day of the preceding month and the increase (an "<u>Increase</u>") or decrease (a "<u>Decrease</u>"), if any, in the aggregate number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock from the number of shares reported on the preceding Outstanding Share Notice (or, in the case of the first Outstanding Share Notice, the number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock outstanding as reported in Section 4(l)). The Maximum Number shall also be increased on the sixty-fifth (65th) day after Fletcher delivers a written notice (a "<u>65-Day Notice</u>") to the Company designating a greater Maximum Number.  A 65-Day Notice may be given by Fletcher at any time and from time to time on one or more occurrences.

(c)     The Company shall not effect any conversion or redemption of the Preferred Stock, and Fletcher shall not have the right to convert or redeem any portion of the Preferred Stock, into Common Stock to the extent such conversion or redemption would result in aggregate issuances to Fletcher under this Agreement, the Certificate of Rights and Preferences and the Warrant of in excess of nine and seventy-five one hundredths percent (9.75%) (the "<u>Maximum Voting Stock Amount</u>") of the number of shares of Common Stock that will be outstanding after giving effect to such conversion or redemption.  The holders of more than fifty percent (50%) of the then outstanding Preferred Stock shall have the right to permanently reduce

17

the percentage used in the determination of the Maximum Voting Stock Amount to four and seventy-five one hundredths percent (4.75%) at any time, effective upon delivery of written notice of such election to the Company. In the event that the Company cannot effect a conversion or redemption of the Preferred Stock pursuant to the terms of this Section 6(c), the conversion or redemption shall be effected into an equal number of shares of Common Stock Equivalent Junior Preferred Stock of the Company; provided, however, that in no event shall the Company effect any conversion or redemption of the Preferred Stock or exercise of the Warrant to the extent such conversion, redemption or exercise would result in aggregate issuances to Fletcher under this Agreement, the Certificate of Rights and Preferences and the Warrant of in excess of thirty-three and thirty-three one hundredths percent (33.33%) of the Total Equity of the Company. For purposes of the preceding sentence, "Total Equity" means the value as reflected on the balance sheet of the Company of all shares of common, preferred and other equity capital of the Company outstanding as of the date of determination.

(d) Any shares of Common Stock, Common Stock Equivalent Junior Preferred Stock or other consideration (in the form of cash, securities or other assets per Common Share issuable to a holder of shares of Common Stock or Common Stock Equivalent Junior Preferred Stock in connection with a Change of Control) that would have been issued to Fletcher upon conversion or redemption of any Preferred Stock, or as dividends on the Preferred Stock or upon exercise of the Warrant but for one or more of the limitations contained in this Section 6 shall be deferred and shall be delivered to Fletcher promptly and in any event no later than three (3) Business Days after the date such limitations cease to restrict the issuance of such shares or other consideration (whether due to an increase in the Maximum Number so as to permit such issuance, the disposition by Fletcher of shares of Common Stock or Common Stock Equivalent Junior Preferred Stock or any other reason) unless the Company has withdrawn the applicable Conversion Notice or Fletcher has withdrawn the applicable Redemption Notice (each as defined in the Certificate of Rights and Preferences) or Warrant Exercise Notice (as defined in the Warrant). During the time of any such deferral, the Company shall no longer be obligated to pay any dividend on the Preferred Stock or provide or recognize any other preferences, limitations, powers or other rights provided under the Series C Certificate to the extent that, if the Preferred Stock would have been converted or redeemed, Fletcher would beneficially own Common Stock and Common Stock Equivalent Junior Preferred Stock that would exceed the Maximum Number.

7. <u>Representations and Warranties of Fletcher</u>. Fletcher hereby represents and warrants to the Company on the date hereof, on each Closing Date, on each Warrant Closing Date and on each Conversion Closing Date and Redemption Closing Date (each as defined in the Certificate of Rights and Preferences) as follows:

(a) Fletcher has been duly incorporated and is validly existing and in good standing under the laws of Bermuda.

(b) The execution, delivery and performance of this Agreement by Fletcher have been duly authorized by all requisite corporate action and no further consent or authorization of Fletcher, its Board of Directors or its stockholders is required. This Agreement has been duly executed and delivered by Fletcher and, when duly authorized, executed and

18

delivered by the Company, will be a valid and binding agreement enforceable against Fletcher in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity.

        (c)     Fletcher understands that no United States federal or state agency has passed on, reviewed or made any recommendation or endorsement of the Investment Securities.

        (d)     Fletcher will have on each Closing Date sufficient immediately-available funds in cash to enable Fletcher to pay the Investment Amount to be paid on such Closing Date.

        8.     <u>Future Equity Issuances</u>.

        (a)     <u>Notice and Participation Rights</u>.  During the Investment Period and for one (1) year thereafter (the "<u>Future Equity Issuance Notice Period</u>"), if the Company intends to engage in any sale or issuance to any Person (other than Fletcher or its affiliates) of any shares of, or securities convertible into, exercisable or exchangeable for, or whose value is derived in whole or in part from, any shares of any class of the Company's capital stock at a price per share less than the then applicable Conversion Price, other than any issuance or sale (i) to any wholly-owned subsidiary, (ii) pursuant to a stock option plan, employee stock purchase plan or restricted stock plan approved by the Board of Directors, or (iii) upon the exercise or conversion of any options (other than options issued to employees or directors pursuant to a stock option plan, employee stock purchase plan or restricted stock plan), warrants or convertible notes outstanding on the date of this Agreement, in each case in accordance with the terms of such options, warrants or convertible notes in effect on the date of this Agreement (a "<u>Future Equity Issuance</u>"), the Company shall promptly notify Fletcher that the Company intends to effect a Future Equity Issuance (the "<u>Future Equity Issuance Notice</u>").  If, within two (2) Business Days after and excluding the date of receipt of such notice, Fletcher notifies the Company in writing that Fletcher would like to be informed of the terms and conditions of such Future Equity Issuance, then the Company shall promptly provide Fletcher with a written description of the terms and conditions of such proposed Future Equity Issuance, including a description of the capital stock to be sold or issued, the investor or investors in the Future Equity Issuance, the price, the quantity and all other information reasonably necessary for Fletcher to make an informed decision on whether it desires to participate in the Future Equity Issuance (the "<u>Future Equity Issuance Description</u>").  If Fletcher notifies the Company in writing that Fletcher elects to purchase all or a portion of the capital stock that the Company intends to sell or issue in the Future Equity Issuance (which election shall include the number of shares of such capital stock that Fletcher intends to purchase) by 11:59 p.m., New York City time, on the third (3rd) Business Day after and excluding the date of the Future Equity Issuance Description, then the Company shall not consummate such Future Equity Issuance without selling Fletcher the capital stock that it elected to purchase at or prior to the consummation of such Future Equity Issuance or promptly thereafter at a closing date and place established prior to such consummation, which purchase shall be at the price and on the other terms and conditions of the Future Equity Issuance.  If Fletcher does not elect to receive a Future Equity Issuance Description with respect to a Future

19

Equity Issuance, then promptly, and no later than one (1) Business Day after and excluding, the date of announcement of such Future Equity Issuance (or, if such Future Equity Issuance is not required to be publicly announced, the date of closing of such Future Equity Issuance), the Company shall provide Fletcher with a written description of the material terms of such Future Equity Issuance.

(b) <u>No Integrated Offering</u>. Notwithstanding the foregoing, the Company shall ensure that no Person acting on its behalf shall sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security that may be integrated with the Offering for purposes of the Securities Act or the rules and regulations of FINRA or Nasdaq.

9. <u>Covenants</u>. The Company covenants and agrees with Fletcher as follows:

(a) For so long as Fletcher has the right to purchase any Investment Securities and for a period of one (1) year thereafter, the Company will use its best efforts to, (i) except as otherwise provided in Section 5 hereof, maintain the effectiveness of the Registration Statement with respect to the shares of Preferred Stock and Warrants issuable under this Agreement and the Warrant; and (ii) cause the representations and warranties contained in paragraphs (o), (hh), (jj) or (kk) of Section 4 hereof to be and remain true and correct, except those representations and warranties which address matters only as of a particular date, which shall be true and correct as of such date. For so long as Fletcher owns any Investment Securities and for a period of one (1) year thereafter, the Company will use its best efforts to (i) maintain the eligibility of the Common Stock for listing on the Nasdaq Global Select Market, Nasdaq Global Market or New York Stock Exchange; (ii) regain the eligibility of the Common Stock for listing or quotation on the Nasdaq Global Select Market, Nasdaq Global Market or New York Stock Exchange in the event that the Common Stock is delisted by the Nasdaq Global Select Market, Nasdaq Global Market or New York Stock Exchange or any other applicable market or exchange; and (iii) obtain a listing on Nasdaq Global Market or the New York Stock Exchange if the Common Stock is delisted by the Nasdaq Global Select Market.

(b) If a Restatement occurs, the Company shall deliver to Fletcher a Restatement Notice within three (3) Business Days of such Restatement.

(c) The Company will provide Fletcher with a reasonable opportunity, which shall not be less than two (2) full Business Days, to review and comment on any public disclosure by the Company of information regarding this Agreement and the transactions contemplated hereby, before such public disclosure.

(d) The Company will make all filings required by law to be filed by it with respect to the transactions contemplated hereby.

(e) The Company will comply with the terms and conditions of the Series C Certificate, the Junior Preferred Certificate and the Warrant.

(f) For so long as Fletcher owns any Investment Securities, within five (5) Business Days after the filing of each of its quarterly reports on Form 10-Q with the SEC, the Company shall deliver to Fletcher a certificate of the Chief Executive Officer and Chief

20

Financial Officer of the Company stating that, based on their knowledge, the final consolidated unaudited financial statements including the footnotes thereto contained therein fairly present in all material respects the financial condition in conformity with accounting principles generally accepted in the United States, results of operations and cash flows of the Company as of and for the periods presented therein.

(g)     The Company shall use its commercially reasonable efforts to cause the Common Shares to be eligible for book-entry transfer through The Depository Trust Company (or any successor thereto) as soon as practicable after the date of this Agreement and thereafter to use its commercially reasonable efforts to maintain such eligibility.

(h)     The Company shall at all times reserve for issuance such number of its shares of Preferred Stock, Common Stock Equivalent Junior Preferred Stock and, after Stockholder Consent is obtained, Common Stock as shall from time to time be sufficient to satisfy its obligation to deliver such shares under this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant.  In the event the number of shares of Common Stock, Common Stock Equivalent Junior Preferred Stock or other securities issued and issuable under this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant exceeds the authorized number of shares of Common Stock (after Stockholder Consent is received), Common Stock Equivalent Junior Preferred Stock (after such stock is designated pursuant to Section 9(k)) or other securities, the Company shall promptly take all actions necessary to increase the authorized number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock.

(i)     Unless expressly waived by Fletcher, the Company shall deliver an Outstanding Share Notice to Fletcher on or before the tenth (10th) day of each calendar month pursuant to Section 6(b).

(j)     The Company shall cooperate in good faith to assist with any assignment, pledge, hypothecation or transfer of the Investment Securities, including without limitation making its representatives available for discussions with lenders and assignees and promptly processing requests to retitle the Investment Securities.

(k)     The Company shall designate the Common Stock Equivalent Junior Preferred Stock by filing the Articles of Amendment related thereto with the Secretary of State of the State of Georgia as promptly as reasonably practicable after the announcement of this Agreement and not later than the earlier of (i) ten (10) Business Days after the date hereof or (ii) the date the Warrant is issued.  The Company shall not register the Common Stock Equivalent Junior Preferred Stock pursuant to Section 12 of the Exchange Act without the prior written consent of Fletcher.

(l)     The Company shall not authorize more than 65,000 shares of Preferred Stock or issue shares of Preferred Stock other than pursuant to this Agreement.

10.     <u>Change of Control</u>.

21

(a)     In the event of a Change of Control, in addition to the rights contained in this Agreement, Fletcher shall have the rights set forth in the Series C Certificate, the Junior Preferred Certificate and the Warrant regarding Changes of Control. The Company agrees that: (i) it shall deliver to Fletcher written notice (a "<u>Change of Control Notice</u>") of any proposed Change of Control (which notice shall specify the expected effective date of such Change of Control) promptly following public disclosure of such proposed Change of Control and in any event not later than fifteen (15) Business Days prior to the expected effective date of the proposed Change of Control; and (ii) it will not enter into an agreement resulting in a Change of Control unless such agreement expressly obligates the Acquiring Person to assume upon consummation of the Change of Control all of the Company's obligations under this Agreement, the Certificate of Rights and Preferences and the Warrant. On or before the date an agreement is entered into with an Acquiring Person resulting in a Change of Control, the Company shall deliver to Fletcher written notice that the Acquiring Person has agreed to assume such obligations and regardless of whether such express assumption occurs or if no such agreement exists, the Acquiring Person shall be bound by such obligations.

(b)     In the event that a proposed Change of Control is publicly disclosed or a Change of Control Notice is delivered (or an event shall have occurred that would, with or without the passage of time, require the delivery of a Change of Control Notice), on and after the date of such announcement or, if earlier, the date of such event, Fletcher shall not be obligated to consummate any further Investments, but rather shall have the right to consummate any Investments in its sole discretion.

(c)     Between the date a proposed Change of Control is publicly disclosed or Change of Control Notice is delivered (or an event shall have occurred that would, with or without the passage of time, require the delivery of a Change of Control Notice) and the effective date of the Change of Control, Fletcher shall continue to have the right to submit to the Company an Investment Notice and consummate any Investment, in Fletcher's sole discretion, in accordance with the terms and conditions of this Agreement. In addition, Fletcher at its sole option may elect to submit to the Company a special notice (a "<u>Contingent Investment Notice</u>") to effect an Investment for all or part of the remaining Aggregate Investment Commitment in connection with such Change of Control; in which case, notwithstanding the provisions of Section 3 hereof:

(i)     the effectiveness of such contingent investment shall be conditional upon the effectiveness of the Change of Control; and

(ii)     the shares of Preferred Stock issuable upon such contingent investment shall be treated as outstanding as of immediately before such Change of Control for all purposes under the Series C Certificate, including all rights with respect thereto under Section 6(F) of the Series C Certificate. Without limiting the generality of the foregoing, the Company shall honor any Contingent Notice (as defined in the Certificate of Rights and Designations) by Fletcher to redeem the shares of Preferred Stock issuable pursuant to this Section 10(c) in connection with such Change of Control.

US2008 1122394.15

(d) "Change of Control" means (i) an acquisition of more than fifty percent (50%) of the equity securities of the Company (measured by vote or value) by means of merger or other form of corporate reorganization in which outstanding shares of the Company are exchanged for securities or other consideration issued, or caused to be issued, by the Acquiring Person or its Parent, Subsidiary or Affiliate (each as defined in Rule 12b-2 of the Exchange Act), other than a restructuring by the Company where outstanding shares of the Company are exchanged for shares of the Acquiring Person on a one-for-one basis and, immediately following the exchange, former stockholders of the Company own all of the outstanding shares of the Acquiring Person on the same pro rata basis as prior to the exchange, (ii) a sale or other disposition of all or substantially all of the assets of the Company (on a consolidated basis) in a single transaction or series of related transactions, (iii) any tender offer, exchange offer, stock purchase or other transaction or event or series of related transactions or events by or involving the Company in which a single entity or group becomes the direct or indirect owner of more than fifty percent (50%) of the equity securities of the Company (measured by vote or value), or (iv) a capital reorganization or reclassification of the Common Stock or other securities (other than a reorganization or reclassification in which the Common Stock or other securities are not converted into or exchanged for cash or other property, and, immediately after consummation of such transaction, the stockholders of the Company immediately prior to such transaction own the Common Stock, other securities or other voting stock of the Company in substantially the same proportions relative to each other as such stockholders owned immediately prior to such transaction). Notwithstanding anything contained herein to the contrary, a change in the state of incorporation of the Company shall not in and of itself constitute a Change of Control.

(e) "Acquiring Person" means, in connection with any Change of Control any of the following, at Fletcher's election, (i) the continuing or surviving Person of a consolidation or merger with the Company (if other than the Company), (ii) the transferee of all or substantially all of the properties or assets of the Company, (iii) the corporation consolidating with or merging into the Company in a consolidation or merger in connection with which the Common Stock is changed into or exchanged for stock or other securities of any other Person or cash or any other property, (iv) the entity or group acting in concert acquiring or possessing the power to cast the majority of the eligible votes at a meeting of the Company's stockholders at which directors are elected, or, (v) in the case of a capital reorganization or reclassification, the Company, or (vi) at Fletcher's election, any Person that (x) controls the Acquiring Person directly or indirectly through one or more intermediaries, (y) is required to include the Acquiring Person in the consolidated financial statements contained in such Person's Annual Report on Form 10-K (if such Person is required to file such a report) or would be required to so include the Acquiring Person in such Person's consolidated financial statements if they were prepared in accordance with U.S. generally accepted accounting principles and (z) is not itself included in the consolidated financial statements of any other Person (other than its consolidated subsidiaries).

11. Restatements.

(a) If a Restatement occurs, the Company shall deliver to Fletcher, a written notice in the form attached hereto as Annex C (a "Restatement Notice") within three (3)

23

Business Days after such Restatement, stating the date on which a Restatement has occurred and including the documents in which the Restatement was publicly disclosed.

(b)      "Restatement"  means the earlier of (i) the announcement by the Company of its intention to restate any portion of the Company Financial Statements and (ii) the actual restatement by the Company of any portion of the Company Financial Statements.

12.      Conditions Precedent to Fletcher's Obligations.  The obligations of Fletcher hereunder are subject to the performance by the Company of its obligations hereunder and to the satisfaction of the following additional conditions precedent, unless expressly waived in writing by Fletcher:

(a)      (i) from and after the date of this Agreement through and including each Closing Date or Warrant Closing Date, (A) the representations and warranties made by the Company in paragraphs (a), (b), (c), (d), (e), (f), (g), (h), (i), (l) and (kk) of Section 4 of this Agreement shall be true and correct (except those representations and warranties which address matters only as of a particular date, which shall be true and correct as of such date) and (B) all other representations and warranties made by the Company in this Agreement shall be true and correct in all material respects (except those representations and warranties qualified by material, materiality, Material Adverse Effect or similar expressions, which shall be true and correct in all respects and those representations and warranties which address matters only as of a particular date, which shall be true and correct as of such date); (ii) from and after the date of this Agreement through and including each Closing Date or Warrant Closing Date, the Company shall have complied fully with all of the covenants and agreements in this Agreement and the Warrant; (iii) on each Closing Date or Warrant Closing Date, the Company shall not possess any negative, material non-public information other than as shall have been filed with the SEC at least five (5) Business Days prior to and excluding the Closing Date or Warrant Closing Date; and (iv) on each Closing Date or Warrant Closing Date, Fletcher shall have received a certificate of the Chief Executive Officer and the Chief Financial Officer of the Company dated such date confirming the matters set forth in the preceding clauses (i), (ii) and (iii).

(b)      On each Closing Date, Conversion Closing Date, Redemption Closing Date (each as defined in the Certificate of Rights and Preferences) and Warrant Closing Date, the Company shall have delivered to Fletcher an opinion of Kilpatrick Stockton LLP, reasonably satisfactory to Fletcher, dated the date of delivery, confirming in substance the matters covered by paragraphs (a), (b), (c), (d), (e), (f), (g), (h), (i), (l) and (kk) of Section 4 hereof.

(c)      No Registration Failure shall have occurred that is continuing.

(d)      A Prospectus in form and substance reasonably satisfactory to Fletcher shall have been filed on or before the date that is one Business Day prior to the first Closing Date and shall remain available and in effect on each Closing Date.

US2008 1122394.15

(e)     The Company shall have submitted to the Nasdaq Global Select Market a correct and complete Notice for Listing of Additional Shares by no later than ten (10) Business Days after the date hereof.

(f)     From and after the date of this Agreement through and including each Closing Date and Warrant Closing Date, all shares of Common Stock issued and issuable hereunder or under the Series C Certificate, the Junior Preferred Certificate or the Warrant shall be duly listed and admitted for trading on the Nasdaq Global Select Market, Nasdaq Global Market or the New York Stock Exchange.

(g)     On each Closing Date and Warrant Closing Date, Fletcher shall have received from the transfer agent of the Company a certificate with respect to the total number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock outstanding as of a date on or around Closing Date.

(h)     From and after the date of this Agreement through and including the Closing Date and Warrant Closing Date, there shall not have been a Restatement.

(i)     On or before the Closing Date, the Company shall have filed with the Georgia Secretary of State the Series C Certificate and the Junior Preferred Certificate.

(j)     The Stockholder Consent shall have been obtained on or prior to June 30, 2010.

For the avoidance of doubt, Fletcher may waive or refuse to waive any of the foregoing conditions in its sole discretion with respect to any Closing without being obligated to waive or refuse to waive any of the foregoing conditions with respect to any other Closing.

13.     <u>Conditions Precedent to the Company's Obligations</u>.  The obligations of the Company hereunder are subject to the performance by Fletcher of its obligations hereunder and to the satisfaction (unless expressly waived in writing by the Company) of the additional conditions precedent that, on each Closing Date or Warrant Closing Date: (a)(i) the representations and warranties made by Fletcher in paragraphs (a), (b) and (d) of Section 7 of this Agreement shall be true and correct (except those representations and warranties which address matters only as of a particular date, which shall be true and correct as of such date) and (ii) all other representations and warranties made by Fletcher in this Agreement shall be true and correct in all material respects (except those representations and warranties which address matters only as of a particular date, which shall be true and correct as of such date); (b) Fletcher shall have complied fully with all the covenants and agreements in this Agreement; and (c) the Company shall have received on each such date a certificate of an appropriate officer of Fletcher dated such date confirming (a) and (b).  For the avoidance of doubt, the Company may waive or refuse to waive any of the foregoing conditions in its sole discretion with respect to any Closing without being obligated to waive or refuse to waive any of the foregoing conditions with respect to any other Closing.

14.     <u>Fees and Expenses</u>.  Each of Fletcher and the Company agrees to pay its own expenses incident to the performance of its obligations hereunder, including, but not limited

25

to the fees, expenses and disbursements of such party's counsel, except as is otherwise expressly provided in this Agreement. Notwithstanding the foregoing, the Company shall pay all fees and expenses associated with the filing of any Registration Statement, including, without limitation, all fees and expenses associated with any FINRA filing, if applicable.

15.    Non-Performance.

(a)    By the Company. If the Company, at any time, shall fail to deliver the Investment Securities required to be delivered to Fletcher pursuant to this Agreement, the Series C Certificate, the Junior Preferred Certificate or the Warrant, in accordance with the terms and conditions of this Agreement, the Series C Certificate, the Junior Preferred Certificate or the Warrant, as the case may be, for any reason other than the failure of any condition precedent to the Company's obligations hereunder or the failure by Fletcher to comply with its obligations hereunder, then the Company shall (without limitation to Fletcher's other remedies at law or in equity):

(i)    indemnify and hold Fletcher harmless against any loss, claim or damage arising from or as a result of such failure by the Company (regardless of whether any of the foregoing results from a third-party claim or otherwise); and

(ii)    reimburse Fletcher for all of its reasonable out-of-pocket expenses (which includes fees and expenses of its counsel) incurred by Fletcher in connection with this Agreement, the Series C Certificate, the Junior Preferred Certificate, the Warrant and the transactions contemplated herein and therein (regardless of whether any of the foregoing results from a third-party claim or otherwise).

(b)    By Fletcher. If, as of the One Year Anniversary Date, Fletcher shall have failed to effect Investments equal to the Aggregate Investment Commitment for any reason other than (i) the failure of any condition precedent to Fletcher's obligations hereunder, (ii) the failure by the Company to comply with its obligations hereunder, or (iii) delivery of a Change of Control Notice or the occurrence of an event that would require the delivery of a Change of Control Notice, then on the Business Day immediately following, Fletcher shall pay to the Company an amount equal to Five Percent (5%) of the amount of the Aggregate Investment Commitment not subject to clauses (i), (ii) or (iii) that has not been satisfied by Fletcher as of such date. If, as of the last day of the Investment Period, Fletcher shall have failed to effect Investments equal to the Aggregate Investment Commitment for any reason other than as set forth in clauses (i), (ii) or (iii) of the immediately preceding sentence, then on the Business Day immediately following, Fletcher shall pay to the Company an amount equal to Five Percent (5%) of the amount of the Aggregate Investment Commitment not subject to clauses (i), (ii) or (iii) of the immediately preceding sentence that has not been satisfied by Fletcher as of such date. All payments pursuant to this Section 15(b) shall be made by wire transfer on the next Business Day of immediately available United States funds in accordance with the wire transfer instructions set forth on Annex E hereto. Notwithstanding Section 16(b), this Section 15(b) shall be the Company's sole remedy against Fletcher for any failure to comply with its obligation to effect the Investments required to be made under this Agreement. For purposes of this Section 15(b), the term "One Year Anniversary Date" shall mean (x) if the Investment Period has not

26

been extended pursuant to Section 1(b), the one year anniversary of the Stockholder Consent Date, and (y) if the Investment Period has been extended pursuant to Section 1(b), the date that is X number of Business Days after the one year anniversary of the Stockholder Consent Date, where X is equal to the number of Business Days by which the Investment Period has been extended.

16.    Indemnification.

(a)    Indemnification of Fletcher.  The Company hereby agrees to indemnify Fletcher and each of its officers, directors, employees, consultants, agents, attorneys, accountants and affiliates and each Person that controls (within the meaning of Section 20 of the Exchange Act) any of the foregoing Persons (each a "Fletcher Indemnified Party") against any claim, demand, action, liability, damages, loss, cost or expense (including, without limitation, reasonable legal fees and expenses incurred by such Person in investigating or defending any of the foregoing regardless of whether the foregoing results from a third-party claim or otherwise) (all of the foregoing, including associated costs and expenses being referred to herein as "Damages"), that it may incur in connection with any of the transactions contemplated hereby arising out of or based upon:

(i)    any untrue or alleged untrue statement of a material fact in a SEC Filing by the Company or any of its affiliates or any Person acting on its or their behalf or omission or alleged omission to state therein any material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading by the Company or any of its affiliates or any Person acting on its or their behalf;

(ii)    any of the representations or warranties made by the Company herein being untrue or incorrect at the time such representation or warranty was made; and

(iii)    any breach or non-performance by the Company of any of its covenants, agreements or obligations under this Agreement, the Certificate of Rights and Preferences or the Warrant;

provided, however, that the foregoing indemnity shall not apply to any Damages to the extent that they arise out of, or are based upon, the gross negligence or willful misconduct of Fletcher in connection therewith.

(b)    Indemnification of the Company.  Fletcher hereby agrees to indemnify the Company and each of its officers, directors, employees, consultants, agents, attorneys, accountants and affiliates and each Person that controls (within the meaning of Section 20 of the Exchange Act) any of the foregoing Persons against any Damages that it may incur in connection with any of the transactions contemplated hereby arising out of or based upon:

(i)    any untrue or alleged untrue statement of a material fact included in an SEC filing by the Company with the written consent of or at the direction of Fletcher therefor by or about Fletcher or any of its affiliates or any Person acting on its or their behalf or omission or alleged omission to state any such material fact necessary in order to make

27

the statements, in the light of the circumstances under which they were made, not misleading by Fletcher or any of its affiliates or any Person acting on its or their behalf;

(ii)     any of the representations or warranties made by Fletcher herein being untrue or incorrect at the time such representation or warranty was made; and

(iii)     any breach or non-performance by Fletcher of any of its covenants, agreements or obligations under this Agreement;

provided, however, that the foregoing indemnity shall not apply to any Damages to the extent that they arise out of, or are based upon, the gross negligence or willful misconduct of the Company in connection therewith.

(c)     Notwithstanding anything to the contrary contained in this Agreement, neither the Company nor Fletcher shall be liable or otherwise responsible for consequential, incidental, special, indirect, exemplary or punitive damages, provided that, notwithstanding the foregoing, neither the Company nor Fletcher waives actual or compensatory damages, including actual or compensatory damages measured by diminution in value of the shares of Preferred Stock, Common Shares or Common Stock Equivalent Junior Preferred Shares.

(d)     Conduct of Third Party Claims.

(i)     Whenever a claim for indemnification shall arise under this Section 16 as a result of a third-party claim, the party seeking indemnification (the  "Indemnified Party"), shall notify the party from whom such indemnification is sought (the "Indemnifying Party") in writing of the claim and the facts constituting the basis for such claim in reasonable detail;

(ii)     Such Indemnifying Party shall have the right to retain the counsel of its choice in connection with such claim and to participate at its own expense in the defense of any such claim; provided, however, that counsel to the Indemnifying Party shall not (except with the consent of the relevant Indemnified Party) also be counsel to such Indemnified Party.  In no event shall the Indemnifying Party be liable for fees and expenses of more than one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; and

(iii)     No Indemnifying Party shall, without the prior written consent of the Indemnified Parties (which consent shall not be unreasonably withheld), settle or compromise or consent to the entry of any judgment with respect to any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever in respect of which indemnification could be sought under this Section 16 unless such settlement, compromise or consent (A) includes an unconditional release of each Indemnified Party from all liability arising out of such litigation, investigation, proceeding or claim and (B) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party.

28

17.     <u>Survival of the Representations and Warranties</u>.  The respective representations and warranties made herein by or on behalf of the parties hereto shall remain in full force and effect, regardless of any investigation made by or on behalf of the other party to this Agreement or any officer, director or employee of, or Person controlling or under common control with, such party and will survive delivery of and payment for any Investment Securities issuable hereunder and for one (1) year thereafter.

18.     <u>Notices</u>.  All communications hereunder shall be in writing and delivered as set forth below.

(a)     If sent to Fletcher, all communications will be deemed delivered: if delivered by hand, on the day received by Fletcher; if sent by reputable overnight courier, on the next Business Day; and if transmitted by facsimile to Fletcher, on the date transmitted (<u>provided</u> such facsimile is later confirmed), in each case to the address set forth in <u>Annex D</u> hereto (unless otherwise notified in writing of a substitute address).

(b)     If sent to the Company, all communications will be deemed delivered: if delivered by hand, on the day received by the Company; if sent by reputable overnight courier, on the next Business Day; and if transmitted by facsimile to the Company, on the date transmitted (provided such facsimile is later confirmed), in each case to the following address (unless otherwise notified in writing of a substitute address):

> United Community Banks, Inc.
> 125 Highway 515 East
> Blairsville, Georgia  30512
> Attention:     Rex S. Schuette
> Telephone:     (706) 745-2265
> Facsimile:     (706) 745-9046
>
> with a copy to (which copy shall not constitute notice):
>
> Kilpatrick Stockton LLP
> 1100 Peachtree Street
> Suite 2800
> Atlanta, Georgia  30309
> Attention:     James W. Stevens
> Telephone:     (404) 815-6270
> Facsimile:     (404) 541-3400

(c)     To the extent that any funds shall be delivered to the Company by wire transfer, unless otherwise instructed by the Company, such funds should be delivered in accordance with the wire instructions set forth in <u>Annex E</u>**.**

(d)     If the Company does not agree and acknowledge the delivery of any 65-Day Notice under this Agreement by 11:59 p.m., New York City time, on the Business Day following the date of delivery of such notice, such non-response by the Company shall be deemed to be agreement and acknowledgment by the Company with the terms of such notice.

29

19.    <u>Miscellaneous</u>.

(a)    The parties may execute and deliver this Agreement as a single document or in any number of counterparts, manually, by facsimile or by other electronic means, including contemporaneous xerographic or electronic reproduction by each party's respective attorneys.  Each counterpart shall be an original, but a single document or all counterparts together shall constitute one instrument that shall be the agreement.

(b)    This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns and, with respect to Section 16 hereof, will inure to the benefit of their respective officers, directors, employees, consultants, agents, attorneys, accountants and affiliates and each Person that controls (within the meaning of Section 20 of the Exchange Act) any of the foregoing Persons, and no other Person will have any right or obligation hereunder.  Except as set forth herein, neither the Company nor Fletcher may assign or transfer this Agreement without the written consent of the other party hereto, which consent shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, Fletcher may, in whole or in part, in its sole discretion (i) assign, pledge, hypothecate or transfer the Investment Securities, (ii) assign, pledge, hypothecate or transfer this Agreement or any of the rights and associated obligations contemplated by this Agreement (including, but not limited to, the Investment Securities) to any affiliates, parallel investment funds, co-investment funds or successor investment funds of Fletcher, and (iii) pledge or hypothecate any of the rights and associated obligations contemplated by this Agreement (including, but not limited to, the Investment Securities) in connection with financing, derivative or hedging transactions with respect to this Agreement and the Investment Securities, <u>provided</u>, <u>that</u>, any such assignment, pledge, hypothecation or transfer must comply with applicable federal and state securities laws.  No Person acquiring Common Stock or Common Stock Equivalent Junior Preferred Stock from Fletcher will thereby obtain any of the rights contained in this Agreement but an acquirer of Preferred Stock or the Warrant will have the rights of Fletcher contained in this Agreement to the extent that the Series C Certificate or the Warrant, respectively, define the rights of the Holder of such securities by express reference to this Agreement.  This Agreement, together with the Series C Certificate, the Junior Preferred Certificate and the Warrant, constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, between the parties hereto with respect to the subject matter of this Agreement.  Except as provided in this Section 19(b), this Agreement is not intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

(c)    This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, and each of the parties hereto hereby submits to the exclusive jurisdiction of any state or federal court in New York City, New York and any court hearing any appeal therefrom, over any suit, action or proceeding against it arising out of or based upon this Agreement (a "<u>Related Proceeding</u>").  Each of the parties hereto hereby waives any objection to any Related Proceeding in such courts whether on the grounds of venue, residence or domicile or on the ground that the Related Proceeding has been brought in an inconvenient forum.

30

(d)     Each party represents and acknowledges that, in the negotiation and drafting of this Agreement and the other instruments and documents required or contemplated hereby, it has been represented by and relied upon the advice of counsel of its choice.  Each party hereby affirms that its counsel has had a substantial role in the drafting and negotiation of this Agreement and such other instruments and documents.  Therefore, each party agrees that no rule of construction to the effect that any ambiguities are to be resolved against the drafter shall be employed in the interpretation of this Agreement and such other instruments and documents.

(e)     Without prejudice to other rights or remedies hereunder, interest shall be due on any amount that is due pursuant to this Agreement or the Warrant and has not been paid when due (or the cash equivalent of Preferred Stock which the Company fails to deliver as required by the terms of this Agreement or of Common Shares or Common Stock Equivalent Junior Preferred Shares which the Company fails to deliver pursuant to this Agreement, the Series C Certificate, the Junior Preferred Certificate or the Warrant), calculated for the period from and including the due date to but excluding the date on which such amount is paid at the lower of (i) twelve percent (12%) or (ii) the prime rate of U.S. money center banks as published in The Wall Street Journal (or if The Wall Street Journal does not exist or publish such information, then the average of the prime rates of three (3) U.S. money center banks agreed to by the parties) plus nine percent (9%) or such lesser amount as is permitted under applicable usury or other law.  For the avoidance of doubt, this Section 19(e) shall not apply to any unpaid dividend on the Preferred Stock.

(f)     Fletcher and the Company stipulate that the remedies at law of the parties hereto in the event of any default or threatened default by either party in the performance of or compliance with any of the terms of this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

(g)     Any and all remedies set forth in this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant:  (i) shall be in addition to any and all other remedies Fletcher or the Company may have at law or in equity, (ii) shall be cumulative, and (iii) may be pursued successively or concurrently as each of Fletcher and the Company may elect.  The exercise of any remedy by Fletcher or the Company shall not be deemed an election of remedies or preclude Fletcher or the Company, respectively, from exercising any other remedies in the future.  The parties acknowledge and agree that this Agreement and the Asset Purchase and Sale Agreement are  wholly separate and distinct agreements that are supported by separate consideration.  Notwithstanding anything to the contrary contained herein or in the Asset Purchase and Sale Agreement, the parties' obligations under this Agreement are separate and distinct from the parties' obligations under the Asset Purchase and Sale Agreement.  Accordingly, breach by either party of  any of the provisions of this Agreement shall not excuse performance by, or provide the basis for any remedy for, either party under the Asset Purchase and Sale Agreement.  Likewise, breach by either party of any of

31

the provisions of the Asset Purchase and Sale Agreement shall not excuse performance by, or provide the basis for any remedy for, either party under this Agreement.

(h)     The Company agrees that the parties have negotiated in good faith and at arms' length concerning the transactions contemplated herein, and that Fletcher would not have agreed to the terms of this Agreement without each and every of the terms, conditions, protections and remedies provided herein and in the Series C Certificate, the Junior Preferred Certificate and the Warrant.  Except as specifically provided otherwise in this Agreement, the Series C Certificate, the Junior Preferred Certificate and the Warrant, the Company's obligations to indemnify and hold Fletcher harmless in accordance with Section 16 of this Agreement are obligations of the Company that the Company promises to pay to Fletcher when and if they become due.  The Company shall record any such obligations on its books and records in accordance with U.S. generally accepted accounting principles.

(i)     This Agreement may be amended, modified or supplemented in any and all respects, but only by a written instrument signed by Fletcher and the Company expressly stating that such instrument is intended to amend, modify or supplement this Agreement.

(j)     Each of the parties will cooperate with the others and use its best efforts to prepare all necessary documentation, to effect all necessary filings, and to obtain all necessary permits, consents, approvals and authorizations of all governmental bodies and other third-parties necessary to consummate the transactions contemplated by this Agreement.

(k)     Prior to consummation of all of the transactions contemplated by this Agreement, the parties to this Agreement will provide one another with information which may be deemed by the party providing the information to be confidential.  Each party agrees that it will hold confidential and protect all information provided to it by the other party to this Agreement or such party's affiliates, except that the obligations contained in this Section 19(k) shall not in any way restrict the rights of any party or person to use information that:  (a) was known to such party prior to the disclosure by the other party; (b) is or becomes generally available to the public other than by breach of this Agreement; or (c) otherwise becomes lawfully available to a party to this Agreement on a non-confidential basis from a third party who is not under an obligation of confidence to the other party to this Agreement.  If this Agreement is terminated, upon request each party hereto agrees to return or destroy all written confidential materials and all copies thereof, provided to it by or on behalf of the other party to this Agreement, except to the extent required by law; provided, however, that Fletcher shall have the right to retain one copy of such confidential materials for legal archival purposes.  The provisions of this Section 19(k) shall survive termination, for any reason whatsoever, of this Agreement, and, without limiting the remedies of the parties hereto in the event of any breach of this Section 19(k), the parties hereto will be entitled to seek injunctive relief against the other party in the event of a breach or threatened breach of this Section 19(k).

(l)     Prior to consummation of all of the transactions contemplated by this Agreement, the parties to this Agreement shall each approve the form and substance of any press release or other public disclosure materially related to this Agreement or any other

32

transaction contemplated hereby; provided, however, that nothing in this Section 19(l) shall be deemed to prohibit any party from making any disclosure which its counsel deems necessary or advisable in order to satisfy such party's disclosure obligations imposed by law.

(m)     For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires: (i) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender and neuter gender of such term; (ii) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with U.S. generally accepted accounting principles; (iii) references herein to "Articles", "Sections", "Subsections", "Paragraphs" and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement, unless the context shall otherwise require; (iv) a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions; (v) the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; (vi) the term "include" or "including" shall mean without limitation; (vii) the table of contents to this Agreement and all section titles or captions contained in this Agreement or in any Schedule or Annex hereto or referred to herein are for convenience only and shall not be deemed a part of this Agreement and shall not affect the meaning or interpretation of this Agreement; (viii) any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statues and references to all attachments thereto and instruments incorporated therein; and (ix) references to a Person are also to its permitted successors and assigns and, in the case of an individual, to his or her heirs and estate, as applicable.

(n)     If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

(o)     Time shall be of the essence in this Agreement.

(p)     All dollar ($) amounts set forth herein and in the Warrant refer to United States dollars.  All payments hereunder and thereunder will be made in lawful currency of the United States of America.

(q)     Notwithstanding anything herein to the contrary, if the Company at any time subdivides (by any stock split, stock dividend, recapitalization, reorganization,

33

reclassification or otherwise) the shares of Common Stock or Common Stock Equivalent Junior Preferred Stock into a greater number of shares, then, after the date of record for effecting each such subdivision, all measurements and references herein related to share prices for such securities will be proportionately decreased and all references to share numbers for such securities herein will be proportionately increased.

[SIGNATURE PAGE FOLLOWS]

US2008 1122394.15

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement, all as of the date first set forth above.

UNITED COMMUNITY BANKS, INC.

By: _____
Name: _____
Title: _____

Jimmy Tallent
President and Chief Executive Officer

FLETCHER INTERNATIONAL, LTD.,
by its duly authorized investment advisor,
FLETCHER ASSET MANAGEMENT, INC.

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO AGREEMENT

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement, all as of the date first set forth above.

UNITED COMMUNITY BANKS, INC.

By: _____

Name: _____

Title: _____

FLETCHER INTERNATIONAL, LTD.,
by its duly authorized investment advisor,
FLETCHER ASSET MANAGEMENT, INC.

By: _____

Name: Moez M. Kaba

Title: Authorized Signatory

By: _____

Name: Denis J. Kiely

Title: Director

# TABLE OF CONTENTS

**Page**

1.  PURCHASE AND SALE ................................................................................................. 1

2.  ASSET PURCHASES ................................................................................................... 4

3.  CLOSINGS ................................................................................................................... 5

4.  REPRESENTATIONS AND WARRANTIES OF THE COMPANY ............................ 5

5.  REGISTRATION PROVISIONS ................................................................................. 14

6.  LIMITS WITH RESPECT TO SHARES HELD OR SHARES ISSUABLE ................ 16

7.  REPRESENTATIONS AND WARRANTIES OF FLETCHER ................................... 18

8.  FUTURE EQUITY ISSUANCES ................................................................................ 19

9.  COVENANTS .............................................................................................................. 20

10. CHANGE OF CONTROL ........................................................................................... 21

11. RESTATEMENTS ....................................................................................................... 23

12. CONDITIONS PRECEDENT TO FLETCHER'S OBLIGATIONS .............................. 24

13. CONDITIONS PRECEDENT TO THE COMPANY'S OBLIGATIONS ...................... 25

14. FEES AND EXPENSES .............................................................................................. 25

15. NON-PERFORMANCE ............................................................................................... 26

16. INDEMNIFICATION .................................................................................................. 27

17. SURVIVAL OF THE REPRESENTATIONS AND WARRANTIES ........................... 29

18. NOTICES .................................................................................................................... 29

19. MISCELLANEOUS .................................................................................................... 30

ii

**ANNEX A**    **FORM OF INVESTMENT NOTICE**
**ANNEX B**    **FORM OF CERTIFICATE OF RIGHTS AND PREFERENCES**
**ANNEX C**    **FORM OF RESTATEMENT NOTICE**
**ANNEX D**    **NOTICE ADDRESS**
**ANNEX E**    **COMPANY WIRE INSTRUCTIONS**
**ANNEX F**    **FORM OF PREFERRED STOCK CONVERSION NOTICE**
**ANNEX G**    **FORM OF PREFERRED STOCK CONVERSION DELIVERY NOTICE**
**ANNEX H**    **FORM OF PREFERRED STOCK REDEMPTION NOTICE**
**ANNEX I**    **FORM OF PREFERRED STOCK REDEMPTION DELIVERY NOTICE**
**ANNEX J**    **FORM OF CERTIFICATE OF DESIGNATION**

US2008 1122394.15

65-Day Notice ........................................................................................................ 17
Acquiring Person .................................................................................................. 23
Aggregate Investment Commitment ...................................................................... 1
Agreement ............................................................................................................... 1
Articles of Incorporation ........................................................................................ 2
Asset Purchase and Sale Agreement ...................................................................... 5
BHCA ...................................................................................................................... 5
Business Day ........................................................................................................... 2
Change of Control ................................................................................................ 23
Change of Control Notice .................................................................................... 22
Closing .................................................................................................................... 1
Closing Date ........................................................................................................... 1
Common Shares ...................................................................................................... 3
Common Stock ........................................................................................................ 3
Common Stock Equivalent Junior Preferred Shares ............................................... 3
Common Stock Equivalent Junior Preferred Stock ................................................. 3
Company .................................................................................................................. 1
Company Financial Statements ............................................................................... 3
Company Reports ..................................................................................................... 8
Contingent Investment Notice .............................................................................. 22
Daily Market Price .................................................................................................. 3
Damages ................................................................................................................ 27
Decrease ................................................................................................................ 17
Environmental Laws ............................................................................................. 11
Exchange Act .......................................................................................................... 4
FDIC ........................................................................................................................ 8
FINRA ...................................................................................................................... 7
Fletcher .................................................................................................................... 1
Fletcher Indemnified Party ................................................................................... 27
Future Equity Issuance .......................................................................................... 19
Future Equity Issuance Notice .............................................................................. 19
Future Equity Issuance Notice Period ................................................................... 19
Hazardous Materials ............................................................................................. 12
Increase ................................................................................................................. 17
Indemnified Party ................................................................................................. 28
Indemnifying Party ............................................................................................... 28
Intellectual Property Rights .................................................................................. 11
Investment ............................................................................................................... 1
Investment Amount ................................................................................................. 3
Investment Notice .................................................................................................... 1
Investment Period .................................................................................................... 1
Investment Price ...................................................................................................... 1

Investment Securities ....................................................................................... 4
Material Adverse Effect ................................................................................... 4
Maximum Number ........................................................................................ 17
Maximum Voting Stock Amount .................................................................. 17
Nasdaq ............................................................................................................ 4
Offering .......................................................................................................... 5
Outstanding Share Notice ............................................................................ 17
Parent ............................................................................................................. 4
Person ............................................................................................................. 4
Preferred Stock ............................................................................................... 1
Prospectus ..................................................................................................... 14
Registration Failure ........................................................................................ 1
Registration Statement ................................................................................... 5
Related Proceeding ....................................................................................... 30
Restatement ................................................................................................... 24
Restatement Filing Date ................................................................................. 2
Restatement Notice ....................................................................................... 23
SEC ................................................................................................................. 2
SEC Filing ...................................................................................................... 7
Securities Act ................................................................................................. 5
Series A Preferred Stock ................................................................................ 8
Series B Preferred Stock ................................................................................ 8
Series C Certificate ........................................................................................ 4
Stockholder Consent .................................................................................... 16
Stockholder Consent Date ............................................................................ 16
Warrant ........................................................................................................... 2

US2008 1122394.15

# FORM OF INVESTMENT NOTICE

[date]

United Community Banks, Inc.
[Address]
[Address]
Attention:
Telephone:
Facsimile:

Ladies and Gentlemen:

  Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010, by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher").  Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.   Fletcher hereby elects to make an Investment on the date, at a price per share and in the amount set forth below.

  In accordance with the terms of the Agreement, the Investment Price shall be One Thousand Dollars ($1,000) per share of Preferred Stock and the Closing Date of such Investment shall be [●].  On the Closing Date, the Company shall deliver to Fletcher's account [●] shares of Preferred Stock against payment of [●] Dollars ($[●]) via The Depository Trust Company's [Delivery Versus Payment system—INSERT REQUIRED INFORMATION FOR DVP] [Deposit/Withdrawal at Custodian (DWAC) system using the following account information: Broker: Credit Suisse, DTC # 355].

        FLETCHER INTERNATIONAL, LTD., by its
        duly authorized investment advisor,
        FLETCHER ASSET MANAGEMENT, INC.

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

A-1

AGREED AND ACKNOWLEDGED:
UNITED COMMUNITY BANKS, INC.


By: _____

Name: _____

Title: _____


With a copy to:

Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia  30309
Attention:      James W. Stevens

A-2

**FORM OF**
**CERTIFICATE OF RIGHTS AND PREFERENCES**
**OF**
**SERIES C CONVERTIBLE PREFERRED STOCK**
**OF**
**UNITED COMMUNITY BANKS, INC.**

**March [●], 2010**

Pursuant to Section 14-2-602 of the Georgia Business Corporation Code and Article V of the Restated Articles of Incorporation, as amended, of United Community Banks, Inc., a corporation organized and existing under the laws of the State of Georgia (the "Company"), hereby certifies that the following resolution was duly adopted by the Board of Directors of the Company effective as of March [●], 2010 pursuant to authority conferred upon the Board of Directors by the Restated Articles of Incorporation of the Company, as amended, which authorize the issuance of up to Ten Million (10,000,000) shares of preferred stock, par value $1.00 per share.

RESOLVED, that pursuant to authority expressly granted to and vested in the Board of Directors of the Company and pursuant to the provisions of the Articles of Incorporation, the Board of Directors hereby creates a series of preferred stock, herein designated and authorized as the Series C Convertible Preferred Stock, par value $1.00 per share, which shall consist of Sixty-Five Thousand (65,000) of the shares of preferred stock which the Company now has authority to issue, and the Board of Directors hereby fixes the powers, designations and preferences and the relative, participating, optional and other special rights of the shares of such series, and the qualifications, limitations and restrictions thereof as follows:

1.  Number.  The number of shares constituting the Series C Convertible Preferred Stock shall be Sixty-Five Thousand (65,000), all of which are issuable solely under the Agreement.

2.  Definitions.  Unless the context otherwise requires, when used herein the following terms shall have the meaning indicated.

"Acquiring Person" has the meaning set forth in the Agreement.

"Acquisition Consideration" is defined in Section 6(f)(iii)(C).

"Agreement" means the Securities Purchase Agreement dated as of April 1, 2010, by and between the Company and Fletcher pursuant to which Sixty-Five Thousand (65,000) shares of Series C Preferred Stock and a warrant are to be issued by the Company, including all schedules, annexes and exhibits thereto, and as such agreement may be amended from time to time.

"Articles of Incorporation" means the Restated Articles of Incorporation of the Company, as amended.

"<u>Board</u>" means the Board of Directors of the Company.

"<u>Business Day</u>" means any day on which the Common Stock may be traded on the Nasdaq, or if not admitted for trading on the Nasdaq, on any day other than a Saturday, Sunday or holiday on which banks in New York City are required or permitted to be closed.

"<u>Capital Stock</u>" means (i) with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated) of capital or capital stock of such Person and (ii) with respect to any Person that is not a corporation, any and all partnership, limited partnership, limited liability company or other equity interests of such Person.

"<u>Certificate of Rights and Preferences</u>" means this Certificate of Rights and Preferences of the Series C Preferred Stock.

"<u>Change of Control</u>" has the meaning set forth in the Agreement.

"<u>Change of Control Notice</u>" is defined in <u>Section 6(f)(i)</u>.

"<u>Common Stock Equivalent Junior Preferred Stock</u>" means the Company's Common Stock Equivalent Junior Preferred Stock, par value $1.00 per share, issuable pursuant to Section 6 of the Agreement, and any Capital Stock for or into which such Common Stock Equivalent Junior Preferred Stock hereafter is exchanged, converted, reclassified or recapitalized by the Company or pursuant to a Change of Control (or, at the election of the Holder, the Capital Stock of any Acquiring Person from and after the consummation of a Change of Control).

"<u>Common Stock</u>" means the Company's common stock, par value $1.00 per share, and any Capital Stock for or into which such common stock hereafter is exchanged, converted, reclassified or recapitalized by the Company or pursuant to a Change of Control (or, at the election of the Holder, the Capital Stock of any Acquiring Person from and after the consummation of a Change of Control).

"<u>Company</u>" means United Community Banks, Inc., a Georgia corporation (or any Acquiring Person from and after the consummation of a Change of Control).

"<u>Contingent Notice</u>" is defined in <u>Section 6(f)(iii)</u>.

"<u>Conversion Closing Date</u>" is defined in <u>Section 6(a)(i)</u>.

"<u>Conversion Notice</u>" is defined in <u>Section 6(a)(i)</u>.

"<u>Conversion Notice Date</u>" is defined in <u>Section 6(a)(i)</u>.

"<u>Conversion Price</u>" means Six Dollars and Two Cents ($6.02), subject to adjustment as set forth herein.

"<u>Conversion Stock Amount</u>" is defined in <u>Section 6(a)(ii)</u>.

"<u>Daily Market Price</u>" has the meaning set forth in the Agreement.

"<u>Dividend Payment Date</u>" is defined in <u>Section 3(a)</u>.

"<u>Dividend Period</u>" is defined in <u>Section 3(a)</u>.

"<u>Dividend Rate</u>" means (i) prior to receipt of the Stockholder Consent, a rate equal to One Thousand Dollars ($1,000) per share multiplied by the lesser of (a) twelve percent (12%) per annum and (b) the sum of the three (3)-month London Interbank Offer Rate (LIBOR) determined as of the first day of the Dividend Period (or if the first day of the Dividend Period is not a Business Day, then the first Business Day after the first day of the Dividend Period) plus eight percent (8%) per annum, subject to <u>Section 3(c)</u>; and (ii) after receipt of the Stockholder Consent, a rate equal to One Thousand Dollars ($1,000) per share multiplied by the lesser of (a) eight percent (8%) per annum and (b) the sum of the three (3)-month London Interbank Offer Rate (LIBOR) determined as of the first day of the Dividend Period (or if the first day of the Dividend Period is not a Business Day, then the first Business Day after the first day of the Dividend Period) plus four percent (4%) per annum, subject to <u>Section 3(c)</u>.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended.

"<u>Fletcher</u>" means Fletcher International, Ltd. a company domiciled in Bermuda, together with its successors.

"<u>Holder</u>" shall mean Fletcher and any one or more Persons to whom Fletcher sells, exchanges, transfers, assigns, gives, pledges, encumbers, hypothecates, alienates or distributes, whether directly or indirectly, any or all the Series C Preferred Stock or all or any portion of the right to purchase the Series C Preferred Stock under the Agreement.

"<u>Investment Period</u>" has the meaning set forth in the Agreement.

"<u>Issue Date</u>" means with respect to any shares of Series C Preferred Stock the original date of issuance of such shares of Series C Preferred Stock.

"<u>Junior Securities</u>" means Capital Stock that, with respect to dividends and distributions upon Liquidation, ranks junior to the Series C Preferred Stock, including but not limited to Common Stock, Common Stock Equivalent Junior Preferred Stock and any other class or series of Capital Stock issued by the Company or any Subsidiary of the Company on or after the date of the Agreement, but excluding any Parity Securities and Senior Securities issued (i) to Fletcher or its authorized assignees under the Agreement, (ii) with the approval of the Holders of a Majority of the Series C Preferred Stock or (iii) upon the conversion, redemption or exercise of securities described in clause (i) or (ii) in accordance with the terms thereof.

"<u>Liquidation</u>" means the voluntary or involuntary liquidation, dissolution or winding up of the Company; <u>provided</u>, <u>however</u>, that a consolidation, merger or share exchange shall not be deemed a Liquidation, nor shall a sale, assignment, conveyance, transfer, lease or other disposition by the Company of all or substantially all of its assets, which does not involve a

distribution by the Company of cash or other property to the holders of Common Stock and Common Stock Equivalent Junior Preferred Stock, be deemed to be a Liquidation.

"Liquidation Preference" is defined in Section 4.

"Majority of the Series C Preferred Stock" means more than fifty percent (50%) of the then outstanding shares of Series C Preferred Stock.

"Maximum Number" has the meaning set forth in the Agreement.

"Nasdaq" has the meaning set forth in the Agreement.

"Ordinary Cash Dividend" means all quarterly cash dividends out of capital surplus or retained earnings legally available therefore (determined in accordance with generally accepted accounting principles, consistently applied), in an amount and frequency consistent with past practice.

"Parent" means, as to any Acquiring Person, any Person that (i) controls the Acquiring Person directly or indirectly through one or more intermediaries, (ii) is required to include the Acquiring Person in the consolidated financial statements contained in such Parent's Annual Report on Form 10-K (if the Parent is required to file such a report) or would be required to so include the Acquiring Person in such Parent's consolidated financial statements if they were prepared in accordance with U.S. generally accepted accounting principles and (iii) is not itself included in the consolidated financial statements of any other Person (other than its consolidated subsidiaries).

"Parity Securities" means any class or series of Capital Stock that, with respect to dividends or distributions upon Liquidation, is *pari passu* with the Series C Preferred Stock.

"Person" means an individual or a corporation, partnership, trust, incorporated or unincorporated association, limited liability company, joint venture, joint stock company, government (or an agency or political subdivision thereof) or other entity of any kind.

"Preferred Stock" means the Company's preferred stock authorized pursuant to the provisions of the Articles of Incorporation.

"Prevailing Market Price" means, with respect to any reference date, the average of the Daily Market Prices of the Common Stock (or, for purposes of determining the Prevailing Market Price of the common stock of an Acquiring Person or its Parent under Section 6(f), the common stock of such Acquiring Person or such Parent) for the twenty-five (25) Business Days ending on and including the third (3rd) Business Day before such reference date.

"Redemption Closing Date" is defined in Section 6(b)(i).

"Redemption Notice" is defined in Section 6(b)(i).

"Redemption Price" means Five Dollars and Twenty-Five Cents ($5.25), subject to adjustment as set forth herein.

"Redemption Stock Amount" is defined in Section 6(b)(ii).

"Restatement" has the meaning set forth in the Agreement.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"Senior Securities" means any class or series of Capital Stock that, with respect to dividends or distributions upon Liquidation, ranks senior to the Series C Preferred Stock.

"Series C Preferred Stock" means the Series C Convertible Preferred Stock of the Company or successor as contemplated by Section 6(f).

"Stated Value" is an amount equal to One Thousand Dollars ($1,000) per share of Series C Preferred Stock plus (x) any unpaid dividends on the Series C Preferred Stock (as of the date of determination, which for purposes of Sections 6(a) and 6(b) shall be the Conversion Closing Date and Redemption Closing Date, respectively), whether or not declared and whether or not earnings are available in respect of such dividends (i.e., the Stated Value shall increase in each Dividend Period by the Dividend Rate if and to the extent that dividends for such Dividend Period are not declared and paid by the respective Dividend Payment Date) and (y) any unpaid dividends declared on the Common Stock and Common Stock Equivalent Junior Preferred Stock in an amount equal to the product of (A) the per-share dividend other than the Ordinary Cash Dividend paid on Common Stock and Common Stock Equivalent Junior Preferred Stock multiplied by (B) the number of shares of Common Stock and/or the number of one-hundredths of a share of Common Stock Equivalent Junior Preferred Stock issuable upon redemption or conversion (whichever number of shares is greater) of a share of Series C Preferred Stock on the date such dividend is declared on the Common Stock and Common Stock Equivalent Junior Preferred Stock.  In the event the Company shall declare a distribution on the Common Stock and Common Stock Equivalent Junior Preferred Stock payable in securities or property other than cash, the value of such securities or property will be the fair market value.  Any securities shall be valued as follows: (i) if traded on a national securities exchange (as defined in the Exchange Act), the value shall be deemed to be the average of the closing prices of the securities on such exchange or system over the twenty-five (25) Business Day period ending three (3) calendar days prior to such declaration; (ii) if actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the twenty-five (25) Business Day period ending three (3) calendar days prior to such declaration; and (iii) if there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the Board.

"Stockholder Consent" has the meaning set forth in the Agreement.

"Stockholder Consent Date" has the meaning set forth in the Agreement.

"Subsidiary" of a Person means (i) a corporation, a majority of whose stock with voting power, under ordinary circumstances, to elect directors is at the time of determination, directly or indirectly, owned by such Person or by one or more Subsidiaries of such Person, or (ii) any other entity (other than a corporation) in which such Person or one or more Subsidiaries of such Person, directly or indirectly, at the date of determination thereof has a least a majority ownership interest.

The foregoing definitions will be equally applicable to both the singular and plural forms of the defined terms.

3. Dividends and Distributions.

(a) Holders shall be entitled to receive out of the assets of the Company legally available for that purpose, cash dividends at the Dividend Rate to be paid in accordance with the terms of this Section 3. In addition, Holders for each share of Series C Preferred Stock then owned by such Holder shall be entitled to receive out of the assets of the Company legally available for that purpose, dividends or other distributions declared on the Common Stock and Common Stock Equivalent Junior Preferred Stock in the same form as such dividends or distributions in an amount equal to the product of (x) the amount of any per-share dividend or distribution other than the Ordinary Cash Dividends paid on the Common Stock and Common Stock Equivalent Junior Preferred Stock multiplied by (y) the number of shares of Common Stock and/or the number of one-hundredths of a share of Common Stock Equivalent Junior Preferred Stock issuable upon redemption or conversion (whichever number of shares is greater) of a share of the Series C Preferred Shares on the date such dividend is declared, to be paid in accordance with the terms of this Section 3. Such dividends shall be payable quarterly in arrears, when and as declared by the Board (or a duly appointed committee of directors), on April 15, July 15, October 15 and January 15 of each year commencing on April 15, 2010 and, in the case of dividends resulting from dividends or distributions declared on Common Stock and Common Stock Equivalent Junior Preferred Stock, no later than the date on which such dividends or distributions are paid to holders of the Common Stock and Common Stock Equivalent Junior Preferred Stock (each such date being herein referred to as a "Dividend Payment Date"). The period from the Issue Date to March 31, 2010, and each quarterly period between consecutive Dividend Payment Dates shall hereinafter be referred to as a "Dividend Period." The dividend for any Dividend Period for any share of Series C Preferred Stock that is not outstanding on every calendar day of the Dividend Period shall be prorated based on the number of calendar days such share was outstanding during the period. Each such dividend shall be paid to the Holders of record of the Series C Preferred Stock as their names appear on the share register of the Company on the Dividend Payment Date. Dividends on account of arrears for any past Dividend Periods may be declared and paid at any time, without reference to any Dividend Payment Date (including, without limitation, for purposes of computing the Stated Value of any shares of Series C Preferred Stock in connection with the conversion

or redemption thereof or any Liquidation of the Company), to Holders of record on a date designated by the Board, not exceeding thirty (30) calendar days preceding the payment date thereof, as may be fixed by the Board. For purposes of determining the amount of dividends accrued as of the first Dividend Payment Date and as of any date that is not a Dividend Payment Date, such amount shall be calculated on the basis of the Dividend Rate for the actual number of calendar days elapsed from and including the Issue Date (in case of the first Dividend Payment Date and any date prior to the first Dividend Payment Date) or the last preceding Dividend Payment Date (in case of any other date) to the date as of which such determination is to be made, based on a three hundred sixty five (365) day year.

(b)     So long as any shares of the Series C Preferred Stock shall be outstanding, (i) the Company shall not and shall not allow its Subsidiaries (other than direct or indirect wholly-owned Subsidiaries) to declare or pay any dividend whatsoever, whether in cash, property or otherwise, set aside any cash or property for the payment of any dividends, or make any other distribution on any Junior Securities or Parity Securities and (ii) the Company shall not and shall not allow its Subsidiaries to repurchase, redeem or otherwise acquire for value or set aside any cash or property for the repurchase or redemption of any Junior Securities or Parity Securities, unless in each such case all dividends to which the Holders of the Series C Preferred Stock shall have been entitled to receive for all previous Dividend Periods shall have been paid and dividends on the Series C Preferred Stock for the subsequent four Dividend Periods shall have been designated and set aside in cash.

(c)     Notwithstanding anything herein to the contrary, whenever, at any time or times after the Company has obtained the approval of the stockholders of the Company to increase the authorized number of shares of Common Stock, the Company shall fail to redeem any Series C Preferred Stock by the date it is obligated to do so under Section 6(b) hereof and such failure is ongoing, then (x) the Dividend Rate with respect to such Series C Preferred Stock that is subject to such redemption shall mean a rate equal to twenty two percent (22%) per annum times the Stated Value until such date that the failure to redeem no longer exists.

(d)     The Company shall be entitled to deduct and withhold from any dividend on the Series C Preferred Stock such amounts as the Company is required to deduct and withhold with respect to such dividend under the Internal Revenue Code of 1986, as amended, or any other provision of state, local or foreign tax law.

4.     Liquidation Preference.  In the event of any Liquidation, after payment or provision for payment by the Company of the debts and other liabilities of the Company and the liquidation preference of any Senior Securities that rank senior to the Series C Preferred Stock with respect to distributions upon Liquidation, each Holder shall be entitled to receive an amount in cash for each share of the then outstanding Series C Preferred Stock held by such Holder equal to the greater of (a) the Stated Value per share to and including the date full payment is tendered to the Holders with respect to such Liquidation and (b) the amount the Holders would have

received if the Holders had converted all outstanding shares of Series C Preferred Stock into Common Stock and/or Common Stock Equivalent Junior Preferred Stock in accordance with the provisions of Section 6(a) hereof or redeemed all outstanding shares of Series C Preferred Stock into Common Stock and/or Common Stock Equivalent Junior Preferred Stock under Section 6(b) hereof (whichever is greater), in each case as of the Business Day immediately preceding the date of such Liquidation (such greater amount being referred to herein as the "Liquidation Preference"), before any distribution shall be made to the holders of any Junior Securities (and any Senior Securities or Parity Securities that, with respect to distributions upon Liquidation, rank junior to the Series C Preferred Stock) upon the Liquidation of the Company.  In case the assets of the Company available for payment to the Holders are insufficient to pay the full Liquidation Preference on all outstanding shares of the Series C Preferred Stock and all outstanding shares of Parity Securities and Senior Securities that, with respect to distributions upon Liquidation, are *pari passu* with the Series C Preferred Stock in the amounts to which the holders of such shares are entitled, then the entire assets of the Company available for payment to the Holders and to the holders of such Parity Securities and Senior Securities shall be distributed ratably among the Holders of the Series C Preferred Stock and the holders of such Parity Securities and Senior Securities, based upon the aggregate amount due on such shares upon Liquidation.  Written notice of any Liquidation of the Company, stating a payment date and the place where the distributable amounts shall be payable, shall be given by facsimile and overnight delivery not less than ten (10) calendar days prior to the payment date stated therein, to the Holders of record of the Series C Preferred Stock, if any, at their respective addresses as the same shall appear on the books of the Company.

5.  <u>Voting Rights</u>.  The Holders shall have the following voting rights with respect to the Series C Preferred Stock:

(a)     Each share of Series C Preferred Stock shall entitle the holder thereof to the voting rights specified in Section 5(b) and no other voting rights except as required by law.

(b)     The consent of the Holders of at least a Majority of the Series C Preferred Stock, voting separately as a single class with one vote per share, in person or by proxy, either in writing without a meeting or at an annual or a special meeting of such Holders called for the purpose, shall be necessary to amend, alter or repeal, by way of merger or otherwise, any of the provisions of the Articles of Incorporation, including the Certificate of Rights and Preferences, or Bylaws of the Company so as to significantly and adversely affect any of the rights or preferences of the Holders of the Series C Preferred Stock. Without limiting the generality of the preceding sentence, such change includes any action that would:

(i)     Reduce the Dividend Rate on the Series C Preferred Stock or defer the date from which dividends will accrue, or cancel accrued and unpaid dividends, or change the relative seniority rights of the holders of Series C Preferred Stock as to the payment of dividends in relation to the holders of any other Capital Stock of the Company;

(ii)     Reduce the amount payable to the holders of the Series C Preferred Stock upon the voluntary or involuntary liquidation, dissolution, or winding up of the Company, or change the relative seniority of the liquidation preferences of the holders of the Series C Preferred Stock to the rights upon liquidation of the holders of any other Capital Stock of the Company;

(iii)     Make the Series C Preferred Stock redeemable at the option of the Company;

(iv)     Authorize, create or issue any shares of Senior Securities (or amend the provisions of any existing class of Capital Stock to make such class of Capital Stock a class of Senior Securities); or

(v)     Decrease (other than by redemption or conversion) the total number of authorized shares of Series C Preferred Stock.

6.  <u>Conversion and Redemption</u>.

(a)     <u>Procedure for Conversion at the Option of the Company</u>.

(i)     <u>General</u>.  Subject to <u>Section 6(c)</u> hereof, on or after the five year anniversary of the Stockholder Consent Date, on any date on which the Prevailing Market Price exceeds the Conversion Price by one hundred percent (100%) or more, the Company shall have the option to convert all, but not less than all, of the then outstanding shares of Series C Preferred Stock by delivering a duly executed written Preferred Stock conversion notice, substantially in the form attached as Annex F to the Agreement (the "<u>Conversion Notice</u>" and the date such notice is deemed delivered hereunder, the "<u>Conversion Notice Date</u>"), by facsimile, mail or overnight courier delivery, to the Holder. The closing of such conversion shall take place, subject to the satisfaction or waiver of the conditions set forth in <u>Section 6(a)(iii)</u>, (a) on the twentieth (20th) Business Day following and excluding the Conversion Notice Date or (b) any other date upon which the exercising Holder and the Company mutually agree (the "<u>Conversion Closing Date</u>"). The Conversion Notice shall apply only to shares of Series C Preferred Stock for which no Redemption Notice has been tendered to the Company before the twentieth (20th) Business Day after the Conversion Notice Date, regardless of when the applicable redemption is consummated.

(ii)     <u>Conversion for stock</u>.  Subject to <u>Section 6(c)</u> hereof, such shares of stock shall be converted into that number of shares of  Common Stock and/or number of one-hundredths (1/100th) of a share of Common Stock Equivalent Junior Preferred Stock equal to (a) the aggregate Stated Value of such shares divided by (b) the Conversion Price (the "<u>Conversion Stock Amount</u>").  On the Conversion Closing Date, the Holder shall surrender the certificate representing the shares of Series C Preferred Stock to be converted to the Company at the address set forth for notices to the Company specified in Section

18 of the Agreement, and the Company shall deliver to such Holder as specified in the Conversion Notice the Conversion Stock Amount of duly authorized, validly issued, fully paid and nonassessable shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock.

(iii) <u>Closing conditions</u>. It shall be a condition of the converting Holder's obligation to close that each of the following is satisfied, unless expressly waived by such Holder in writing (which Holder may do or refrain from doing in its sole discretion):

(A) (w) the representations and warranties made by the Company in the Agreement shall be true and correct as of the Conversion Closing Date, except those representations and warranties that address matters only as of a particular date, which shall be true and correct as of such date; (x) the Company shall have complied fully with all of the covenants and agreements in the Agreement; (y) all shares of Common Stock to be issued upon such conversion shall be duly listed and admitted to trading on the Nasdaq Global Select Market, the Nasdaq Global Market or the New York Stock Exchange; and (z) such Holder shall have received a certificate of the Chief Executive Officer and the Chief Financial Officer of the Company dated such date and to the effect of clauses (x), (y) and (z).

(B) On the Conversion Closing Date, the Company shall have delivered to the Holder (x) a Conversion Notice, substantially in the form attached as Annex G to the Agreement and (y) the legal opinion described in Section 12(b) of the Agreement.

(C) If the issuance of Common Stock or Common Stock Equivalent Junior Preferred Stock would cause the number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock held by any Holder to exceed the Maximum Number then delivery of such shares of Common Stock or Common Stock Equivalent Junior Preferred Stock shall be deferred pursuant to Section 6(d) of the Agreement. Notwithstanding anything herein to the contrary, in such event, the Company shall no longer be obligated to pay any dividend on the Series C Preferred Stock or provide or recognize any other preferences, limitations, powers or other rights provided by this Certificate of Rights and Preferences to the extent that, if the Series C Preferred Stock would have been converted, the Holder would beneficially own Common Stock and Common Stock Equivalent Junior Preferred Securities that would exceed the Maximum Number.

The Company shall use its best efforts to cause each of the foregoing conditions to be satisfied at the earliest practicable date after a Conversion Notice. If such conditions are not satisfied or waived prior to the twentieth (20th) Business Day following and excluding the date the Conversion Notice is delivered, then the

Company may, at its sole option, and at any time, withdraw the Conversion Notice by written notice to the Holder regardless of whether such conditions have been satisfied or waived as of the withdrawal date and, after such withdrawal, shall have no further obligations with respect to such Conversion Notice and may submit a Conversion Notice with respect to the shares referenced in the withdrawn Conversion Notice pursuant to <u>Section 6(a)(i)</u> hereof, subject to the closing conditions in this <u>Section 6(a)(iii)</u>.

        (iv)      <u>Holder of record</u>.  Each conversion of Series C Preferred Stock shall be deemed to have been effected immediately before the close of business on the Business Day on which the Conversion Notice is delivered (except, that, for purposes of calculation of the Stated Value, dividends shall accrue until and including the Conversion Closing Date), and at such time the Person or Persons in whose name or names any certificate or certificates for shares of Common Stock or Common Stock Equivalent Junior Preferred Securities shall be issuable upon such conversion as provided in <u>Section 6(a)(ii)</u> shall be deemed to have become the holder or holders of record thereof.

(b)      <u>Procedure for Redemption at the Option of the Holder</u>.

        (i)      <u>General</u>.  Subject to <u>Section 6(c)</u> hereof, at any time after the Company has obtained the approval of the stockholders of the Company to increase the authorized number of shares of Common Stock, a Holder of Series C Preferred Stock may at the option of the Holder require the Company to redeem any or all shares of Series C Preferred Stock held by such Holder for Common Stock and/or Common Stock Equivalent Junior Preferred Stock on one or more occasions by delivering an optional redemption notice (a "<u>Redemption Notice</u>") to the Company substantially in the form attached as Annex H to the Agreement; provided, however, that until the Company has obtained the approval of the stockholders of the Company to increase the authorized number of shares of Common Stock, a Holder of Series C Preferred Stock may require the Company to redeem any or all of such shares of Series C Preferred Stock for Common Stock Equivalent Junior Preferred Stock.  The closing of such redemption shall take place, subject to the satisfaction or waiver of the conditions set forth in <u>Section 6(b)(iii)</u> (a) on the second (2nd) Business Day, or if the Holder so elects, the third (3rd) Business Day, following and excluding the date the Redemption Notice is delivered or (b) any other date upon which the exercising Holder and the Company mutually agree (the "<u>Redemption Closing Date</u>").

        (ii)      <u>Redemption for stock</u>.  Subject to <u>Section 6(c)</u> hereof, such shares of Series C Preferred Stock shall be redeemed into that number of shares of Common Stock and/or number of one-hundredths ($1/100^{th}$) of a share of Common Stock Equivalent Junior Preferred Stock equal to (a) the aggregate Stated Value of such shares divided by (b) the Redemption Price (the "<u>Redemption Stock Amount</u>").  On the Redemption Closing Date, the Holder shall surrender the

certificate representing the shares of Series C Preferred Stock to be redeemed to the Company at the address set forth for notices to the Company specified in Section 18 of the Agreement and the Company shall deliver to such Holder as specified in the Redemption Notice the Redemption Stock Amount of duly authorized, validly issued, fully paid and nonassessable shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock.

        (iii)      <u>Closing conditions</u>.  It shall be a condition of the redeeming Holder's obligation to close that each of the following is satisfied, unless expressly waived by such Holder in writing:

        (A)  (w) the representations and warranties made by the Company in the Agreement shall be true and correct as of the Redemption Closing Date, except those representations and warranties that address matters only as of a particular date, which shall be true and correct as of such date; (x) the Company shall have complied fully with all of the covenants and agreements in the Agreement; (y) all shares of Common Stock to be issued upon such redemption shall be duly listed and admitted to trading on the Nasdaq Global Select Market, the Nasdaq Global Market or the New York Stock Exchange; and such Holder shall have received a certificate of the Chief Executive Officer and (z) the Chief Financial Officer of the Company dated such date and to the effect of clauses (w), (x) and (y).

        (B)  On the Redemption Closing Date, the Company shall have delivered to the Holder (x) a Preferred Stock redemption delivery notice, substantially in the form attached as Annex I to the Agreement and (y) the legal opinion described in Section 12(b) of the Agreement.

        (C)  As of the Redemption Closing Date, the Company shall have notified the Holder of all Restatements.

        (D)  If the issuance of Common Stock or Common Stock Equivalent Junior Preferred Stock would cause the number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock held by any Holder to exceed the Maximum Number then delivery of such shares of Common Stock or Common Stock Equivalent Junior Preferred Stock shall be deferred pursuant to Section 6(d) of the Agreement. Notwithstanding anything herein to the contrary, in such event, the Company shall no longer be obligated to pay any dividend on the Preferred Stock or provide or recognize any other preferences, limitations, powers or other rights provided by this Certificate of Rights and Preferences to the extent that, if the Series C Preferred Stock would have been redeemed, the Holder would beneficially own Common Stock and Common Stock Equivalent Junior Preferred Securities that would exceed the Maximum Number.

(iv)     Holder of record.  Each redemption of Series C Preferred Stock shall be deemed to have been effected immediately before the close of business on the Business Day on which the Redemption Notice is delivered (except, that, for the purposes of calculation of the Stated Value, dividends shall accrue until and including the Redemption Closing Date), and at such time the Person or Persons in whose name or names any certificate or certificates for shares of Common Stock (or Other Securities) shall be issuable upon such redemption as provided in Section 6(b)(ii) shall be deemed to have become the holder or holders of record thereof.  The foregoing notwithstanding, such redemption shall not be deemed effective if and as of the date that the Holder delivers written notice of withdrawal to the Company as set forth in Section 6(b)(v) below.

(v)     Withdrawal of Redemption Notice.  If the conditions set forth in Section 6(b)(iii) are not satisfied or waived on or prior to the Redemption Closing Date or if the Company fails to perform its obligations on any Redemption Closing Date (including delivery of all shares of Series C Preferred Stock issuable on such date), then in addition to all remedies available to Holder at law or in equity, Holder may, at its sole option, and at any time, withdraw the Redemption Notice by written notice to the Company regardless of whether such conditions have been satisfied or waived as of the withdrawal date and, after such withdrawal, shall have no further obligations with respect to such Redemption Notice and may submit a Redemption Notice on any future date with respect to such Series C Preferred Stock and the Redemption Price for such subsequent Redemption Notice shall be the lesser of (x) the Redemption Price in the withdrawn Redemption Notice and (y) the Redemption Price in effect as of the date of the subsequent Redemption Notice.  If the Company fails to deliver (A) shares of Common Stock as provided in Section 6(b) on or before the later of the twentieth (20th) Business Day following and excluding (1) the Redemption Closing Date or (2) three (3) Business Days after the Stockholder Consent Date (if and to the extent such approval is required to issue such shares of Common Stock) or (B) shares of Common Stock Equivalent Junior Preferred Stock on or before the twentieth (20th) Business Day following and excluding the Redemption Closing Date, then the Redemption Price shall equal the lesser of Four Dollars and Forty-One Cents ($4.41) and the Redemption Price in effect immediately before such date.

(vi)     Partial redemption.  If any redemption is for only part of the shares represented by the certificate surrendered, the Company shall deliver on the Redemption Closing Date a new Series C Preferred Stock certificate of like tenor, calling in the aggregate on the face or faces thereof for the number of shares of Series C Preferred Stock in the name and to an address specified by the Holder.

(c)     Maximum Voting Stock Amount.  The Company shall not effect any conversion or redemption of the Series C Preferred Stock, and the Holders shall not have

the right to convert or redeem any portion of the Series C Preferred Stock, into Common Stock to the extent such conversion, redemption or exercise would result in aggregate issuances upon conversion or redemption of the Series C Preferred Stock in excess of nine and seventy-five one hundredths percent (9.75%)(the "Maximum Voting Stock Amount") of the number of shares of Common Stock that would be outstanding after giving effect to such conversion or redemption. Holders of a Majority of the Series C Preferred Stock shall have the right to permanently reduce the percentage used in the determination of the Maximum Voting Stock Amount to four and seventy-five one hundredths percent (4.75%) at any time, effective upon delivery of written notice of such election to the Company. In the event that the Company cannot effect a conversion or redemption of the Series C Preferred Stock into Common Stock pursuant to the terms of this Section 6(c), the conversion or redemption shall be effected into an equal number of shares of Common Stock Equivalent Junior Preferred Stock of the Company.

(d)     The Company shall at all times reserve for issuance such number of its shares of Common Stock and Common Stock Equivalent Junior Preferred Stock as shall be required under the Agreement. The Company will procure, at its sole expense, the listing of the Common Stock issuable upon conversion or redemption of the Series C Preferred Stock (including upon the conversion of Common Stock Equivalent Junior Preferred Stock issuable upon the conversion or redemption of the Series C Preferred Stock) and shares issuable as dividends hereunder, subject to issuance or notice of issuance, on all stock exchanges and quotation systems on which the Common Stock is then listed or quoted, no later than the date on which such Series C Preferred Stock is issued to the Holder and thereafter shall use its best efforts to prevent delisting or removal from quotation of such shares. The Company will pay any and all documentary stamp or similar issue or transfer taxes that may be payable in respect of the issuance or delivery of shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock on conversion or redemption of shares of the Series C Preferred Stock. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involving the issue and delivery of shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock in a name other than that in which the shares of Series C Preferred Stock so converted or redeemed were registered, and no such issue and delivery shall be made unless and until the person requesting such issue has paid to the Company the amount of any such tax, or has established, to the reasonable satisfaction of the Company, that such tax has been paid.

(e)     No fractional shares or scrip representing fractional shares of Common Stock or, other than fractional shares in increments of one-hundredth (1/100th) of a share, of Common Stock Equivalent Junior Preferred Stock shall be issued upon the conversion or redemption of the Series C Preferred Stock. If any such conversion or redemption would otherwise require the issuance of a fractional share of Common Stock or, other than fractional shares in increments of one-hundredth (1/100th) of a share, of Common Stock Equivalent Junior Preferred Stock, an amount equal to such fraction multiplied by the current Daily Market Price per share of Common Stock on the date of conversion or redemption shall be paid to the Holder in cash by the Company. If more than one share

of Series C Preferred Stock shall be surrendered for conversion or redemption at one time by or for the same Holder, the number of shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock issuable upon conversion or redemption thereof shall be computed on the basis of the aggregate number of shares of Series C Preferred Stock so surrendered.

      (f)    <u>Change of Control</u>.

      (i)    If the Company on or after the date of the Agreement is party to any Change of Control, proper provision shall be made so that, upon the basis and the terms and in the manner provided herein, the Holder of each unconverted and unredeemed share of Series C Preferred Stock, upon conversion or redemption thereof at any time after the consummation of such Change of Control, shall be entitled to, and appropriate adjustments will be made to ensure that the Holder will receive, equivalent rights as those provided in this Certificate of Rights and Preferences, including, without limitation, the voting, dividend, conversion, redemption and liquidation rights contained herein with respect to the Acquiring Person. The Company shall, prior to the consummation of any Change of Control, provide that each Person (other than the Company) that may be required to deliver any stock, securities, cash or property upon conversion of Series C Preferred Stock as provided herein shall assume, by written instrument delivered to, and reasonably satisfactory to, the Holders of a Majority of the Series C Preferred Stock, (a) the obligations of the Company under this Certificate of Rights and Preferences (and if the Company shall survive the consummation of such transaction, such assumption shall be in addition to, and shall not release the Company from, any continuing obligations of the Company under this Certificate of Rights and Preferences) and (b) the obligation to deliver to the Holders of Series C Preferred Stock such shares of stock, securities, cash or property as, in accordance with the provisions of this Certificate of Rights and Preferences, such Holders may be entitled to receive, and such Person shall have similarly delivered to such Holders an opinion of counsel for such Person, which counsel shall be reasonably satisfactory to Holders of a Majority of the Series C Preferred Stock, stating that the rights of such Holders under this Certificate of Rights and Preferences shall thereafter continue in full force and effect with respect to such Acquiring Person in accordance with the terms hereof.

      (ii)    In the event of a Change of Control, all references to the Conversion Price or the Redemption Price herein shall be references to the Stock Adjustment Measuring Price. "<u>Stock Adjustment Measuring Price</u>" means an amount equal to the Conversion Price or the Redemption Price, as applicable, multiplied by a fraction,

      (A) the numerator of which is the Daily Market Price of the securities for Common Stock is exchanged in the Change of Control (or if none, the most widely-held class of voting securities of the Acquiring

Person) determined as of the Business Day immediately preceding and excluding the date on which the Change of Control is consummated; and

    (B)  the denominator of which is the Daily Market Price of the Common Stock of the Company determined as of the Business Day immediately preceding and excluding the date on which the Change of Control is consummated.

    (iii)    Prior to the effective date of a Change of Control, the Company shall continue to have the right to submit to each Holder Conversion Notices and each Holder shall continue to have the right to submit to the Company Redemption Notices and consummate closings of any such conversions or redemptions, in each party's sole discretion, in accordance with the terms and conditions of this Certificate of Rights and Preferences.  In addition, the Holder at its sole option may elect to submit to the Company a special notice (a "Contingent Notice") to redeem the Series C Preferred Stock (including any Series C Preferred Stock issued pursuant to a Contingent Investment Notice (as defined in the Agreement) under the Agreement) in whole or in part in connection with such Change of Control; in which case, notwithstanding anything to the contrary herein:

    (A)  the effectiveness of such contingent redemption shall be conditional upon the effectiveness of the Change of Control;

    (B)  until the effective date of such Change of Control, the Holder shall have the right to deliver a notice to withdraw such Contingent Notice; and

    (C)  if such Contingent Notice shall not have been withdrawn, then on the effective date of such Change of Control, such Holder shall receive the same consideration, in the form of cash, securities or other assets (the "Acquisition Consideration") per share of Common Stock and Common Stock Equivalent Junior Preferred Stock issuable to any other holder of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock in connection with such Change of Control based upon the number of shares of Common Stock and Common Stock Equivalent Junior Preferred Stock which the Holder would have held if the Holder had consummated such redemption on the Business Day immediately preceding the date on which such Change of Control occurs.

    7.   Status of Converted and Redeemed Shares; Limitations on Series C Preferred Stock. The Company shall return to the status of unauthorized and undesignated shares of Preferred Stock each share of Series C Preferred Stock which shall be converted, redeemed or for any other reason acquired by the Company, and such shares thereafter may have such characteristics and designations as the Board may determine (subject to Section 5 hereof), provided, however, that no share of Series C Preferred Stock which shall be converted, redeemed or otherwise

acquired by the Company shall thereafter be reissued, sold or transferred by the Company as Series C Preferred Stock.  The Company will not issue any further shares of Series C Preferred Stock.

8.    <u>Subdivision of Common Stock</u>.  Notwithstanding anything herein to the contrary, if the Company at any time subdivides (by any stock split, stock dividend, recapitalization, reorganization, reclassification or otherwise) the shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock into a greater number of shares, then, after the date of record for effecting each such subdivision, all measurements and references herein related to share prices for such securities will be proportionately decreased and all references to share numbers for such securities herein will be proportionately increased.

9.    <u>Nonperformance</u>.  If the Company, shall (i) at any time fail to deliver the shares of Common Stock Equivalent Junior Preferred Stock required to be delivered to the Holder pursuant hereto or (ii) at any time after the Company has obtained the approval of the stockholders of the Company to increase the authorized number of shares of Common Stock, fail to deliver the shares of Common Stock or required to be delivered to the Holder pursuant hereto, for any reason other than the failure of any condition precedent to the Company's obligations hereunder or the failure by the Holder to comply with its obligations hereunder, then the Company shall (without limitation to the Holder's other remedies at law or in equity): (i) indemnify and hold the Holder harmless against any loss, claim or damage arising from or as a result of such failure by the Company (regardless of whether any of the foregoing results from a third-party claim or otherwise) and (ii) reimburse the Holder for all of its reasonable out-of-pocket expenses (which includes fees and expenses of its counsel) incurred by the Holder in connection herewith and the transactions contemplated herein (regardless of whether any of the foregoing results from a third-party claim or otherwise).

10.    <u>Assignment</u>.  The Holder may, in its sole discretion, freely assign, pledge, hypothecate or transfer all shares of Series C Preferred Stock.

[The rest of this page is intentionally left blank.]

IN WITNESS WHEREOF, this Certificate of Rights and Preferences has been signed on behalf of the Company by its Chief Financial Officer and attested to by its Corporate Secretary, all as of the date first set forth above.

UNITED COMMUNITY BANKS, INC.

_____
Name: Rex S. Schuette
Title:   Chief Financial Officer


_____
Name: Lori McKay
Title:   Corporate Secretary

[Signature Page to Certificate of Rights and Preferences]

18

**ANNEX C**

**FORM OF RESTATEMENT NOTICE**

[date]

Fletcher International, Ltd.
c/o Appleby Services (Bermuda) Ltd.
Canon's Court
22 Victoria Street
PO Box HM 1179
Hamilton HM EX
Bermuda
Attention:  Desirae Jones, Corporate Administrator
Telephone: +1 441 295 2244 (Main)

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher").  Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

In accordance with Section 11(a)(i) of the Agreement, the Company hereby gives notice to Fletcher that a Restatement has occurred on [DATE], as described in the enclosed [DOCUMENT IN WHICH RESTATEMENT WAS PUBLICLY DISCLOSED].

UNITED COMMUNITY BANKS, INC.

By: _____
Name: _____
Title: _____

C-1

With copies to:

Fletcher International, Ltd.
c/o Fletcher Asset Management, Inc.
48 Wall Street
New York, NY 10005
Attention:  Peter Zayfert
Telephone: 212-284-4801

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, CA 94301
Attention: Leif King
Telephone: 650-470-4662
Facsimile: 650-798-6530

US2008 1122394.15

**ANNEX D**

**<u>NOTICE ADDRESS</u>**

Fletcher International, Ltd.
c/o Appleby Services (Bermuda) Ltd.
Canon's Court
22 Victoria Street
PO Box HM 1179
Hamilton HM EX
Bermuda
Attention: Desirae Jones, Corporate Administrator
Telephone: +1 441-295-2244 (Main)

      with copies to (which copies shall not constitute notice):

Fletcher International, Ltd.
c/o Fletcher Asset Management, Inc.
48 Wall Street
New York, NY 10005
Attention:  Peter Zayfert
Telephone: 212-284-4801

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, CA 94301
Attention: Leif King
Telephone: 650-470-4662
Facsimile: 650-798-6530

D-1

**ANNEX E**

## COMPANY WIRE INSTRUCTIONS

United Community Bank
ABA 061112843

Credit
United Community Bank, Inc.
DDA  20621

US2008 1122394.15

**ANNEX F**

**FORM OF PREFERRED STOCK CONVERSION NOTICE**

[date]

[Holder]
[Address]
[Address]
Attention:
Telephone:
Facsimile:

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher").  Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

The Company hereby elects to convert [●] shares of Preferred Stock into [●] shares of [Common Stock and/or Common Stock Equivalent Junior Preferred Stock] at the Conversion Price (as defined in the Certificate of Rights and Preferences) equal to [●].  In accordance with Section 6 of the Certificate of Rights and Preferences, such shares of [Common Stock and/or Common Stock Equivalent Junior Preferred Stock] shall be delivered to the Holder [in uncertificated form by book-entry transfer][in certificated form at the address specified below:

> [Custodian]
> [Address]
> Attention:    [_____]
>
> Telephone: [_____][1]]

---

[1] Fletcher to provide custodian information.

US2008 1122394.15

UNITED COMMUNITY BANKS, INC.

By: _____
Name: _____
Title: _____


With a copy to:

Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia  30309
Attention:      James W. Stevens

F-2

# ANNEX G

## FORM OF PREFERRED STOCK CONVERSION DELIVERY NOTICE

[date]

[Holder]
[Address]
[Address]
Attention:
Telephone:
Facsimile:

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "<u>Agreement</u>") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "<u>Company</u>") and Fletcher International, Ltd. ("<u>Fletcher</u>").  Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

This notice confirms that [●] shares of Preferred Stock have been converted by the Company into [●] shares of Common Stock and [●] shares of Common Stock Equivalent Junior Preferred Stock at the Conversion Price (as defined in the Certificate of Rights and Preferences) equal to [●].  [*If the shares are being delivered by book entry transfer, insert the following* – Such shares of Common Stock or Common Stock Equivalent Junior Preferred Stock have been delivered to [the Holder] in uncertificated form by book-entry transfer.][*If the shares are being delivered in physical form to the holder, insert the following* – Attached are copies of the front and back of the [●] original stock certificates, representing [●] shares of Common Stock and [●] shares of Common Stock Equivalent Junior Preferred Stock, together with a copy of the overnight courier air bill which will be used to ship such stock certificates.  We will send the original stock certificates by overnight courier to the following address:

[Custodian]
[Address]
Attention:     [_____]

Telephone: [_____]² 

---

² Fletcher to provide custodian information.

US2008 1122394.15

with a copy to:

> Fletcher International, Ltd.
> c/o Fletcher Asset Management, Inc.
> 48 Wall Street
> New York, NY 10005
> Attention: Peter Zayfert
> Telephone: (212) 284-4800
> Facsimile: (212) 284-4801]

[*If Preferred Stock certificates tendered by Fletcher are not being fully converted, insert the following* – Also attached are copies of the front and back of the original stock certificate representing [●] shares of Preferred Stock, representing the unconverted portion of the tendered Preferred Stock certificates, together with a copy of the overnight courier air bill which will be used to ship such stock certificate. We will send the original stock certificate by overnight courier to [_____] at the address set forth in the previous paragraph.]

UNITED COMMUNITY BANKS, INC.


By: _____
Name: _____
Title: _____


With a copy to:

Fletcher International, Ltd.
c/o Fletcher Asset Management, Inc.
48 Wall Street
New York, NY 10005
Attention: Peter Zayfert
Telephone: (212) 284-4800
Facsimile: (212) 284-4801

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, CA 94301
Attention: Leif King
Telephone: (650) 470-4662
Facsimile: (650) 798-6530

US2008 1122394.15

# ANNEX H

## **FORM OF PREFERRED STOCK REDEMPTION NOTICE**

[date]


United Community Banks, Inc.
[Address]
[Address]
Attention:
Telephone:
Facsimile:


Ladies and Gentlemen:


       Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher").  Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

       Fletcher hereby elects to redeem [●] shares of Preferred Stock into [●] shares of Common Stock and [●] shares of Common Stock Equivalent Junior Preferred Stock at a Redemption Price (as defined in the Certificate of Rights and Preferences) equal to [●].  In accordance with Section 6 of the Certificate of Rights and Preferences, such shares of Common Stock or Common Stock Equivalent Junior Preferred Stock shall be delivered to Fletcher [in uncertificated form by book-entry transfer][in certificated form at the address specified below:

             [Custodian]
             [Address]
             Attention:  [_____]

             Telephone:  [_____][3]

---

[3] Fletcher to provide custodian information.

US2008 1122394.15

FLETCHER INTERNATIONAL, LTD., by its
duly authorized investment advisor,
FLETCHER ASSET MANAGEMENT, INC.

By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____


AGREED AND ACKNOWLEDGED:
UNITED COMMUNITY BANKS, INC.


By: _____
Name: _____
Title: _____


With a copy to:

Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia  30309
Attention:     James W. Stevens

H-2

# ANNEX I

## FORM OF PREFERRED STOCK REDEMPTION DELIVERY NOTICE

[date]

Fletcher International, Ltd.
c/o Appleby Services (Bermuda) Ltd.
Canon's Court
22 Victoria Street
PO Box HM 1179
Hamilton HM EX
Bermuda
Attention: Desirae Jones, Corporate Administrator
Telephone: +1 441 295 2244 (Main)

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

This notice confirms that [●] shares of Preferred Stock have been redeemed by Fletcher into [●] shares of Common Stock and [●] shares of Common Stock Equivalent Junior Preferred Stock at a Redemption Price (as defined in the Certificate of Rights and Preferences) equal to [●]. [*If the shares are being delivered by book entry transfer, insert the following –* Such shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock have been delivered to [the Holder] in uncertificated form by book-entry transfer.][*If the shares are being delivered in physical form to the holder, insert the following –* Attached are copies of the front and back of the [●] original stock certificates, representing [●] shares of Common Stock and [●] shares of Common Stock Equivalent Junior Preferred Stock, together with a copy of the overnight courier air bill which will be used to ship such stock certificates. We will send the original stock certificates by overnight courier to the following address:

> [Custodian]
> [Address]
> Attention: [_____]
>
> Telephone: [_____]⁴

with a copy to:

---

⁴ Fletcher to provide custodian information.

US2008 1122394.15

Fletcher International, Ltd.
c/o Fletcher Asset Management, Inc.
48 Wall Street
New York, NY 10005
Attention: Peter Zayfert
Telephone: (212) 284-4800
Facsimile: (212) 284-4801]

[*If Preferred Stock certificates tendered by Fletcher are not being fully redeemed, insert the following* – Also attached are copies of the front and back of the original stock certificate representing [●]_____ shares of Preferred Stock, representing the unredeemed portion of the tendered Preferred Stock certificates, together with a copy of the overnight courier air bill which will be used to ship such stock certificate. We will send the original stock certificate by overnight courier to [_____] at the address set forth in the previous paragraph.]

UNITED COMMUNITY BANKS, INC.


By: _____
Name: _____
Title: _____

With a copy to:

Fletcher International, Ltd.
c/o Fletcher Asset Management, Inc.
48 Wall Street
New York, NY 10005
Attention: Peter Zayfert
Telephone: (212) 284-4800
Facsimile: (212) 284-4801

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, CA 94301
Attention: Leif King
Telephone: (650) 470-4662
Facsimile: (650) 798-6530

I-2

## CERTIFICATE OF DESIGNATION
### OF
## COMMON STOCK EQUIVALENT JUNIOR PREFERRED STOCK
### OF
## UNITED COMMUNITY BANKS, INC.

Pursuant to Section 14-2-602 of the
Georgia Business Corporation Code

United Community Banks, Inc., a corporation organized under the laws of the State of Georgia (the "Corporation"), does hereby certify that:

1. At a meeting duly convened and held on March $2\cancel{6}$, 2010, the Board of Directors of the Corporation (the "Board") duly adopted the following resolutions authorizing the issuance and sale by the Corporation of a series of the Corporation's preferred stock, $1.00 par value per share, to be known as the Common Stock Equivalent Junior Preferred Stock:

> "**RESOLVED,** that the powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Corporation's Common Stock Equivalent Junior Preferred Stock, including those established by the Board and the number of authorized shares thereof, are authorized and approved as set forth in the Certificate of Designation attached hereto as Exhibit A, which is incorporated herein and made a part of these resolutions by reference."

2. Attached hereto, and thereby made a part hereof, is such Exhibit A from the Board's resolution designating the Common Stock Equivalent Junior Preferred Stock.

**IN WITNESS WHEREOF,** this Certificate of Designation is executed on behalf of the Corporation by its duly authorized officer this $3/$ day of March, 2010.

UNITED COMMUNITY BANKS, INC.

By:

Name: Jimmy C. Tallent

Title: CEO · President

CORPORATIONS DIVISION
SECRETARY OF STATE

2010 MAR 31 PM 5:40

# CERTIFICATE OF DESIGNATION
## OF
## COMMON STOCK EQUIVALENT
## JUNIOR PREFERRED STOCK
## OF
## UNITED COMMUNITY BANKS, INC.

Pursuant to the authority vested in the Board of Directors (the "Board") by the Restated Articles of Incorporation of United Community Banks, Inc. (the "Corporation"), as amended (the "Articles of Incorporation"), the Board does hereby designate, create, authorize and provide for the issue of a series of preferred stock, $1.00 par value per share, which shall be designated as "Common Stock Equivalent Junior Preferred Stock" (the "Junior Preferred Stock"), consisting of 1,000,000 shares having the following powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations:

## Section I.    Definitions

"Acquiring Person" has the meaning specified in Section VI(c).

"Applicable Conversion Rate" means the Initial Conversion Rate, subject to adjustment pursuant to Section II(b), as applicable, for any such event occurring subsequent to the initial determination of such rate.

"Board" has the meaning specified in the preamble.

"Articles of Incorporation" has the meaning specified in the preamble.

"Capacity Amendment" means an amendment to the Articles of Incorporation increasing the number of shares of Common Stock that the Corporation is authorized to issue to more than 100,000,000.

"Change of Control" has the meaning specified in Section VI(b).

"Common Dividend Equivalent Amount" has the meaning specified in Section III(a).

"Common Stock" means the Common Stock, $1.00 par value per share, of the Corporation.

"Conversion Date" means, with respect to a share of Junior Preferred Stock, the date on which such share is converted into Common Stock.

"Convertible Holder" means a Holder, other than the initial Holder or an affiliate thereof, who acquires one or more shares of Junior Preferred Stock following a Permitted Transfer.

"Conversion Notice" shall mean the notice given by a Convertible Holder to the Corporation, specifying the number of shares of Junior Preferred Stock to be converted into Common Stock and certifying that such Person is a Convertible Holder.

"Corporation" has the meaning specified in the preamble.

"Exchange Property" has the meaning specified in Section VI(a).

"Holder" means a Person in whose name any shares of Junior Preferred Stock are registered, which may be treated by the Corporation as the absolute owner of such shares for all purposes.

"Initial Conversion Rate" means, for each share of Junior Preferred Stock, one hundred (100) shares of Common Stock.

"Issue Date" means the date that the Junior Preferred Stock is first issued.

"Junior Preferred Stock" has the meaning specified in the preamble.

"Junior Stock" shall mean any class of capital stock or series of Preferred Stock of the Corporation established by the Board after the Issue Date, the terms of which do not expressly provide that such class or series ranks senior to or on parity with the Junior Preferred Stock as to dividend rights or rights upon the liquidation, winding-up or dissolution of the Corporation.

"Liquidation Event" has the meaning specified in Section V(a).

"Parity Stock" shall mean any class of capital stock or series of Preferred Stock established by the Board after the Issue Date, the terms of which expressly provide that such class or series will rank on parity with the Junior Preferred Stock as to dividend rights or rights upon the liquidation, winding-up or dissolution of the Corporation.

"Permitted Transfer" means a sale or other transfer (i) to an affiliate of the initial Holder or to the Corporation; (ii) in a widespread public distribution; (iii) in transfer in which no transferee (or group of associated transferees) would receive 2 percent or more of any class of voting securities of the Corporation; or (iv) to a transferee that would control more than 50 percent of the voting securities of the Corporation without any transfer from the initial Holder.

"Person" means a legal person, including any individual, corporation, estate, partnership, joint venture, association, joint-stock company, limited liability company or trust.

"Record Date" means, with respect to any dividend, distribution or other transaction or event in which the holders of the Common Stock (or other applicable security) have the right to receive any cash, securities or other property or in which the Common Stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of the Common Stock (or other applicable security) entitled to receive such cash, securities or other property (whether such date is fixed by the Board or a duly authorized committee of the Board or by statute, contract or otherwise).

"Senior Stock" shall mean each class of capital stock or series of Preferred Stock established by the Board after the Issue Date, the terms of which expressly provide that such class or series will rank senior to the Junior Preferred Stock as to dividend rights or rights upon the liquidation, winding-up or dissolution of the Corporation.

"Stockholder Approval" means the requisite approval by the stockholders of the Corporation of the Capacity Amendment.

"Transfer Agent" shall mean the Corporation's duly appointed transfer agent, registrar, redemption, conversion and dividend disbursing agent for the Junior Preferred Stock and transfer agent and registrar for any Common Stock issued upon conversion of the Junior Preferred Stock, or any successor duly appointed by the Corporation.

2

## Section II. Conversion

(a)      No share of Junior Preferred Stock (or fraction thereof) may be converted into Common Stock unless held by a Convertible Holder. Each share of Junior Preferred Stock (or fraction thereof) held by a Convertible Holder shall be convertible at any time following the Stockholder Approval into a number of shares of Common Stock equal to the product of (i) the fraction of a share of Junior Preferred Stock converted and (ii) the Applicable Conversion Rate in effect on the Conversion Date, plus cash in lieu of any fractional shares of Common Stock pursuant to Section II(c)(iv). For all purposes with respect to the conversion of Junior Preferred Stock, references herein to "Common Stock" shall include and mean any cash, securities or other property (including payments of cash in lieu of fractional shares of Common Stock) that may be due upon such conversion and references to "Junior Preferred Stock" shall include and mean any fractional shares thereof.

(b)      Adjustments to Conversion Rate. If, at any time while Junior Preferred Stock remains outstanding, (i) the Corporation issues to holders of the Common Stock as a class shares of Common Stock or other securities of the Corporation as a dividend or distribution on the Common Stock, or (ii) the Corporation effects a share split or share combination of the Common Stock, (each, an "Adjustment Event"), then the Corporation shall adjust the Initial Conversion Rate or Applicable Conversion Rate, as applicable, or other terms of the Junior Preferred Stock in effect immediately prior to such event so that each Holder of shares of Junior Preferred Stock thereafter surrendered for conversion shall be entitled to receive the number of shares of Common Stock that such Holder would have owned or would have been entitled to receive upon or by reason of any of the events described above, had such shares of the Junior Preferred Stock been converted into shares of Common Stock immediately prior to the occurrence of such event. An adjustment made pursuant to this Section II(b) shall become effective retroactively (x) in the case of any such dividend or distribution, to the day immediately following the close of business on the Record Date for the determination of holders of Common Stock entitled to receive such dividend or distribution or (y) in the case of any such subdivision, split, combination or reclassification, to the close of business on the day upon which such corporate action becomes effective.

(c)      Shares of Junior Preferred Stock shall be converted into shares of Common Stock in accordance with the following procedures:

(i)      At all times after the Stockholder Approval, a Convertible Holder may exercise a conversion right by the delivery of a Conversion Notice to the office of the Transfer Agent during normal business hours and (if so required by the Corporation or the Transfer Agent) an instrument of transfer, in form satisfactory to the Corporation and to the Transfer Agent, duly executed by such Convertible Holder or his duly authorized attorney, and funds in the amount of any applicable transfer tax (unless provision satisfactory to the Corporation is otherwise made therefor), if required pursuant to Section II(c)(iii).

(ii)     As promptly as practicable after the delivery of a Conversion Notice and the payment in cash of any amount required by the provisions of Sections 2(c)(i) and 2(c)(iii), the Corporation will deliver or cause to be delivered at the office of the Transfer Agent to or upon the written order of the Convertible Holder, certificates or a confirmation of book-entry transfer of shares representing the number of fully paid and

3

non-assessable shares of Common Stock issuable upon such conversion, issued in such name or names as the Convertible Holder may direct. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of the delivery of the Conversion Notice, and all rights of the Convertible Holder shall cease with respect to such shares of Junior Preferred Stock at such time and the Person or Persons in whose name or names the shares of Common Stock issued upon conversion are to be issued shall be treated for all purposes as having become the record holder or holders of such shares of Common Stock at such time; provided, however, that any delivery of a Conversion Notice and payment on any date when the stock transfer books of the Corporation shall be closed shall constitute the Person or Persons in whose name or names the shares of Common Stock are to be issued as the record holder or holders thereof for all purposes immediately prior to the close of business on the next succeeding day on which such stock transfer books are open.

(iii)     The issuance of shares of Common Stock upon conversion of shares of Junior Preferred Stock shall be made without charge for any stamp or other similar tax in respect of such issuance. However, if any such shares to be issued upon conversion are to be issued in a name other than that of the Holder of the share or shares of Junior Preferred Stock converted, the person or persons requesting the issuance thereof shall pay to the Corporation the amount of any tax which may be payable in respect of any transfer involved in such issuance, or shall establish to the satisfaction of the Corporation that such tax has been paid.

(iv)     No fractional shares of Common Stock or scrip shall be issued upon conversion of shares of Junior Preferred Stock. If more than one share of Junior Preferred Stock shall be surrendered for conversion at any one time by the same Holder, the number of full shares of Common Stock issuable upon conversion thereof shall be computed on the basis of the aggregate number of shares of Junior Preferred Stock so surrendered. Instead of any fractional shares of Common Stock that would otherwise be issuable upon conversion of any shares of Junior Preferred Stock, the Corporation shall pay to the Holder an amount in cash in respect of such fractional interest equal to the value of such fractional interest based on the closing sales price of the Common Stock on such national securities exchange or automated quotation system on which the Common Stock is then listed or authorized for quotation or, if the Common Stock is not so listed or authorized for quotation, an amount determined in good faith by the Board to be the fair value of the Common Stock at the close of business on the business day immediately preceding the applicable Conversion Date.

(v)     At all times after the Stockholder Approval, the Corporation shall be required to reserve or keep available, out of its authorized but unissued Common Stock, or have sufficient authorized Common Stock to cover, the shares of Common Stock deliverable upon the conversion of the Junior Preferred Stock  The Corporation shall take all action necessary so that all shares of Common Stock that may be issued upon conversion of shares of Junior Preferred Stock will upon issue be validly issued, fully paid and nonassessable, and free from all liens and charges in respect of the issuance or delivery thereof.

4

(d)     From and after a Conversion Date, dividends hereunder shall no longer accrue with respect to shares of Junior Preferred Stock converted on such date, and such converted shares of Junior Preferred Stock shall cease to be outstanding, subject to the rights of Holders of such Junior Preferred Stock to receive any previously accrued and unpaid dividends on such shares and any other payments to which they are otherwise entitled pursuant to Section III or Section VI.

## Section III.    Dividend Rights

(a)     From and after the Issue Date, (i) Holders shall be entitled to receive, when, as and if declared by the Board or any duly authorized committee of the Board, but only out of assets legally available therefor, all dividends or other distributions in the form of cash or assets (other than shares of Common Stock) declared and paid or made in respect of the shares of Common Stock, at the same time and on the same terms as holders of Common Stock, in an amount per one-hundredth of a share of Junior Preferred Stock equal to the product of (A) the Applicable Conversion Rate then in effect and (B) any per share dividend or other distribution in the form of cash or assets (other than shares of Common Stock) declared and paid or made in the form of cash or assets (other than shares of Common Stock) declared and paid or made in respect of each share of Common Stock (the "Common Equivalent Dividend Amount"), and (ii) no cash dividend or other cash distribution shall be declared and paid or made in respect of Common Stock unless the Board or any duly authorized committee of the Board declares and pays to Holders of the Junior Preferred Stock, at the same time and on the same terms as holders of Common Stock, the Common Equivalent Dividend Amount per one-hundredth of a share of Junior Preferred Stock. Notwithstanding any provision in this Section III(a) to the contrary, Holders of the Junior Preferred Stock shall not be entitled to receive any dividend or other distribution in the form of cash or assets (other than shares of Common Stock) paid or made with respect to the Common Stock after the Issue Date (x) if the Record Date for determination of holders of Common Stock entitled to receive such dividend or distribution occurs prior to the Issue Date, or (y) with respect to shares of Junior Preferred Stock converted on or prior to such Record Date.

(b)     Each dividend or other distribution pursuant to Section III(a) above will be payable to Holders of record of Junior Preferred Stock as they appear in the records of the Corporation at the close of business on the Record Date for the corresponding dividend or distribution to the holders of shares of Common Stock.

(c)     To the extent the Corporation declares dividends on the Junior Preferred Stock and Common Stock but does not make full payment of such declared dividends, the Corporation will allocate the dividend payments on a pro rata basis among the holders of shares of Junior Preferred Stock and the holders of Common Stock so that the amount of dividends actually paid per share on the Junior Preferred Stock and Common Stock shall in all cases bear to each other the same ratio as the then Applicable Conversion Rate. The foregoing right shall not be cumulative and shall not in any way create any claim or right in favor of Holders in the event that dividends have not been declared or paid in respect of any prior calendar quarter.

(d)     Holders of Junior Preferred Stock shall not be entitled to any dividends, whether payable in cash, securities or other property, on the Junior Preferred Stock other than dividends (if any) declared and payable on Junior Preferred Stock as specified in this Section III and dividends of Common Stock or other securities of the Corporation pursuant to Section II(b).

5

(e)     Notwithstanding any provision in this Certificate of Designation to the contrary, Holders of Junior Preferred Stock shall not be entitled to receive any dividends with respect to any such shares converted into Common Stock, except to the extent that any such dividends have been declared by the Board or any duly authorized committee of the Board (and the Record Date for such dividend occurs) after the Issue Date and prior to the applicable Conversion Date of such shares.

## Section IV.     Voting

(a)     Shares of Junior Preferred Stock shall have no voting rights except as set forth in Section IV(b) or as otherwise required by Georgia law from time to time. In exercising the voting rights set forth in Section IV(b), each Holder shall be entitled to one vote for each share of Junior Preferred Stock held by such Holder.

(b)     So long as any shares of Junior Preferred Stock remain outstanding, unless a greater percentage shall then be required by law, the Corporation shall not, without the affirmative vote or written consent of the Holders (voting or consenting separately as one class) of at least a majority of the outstanding shares of Junior Preferred Stock, amend, alter or repeal or otherwise change (including in connection with any merger, consolidation or other similar transaction) any provision of the Articles of Incorporation, including this Certificate of Designation, if the amendment, authorization or repeal would significantly and adversely affect the rights or preferences of the Junior Preferred Stock. Notwithstanding the foregoing, except as otherwise required by law, the Corporation may, without the consent of any Holder, authorize, increase the authorized amount of, or issue shares of Senior Stock or Parity Stock, and in taking such actions, the Corporation shall not be deemed to have significantly adversely affected the existing terms of the Junior Preferred Stock.

## Section V.     Liquidation

(a)     In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, whether voluntary or involuntary, which occurs while any Junior Preferred Stock remains outstanding (each a "Liquidation Event"), Holders of shares of Junior Preferred Stock shall, subject to the prior rights of any holders of Senior Stock, be entitled to receive and be paid out of the assets of the Corporation available for distribution to its stockholders, for each such share (or fraction thereof), a liquidating distribution in an amount equal to that received by holders of the Common Stock for each share of Common Stock into which such share of Junior Preferred Stock (or fraction thereof) was convertible at the Applicable Conversion Rate immediately prior to such Liquidation Event.

(b)     If, in any distribution described in Section V(a) above, the assets of the Corporation or proceeds thereof are not sufficient to pay in full the amounts payable with respect to all outstanding shares of Junior Preferred Stock and the corresponding amounts payable with respect to the Common Stock or any other Parity Stock as to such distribution, Holders of Junior Preferred Stock and the holders of Common Stock or any other Parity Stock shall share ratably in any such distribution in proportion to the full respective distributions to which they are entitled.

(c)     For purposes of this Section V, neither the sale, conveyance, exchange or transfer (for cash, shares of stock, securities or other consideration) of all or substantially all of the property and assets of the Corporation (other than in connection with the voluntary or involuntary liquidation, winding up or dissolution of the Corporation) nor the merger,

consolidation or any other business combination transaction of the Corporation into or with any other corporation or Person shall be deemed to be a voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Corporation.

(d)     In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the Corporation shall, within ten (10) days after the date the Board approves such action, or at least twenty (20) days prior to any stockholder's meeting called to approve such action, if applicable, or within twenty (20) days after the commencement of any involuntary proceeding, whichever is earlier, give each Holder initial written notice of the proposed action. Such initial written notice shall describe the material terms and conditions of such proposed action.

## Section VI.     Adjustments for Change of Control

(a)     Upon the occurrence of a Change of Control (as defined herein) while any shares of Junior Preferred Stock remain outstanding, each share of Junior Preferred Stock (or fraction thereof) outstanding immediately prior to such Change of Control shall, without the consent of Holders, become convertible into the types and amounts of securities, cash, and other property that is or was receivable in such Change of Control by a holder of the number of shares of Common Stock into which such share of Junior Preferred Stock (or fraction thereof) was convertible immediately prior to such Change of Control (such securities, cash, and other property, the "Exchange Property"); provided, however, that if receipt of the Exchange Property would cause the Holder to the Holder to acquire control of a bank, as "control" is defined in Section 2(a)(2) of the Bank Holding Company Act of 1956, as amended, and the implementing regulations of the Board of Governors of the Federal Reserve System, require the Holder to file a Change in Bank Control Act notice or require the Holder to make any similar regulatory filing, proper provision shall be made for such Holder to receive shares of non-voting securities in lieu of any voting securities included in the Exchange Property, the terms of which non-voting securities shall be as nearly equivalent as practicable to those of the Junior Preferred Stock.

(b)     A "Change of Control" shall mean:

(i)     an acquisition of more than fifty percent (50%) of the equity securities of the Corporation (measured by vote or value) by means of merger or other form of corporate reorganization in which outstanding shares of the Corporation are exchanged for securities or other consideration issued, or caused to be issued, by the Acquiring Person (as defined below) or its Parent, Subsidiary or Affiliate (each as defined in Rule 12b-2 of the Exchange Act);

(ii)     a sale or other disposition of all or substantially all of the assets of the Corporation (on a consolidated basis) in a single transaction or series of related transactions;

(iii)     any tender offer, exchange offer, stock purchase or other transaction or event or series of related transactions or events by or involving the Corporation in which a single entity or group becomes the direct or indirect owner of more than fifty percent (50%) of the equity securities of the Corporation (measured by vote or value);

(iv)     a capital reorganization or reclassification of the Common Stock or other securities.

Notwithstanding anything contained herein to the contrary, a change in the state of incorporation of the Corporation shall not in and of itself constitute a Change of Control.

7

(c)     "Acquiring Person" means, in connection with any Change of Control any of the following, at the Holder's election, (i) the continuing or surviving Person of a consolidation or merger with the Corporation (if other than the Corporation), (ii) the transferee of all or substantially all of the properties or assets of the Corporation, (iii) the corporation consolidating with or merging into the Corporation in a consolidation or merger in connection with which the Common Stock is changed into or exchanged for stock or other securities of any other Person or cash or any other property, (iv) the entity or group acting in concert acquiring or possessing the power to cast the majority of the eligible votes at a meeting of the Corporation's stockholders at which directors are elected, or, (v) in the case of a capital reorganization or reclassification, the Corporation, or (vi) at the Holder's election, any Person that (x) controls the Acquiring Person directly or indirectly through one or more intermediaries, (y) is required to include the Acquiring Person in the consolidated financial statements contained in such Person's Annual Report on Form 10 K (if such Person is required to file such a report) or would be required to so include the Acquiring Person in such Person's consolidated financial statements if they were prepared in accordance with U.S. generally accepted accounting principles and (z) is not itself included in the consolidated financial statements of any other Person (other than its consolidated subsidiaries).

(d)     If holders of shares of Common Stock have the opportunity to elect the form of consideration to be received in a Change of Control, the Holders of Junior Preferred Stock shall be entitled to receive the same election.

(e)     The Corporation (or any successor) shall, within 20 days of the occurrence of any Change of Control or, if earlier, the date on which similar notice is given to holders of Common Stock, provide written notice to the Holders of such occurrence and of the type and amount of the cash, securities or other property that constitutes the Exchange Property.  Failure to deliver such notice shall not affect the operation of this Section VI.

### Section VII.   Reports as to Adjustments

Whenever the number of shares of Common Stock into which the shares of Junior Preferred Stock are convertible is adjusted as provided in Section II(b), the Corporation shall, as soon as is reasonable practicable, compute such adjustment and furnish to the Holders a certificate of the Corporation, setting forth the number of shares of Common Stock into which each share of Junior Preferred Stock (or fraction thereof) is convertible as a result of such adjustment, a brief statement of the facts requiring such adjustment, the computation thereof and when such adjustment will become effective.

### Section VIII. Transfer Restrictions

Shares of Junior Preferred Stock may not be transferred to any Person other than pursuant to a Permitted Transfer, and any attempt to transfer one or more shares of Junior Preferred Stock (or fraction thereof) to a Person other than pursuant to a Permitted Transfer shall be void and of no effect.

### Section IX.   Exclusion of Other Rights

Except as may otherwise be required by law, shares of Junior Preferred Stock shall not have any powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations, other than those specifically set forth herein (as this Certificate of

8

Designation may be amended from time to time) and in the Articles of Incorporation. The shares of Junior Preferred Stock shall have no preemptive or subscription rights.

### Section X.    Severability of Provisions

If any powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock set forth in this Certificate of Designation (as this Certificate of Designation may be amended from time to time) is invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock set forth in this Certificate of Designation (as so amended) which can be given effect without the invalid, unlawful or unenforceable powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock shall, nevertheless, remain in full force and effect, and no powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock herein set forth shall be deemed dependent upon any other such powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock unless so expressed herein.

### Section XI.    Rank

Notwithstanding anything set forth in the Articles of Incorporation or this Certificate of Designation to the contrary, the Board or any authorized committee of the Board, without the vote of Holders of the Junior Preferred Stock, may authorize and issue additional shares of stock ranking junior or senior to, or on parity with, the Junior Preferred Stock as to dividends and the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation or any other powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations.

### Section XII.   No Redemption

The Corporation may not, at any time, redeem the outstanding shares of the Junior Preferred Stock, except upon the unanimous consent of the Holders of all outstanding shares of Junior Preferred Stock.

### Section XIII.  Repurchases

Subject to the limitations imposed herein, the Corporation may purchase and sell shares of Junior Preferred Stock (or fraction thereof) from time to time to such extent, in such manner, and upon such terms as the Board or any duly authorized committee of the Board may determine.

### Section XIV.   No Sinking Fund

Shares of Junior Preferred Stock are not subject to the operation of a sinking fund or any similar provisions.

### Section XV.  Notices

All notices, requests and other communications to a Holder of Junior Preferred Stock shall be in writing (including facsimile transmission) and shall be given at the address of such Holder as shown on the books of the Corporation. A Holder of Junior Preferred Stock may waive any

notice required hereunder by a writing signed before or after the time required for notice or the action in question. Notice shall be deemed given on the earlier of the date received or three business days after the date such notice is mailed by first-class mail, postage prepaid.

# WARRANTS TO PURCHASE
# SHARES OF COMMON STOCK
# OF UNITED COMMUNITY BANKS, INC.

United Community Banks, Inc., a Georgia corporation (together with its successors, the "Company"), for value received, hereby certifies that Fletcher International, Ltd., a company domiciled in Bermuda (together with its successors, "Fletcher" and Fletcher or any Person to whom Fletcher sells, exchanges, transfers, assigns, gives, pledges, encumbers, hypothecates, alienates or distributes, whether directly or indirectly, this Certificate or any right or interest herein or with respect hereto, the "Holder"), is entitled to purchase from the Company up to the Warrant Amount (as defined below) of duly authorized, validly issued, fully paid and nonassessable shares of the Company's Common Stock Equivalent Junior Preferred Stock, par value $1.00 per share, (the "Common Stock Equivalent Junior Preferred Stock"), at the then-prevailing Warrant Price (as defined below) at any time or from time to time during the Warrant Term (as defined below), all subject to the terms, conditions and adjustments set forth below in this warrant certificate (this "Certificate") and in the Securities Purchase Agreement, dated as of April 1, 2010, between the Company and Fletcher (as it may be amended from time to time, the "Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

1. Warrants.

The warrants represented hereby (the "Warrants") have been issued pursuant to the Agreement, and are subject to the terms and conditions thereof. Unless otherwise defined herein, capitalized terms used herein shall have the meanings set forth in the Agreement. A copy of the Agreement may be obtained at no cost by the Holder upon written request to the Secretary of the Company at the principal executive offices of the Company.

1.1 General; Warrant Price; Warrant Term.

(a) The Warrants entitle the Holder to purchase newly-issued shares of Common Stock Equivalent Junior Preferred Stock in accordance with Section 1.5 hereof and Section 6 of the Agreement. The warrant amount shall (i) equal Fifteen Million Dollars ($15,000,000) on the date hereof, (ii) be increased by $0.15 for each $1.00 of assets purchased pursuant to the Asset Purchase and Sale Agreement (as defined in the Agreement) up to a total increase of Fifteen Million Dollars ($15,000,000) and (iii) be increased on a dollar for dollar basis by the aggregate dollar amount of the Series C convertible preferred stock, par value $1.00 per share, of the Company (the "Preferred Stock") purchased under the Agreement in excess of Thirty Million Dollars ($30,000,000). The first Thirty Million Dollars ($30,000,000) of the warrant amount shall be referred to herein as the "Initial Warrant Amount". The warrant amount in excess of the Initial Warrant Amount shall be referred to herein as the "Additional Warrant Amount". The Additional Warrant Amount, together with the Initial Warrant Amount, shall be referred to herein as the "Warrant Amount". The Warrant Amount shall be reduced by the aggregate Warrant Price deemed paid at each Warrant Closing (as defined below). The "Warrant Price" means a price per one-hundredth (1/100th) of a share of Common Stock Equivalent Junior

Preferred Stock as of each Warrant Closing Date equal to (i) Four Dollars and Twenty-Five Cents ($4.25) with respect to the Initial Warrant Amount and (ii) Six Dollars and Two Cents ($6.02) with respect to the Additional Warrant Amount, in each case subject to adjustment as set forth herein and in the Agreement.

(b) The Warrants may be exercised (in whole or in part) at any time or from time to time during the Warrant Term. The "Warrant Term" shall mean the period beginning on the date hereof and ending at 11:59 p.m. New York City time on the ninth (9th) anniversary of the Stockholder Consent Date (as defined in the Agreement).

1.2 Manner of Exercise.

(a) The Warrants may be exercised by the Holder, in whole or in part, from time to time, on any day during the Warrant Term, by delivery of a notice in substantially the form attached to this Certificate (or a reasonable facsimile thereof) duly executed by the Holder (a "Warrant Exercise Notice").

(b) The Warrant Exercise Notice shall designate the aggregate Warrant Amount to be exercised, the Warrant Price and the number of shares of Common Stock Equivalent Junior Preferred Stock to be received upon such exercise. The closing of each exercise (each a "Warrant Closing") shall take place (i) on the third (3rd) Business Day after and excluding the date of the Warrant Exercise Notice or (ii) on any other date upon which the exercising Holder and the Company mutually agree (the "Warrant Closing Date").

1.3 Conditions to Closing.

(a) Conditions Precedent to Holder's Obligation to Close. It shall be a condition to each Holder's obligation to close on each Warrant Closing Date that each of the conditions set forth in Section 12 of the Agreement is satisfied, unless waived by such Holder (which waiver may be made or not made in Holder's sole discretion, and any waiver shall apply solely to the Warrant Closing or Warrant Closings specified by such Holder and shall not obligate such Holder to make or not make any subsequent waiver).

(b) Conditions Precedent to Company's Obligation to Close. The obligations of the Company hereunder are subject to the performance by the Holder of its obligations hereunder and to the satisfaction (unless expressly waived in writing by the Company) of the additional conditions set forth in Section 13 of the Agreement.

(c) Agreement to Cause Conditions to be Satisfied. The Company with respect to Section 1.3(a) hereof and the Holder with respect to Section 1.3(b) hereof shall each use commercially reasonable efforts to cause each of the foregoing conditions to be satisfied at the earliest possible date.

(d) Withdrawal of Notice. If the conditions set forth in Section 1.3(a) hereof are not satisfied or waived prior to the second (2nd) Business Day following and excluding the date of the Warrant Exercise Notice (except for those conditions which by their terms can be satisfied

2

only on the Warrant Closing Date) or if the Company fails to perform its obligations on any Warrant Closing Date (including but not limited to delivery of all shares of Common Stock Equivalent Junior Preferred Stock issuable on such date) for any reason other than the Holder's failure to satisfy the conditions required by Section 1.3(b) hereof, then in addition to all remedies available to the Holder at law or in equity, such Holder may, at its sole option, and at any time, withdraw the Warrant Exercise Notice by written notice to the Company regardless of whether such condition has been satisfied or waived as of the withdrawal date and, after such withdrawal, shall have no further obligations with respect to such Warrant Exercise Notice and may submit a Warrant Exercise Notice on any future date with respect to such Warrants and the Warrant Price for the amount of such subsequent Warrant Exercise Notice equal to or less than the previously withdrawn Warrant Exercise Notice shall be the lesser of (i) the Warrant Price in the withdrawn Warrant Exercise Notice and (ii) the Warrant Price in effect as of the subsequent Warrant Exercise Notice Date.

1.4     When Exercise Effective.

Each exercise of any Warrant shall be deemed to have been effected on the Warrant Closing Date upon the deemed receipt of the relevant Warrant Price and the Person (as defined in the Agreement) or Persons in whose name or names any certificate or certificates representing the Common Stock Equivalent Junior Preferred Stock shall be issuable upon such exercise as provided in Section 1.5 hereof shall be deemed to have become the holder(s) of record thereof.

1.5     Delivery of Common Stock and Payment.

(a)     Subject to Section 1.3 hereof and Section 6 of the Agreement, on a Warrant Closing Date, the Company shall deliver an amount of duly authorized, validly issued, fully paid and non-assessable shares of Common Stock Equivalent Junior Preferred Stock (the "Settlement Stock") equal to "X" where:

$$X = [(N \times D) - (N \times P)] / P$$

$N$ = the number of one-hundredths (1/100ths) of a share of Common Stock Equivalent Junior Preferred Stock equal to the Warrant Amount to be exercised pursuant to such Warrant Exercise Notice divided by the Warrant Price with respect to such Warrant Exercise Notice

$D$ = Daily Market Price (as defined in the Agreement) on the third (3rd) Business Day before, and excluding, the date of the Warrant Exercise Notice

$P$ = Warrant Price with respect to such Warrant Exercise Notice

3

(b)     The Company shall issue and deliver the Settlement Stock pursuant to Section 1.7 hereof on the relevant Warrant Closing Date.  Upon receipt of the Settlement Stock on the Warrant Closing Date, (i) that amount of Warrants as specified for exercise in the Warrant Exercise Notice shall be deemed exercised and (ii) that amount of cash that would have been paid by the Holder on the relevant Warrant Closing Date if the Warrant Price specified in the Warrant Exercise Notice were paid in cash shall be deemed paid by the Holder and received by the Company.

(c)     In determining whether the limitations described in Section 6 of the Agreement have been reached, computation shall be made based on the number of shares of Settlement Stock actually issued on a Warrant Closing Date.

1.6     Adjustment to Warrant Price.  Notwithstanding anything herein to the contrary, if the Company at any time subdivides (by any stock split, stock dividend, recapitalization, reorganization, reclassification or otherwise) the shares of common stock, par value $1.00 per share, of the Company ("Common Stock") and/or Common Stock Equivalent Junior Preferred Stock into a greater number of shares, then, after the date of record for effecting each such subdivision, all measurements and references herein related to share prices (including the Warrant Price) for such securities will be proportionately decreased and all references to share numbers for such securities herein will be proportionately increased.

1.7     Delivery of Common Stock and Dividend Payment.

(a)     On the Warrant Closing Date, the Company at its expense (including payment by it of any applicable issue taxes) shall cause to be issued in the name of and delivered to the exercising Holder or as such Holder may direct, at the election of such Holder:

(i)     via the Depository Trust Company's Deposit and Withdrawal at Custodian (or DWAC) system the number of duly authorized, validly issued, fully paid and non-assessable shares of Common Stock Equivalent Junior Preferred Stock to which such Holder shall be entitled upon such exercise plus, in lieu of any fractional share, other than fractional shares in increments of one hundredth (1/100th) of a share, of Common Stock Equivalent Junior Preferred Stock to which such Holder would otherwise be entitled, cash in an amount equal to the same fraction of the Daily Market Price on the date of the Warrant Exercise Notice, and a certificate from the Company stating the new Warrant Amount reflecting a reduction in each of the dollar amounts in the definition of Warrant Amount, on a dollar-for-dollar basis, for each dollar deemed paid; and

(ii)     dividends or other distributions declared on the Common Stock and Common Stock Equivalent Junior Preferred Stock in an amount equal to the product of (x) the aggregate amount of all per-share dividends or distributions other than the Ordinary Cash Dividends paid on the Common Stock and Common Stock Equivalent Junior Preferred Stock multiplied by (y) the gross number of one-hundredths (1/100th) of a share of Common Stock Junior Equivalent Junior

4

Preferred Stock that would have been issuable on the relevant Warrant Closing Date if payment of the Warrant Price specified in the Warrant Exercise Notice were paid in cash (the "<u>Dividend Payment</u>"). To the extent that the Dividend Payment consists of cash, the Company may pay such amount (a) by wire transfer of immediately available funds to such Holder or (b) if the Daily Market Price on the date the relevant Investment Notice is delivered is greater than the Warrant Price, by delivering a number of shares of Common Stock Equivalent Junior Preferred Stock equal to the cash portion of the Dividend Payment divided by the Warrant Price. To the extent that the Dividend Payment consists of securities or other non-cash property, the Company shall deliver such securities or other non-cash property to such Holder; <u>provided</u> that if such securities or other non-cash property would have a reduced value if delivery is so delayed (for example only and not by way of limitation, a short-term right to purchase securities), then proper provision shall be made to deliver to Holder the sum of (i) the fair value of such securities or other non-cash property measured as of the distribution date and (ii) the appreciation, if any, in value of such securities through the date of delivery. For example only and not by way of limitation, if the Company distributes a short-term right to purchase securities to other equity holders, it shall deliver to Holder the value Holder would have received had Holder exercised such right plus the appreciation, if any, had Holder held the purchased securities through the date on which such fair value is delivered to Holder. In the event that Holder and the Company mutually agree that it would be impractical for the Company to distribute identical securities or other non-cash property to Holder, then Holder and the Company shall work together in good faith to determine a fair and equivalently valued substitute therefor. "<u>Ordinary Cash Dividend</u>" means all quarterly cash dividends out of capital surplus or restated earnings legally available therefore (determined in accordance with generally accepted accounting principles, consistently applied), in an amount and frequency consistent with past practice.

1.8     Extension of Warrant Term.

The Warrant Term shall be extended by one (1) Business Day for each Business Day: (i) that the Registration Statement (as defined in the Agreement) is not effective and available for the issuance of any Preferred Stock and Warrants for a period of more than ninety (90) days in the aggregate, whether continuous or non-continuous; or (ii) at any time after the One Year Anniversary Date (as defined in the Agreement) but before the date this is sixty (60) days before the expiration of the Investment Period (as defined in the Agreement), occurring during the period (x) commencing on the earlier of the day on which the Company restates or announces its intention to restate any portion of the Company Financial Statements, and (y) ending on the date on which the Company files quarterly or annual financial statements that constitute a Restatement (as defined in the Agreement) on a Form 10-K, Form 10-Q, Form 8-K or any other filing with the SEC (and if the Company makes multiple filings of a Restatement with the SEC, the last of such dates) (the "<u>Restatement Filing Date</u>"). If (i) the Company restates or announces its intention to restate any portion of the Company Financial Statements (as defined

5

in the Agreement) less than sixty (60) days before the expiration of the Warrant Term, (ii) the Company has restated or announced its intention to restate any portion of the Company Financial Statements and the Restatement Filing Date is not at least sixty (60) days before the expiration of the Warrant Term, or (iii) there is any Registration Failure (as defined in the Agreement) during the sixty (60) days immediately preceding the expiration of the Warrant Term, the Warrant Term shall be extended to a date that is at least sixty (60) days after the later of the Restatement Filing Date or the remediation of the failure described in clause (iii) of this Section 1.8.

2.      Reservation of Shares.

For so long as the Warrant Amount represented hereby has not been exercised in full, the Company shall at all times prior to the end of the Warrant Term reserve and keep available, free from pre-emptive rights, out of its authorized but unissued capital stock, the number of shares Common Stock Equivalent Junior Preferred Stock deliverable upon exercise of this Certificate and, after the Company has obtained the approval of the Company stockholders to increase the authorized number of shares of Common Stock, the number of shares Common Stock deliverable upon conversion of such shares of Common Stock Equivalent Junior Preferred Stock. In the event the number of shares of Common Stock, Common Stock Equivalent Junior Preferred Stock or other securities issued and issuable under this Certificate, the Agreement, the Certificate of Rights and Preferences of the Series C Convertible Preferred Stock and Certificate of Designation of Common Stock Equivalent Junior Preferred Stock of the Company exceeds the authorized number of shares of Common Stock, Common Stock Equivalent Junior Preferred Stock or other securities, the Company shall promptly take all actions necessary to increase the authorized number of shares of Common Stock, Common Stock Equivalent Junior Preferred Stock or other securities.

3.      Report as to Adjustments.

In each case of any adjustment or readjustment of the Warrant Amount, the Warrant Term, the Warrant Price or any other adjustment or readjustment pursuant to the terms of the Agreement or this Certificate, or upon the written request at any time of any Holder, the Company at its expense will promptly compute such adjustment or readjustment (the "Company Calculation") in accordance with the terms of this Certificate and the Agreement and cause the Company's Chief Financial Officer to verify such computation and prepare a report setting forth such adjustment or readjustment and showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment or readjustment is based, including a statement of (i) the Warrant Amount, (ii) the Warrant Term and (iii) the Warrant Price in effect immediately prior to such adjustment or readjustment (as adjusted and readjusted, as applicable). The Company will forthwith deliver a copy of each such report to each Holder and will also keep copies of all such reports at its principal office and will cause the same to be available for inspection at such office during normal business hours by any Holder. The Holder may dispute the Company Calculation by providing its computation of such adjustment or readjustment (the "Holder Calculation") and requesting in writing that the Company's independent certified public accountants verify the Company Calculation. The Holder shall be responsible for the costs and expenses of such accountants if the difference between the computation of the adjustment or

6

readjustment by such accountants (the "Accountant Calculation") and the Holder Calculation is greater than the difference between the Accountant Calculation and the Company Calculation, and otherwise the Company shall bear such costs and expenses.

4.    Taxes.

The Company shall pay all documentary stamp taxes (if any) attributable to the issuance of Common Stock Equivalent Junior Preferred Stock upon each exercise of the Warrants by the Holder; provided, however, that the Company shall not be required to pay any tax or taxes which may be payable in respect of any transfer involved in the registration of any certificates for Common Stock Equivalent Junior Preferred Stock in a name other than that of a Holder upon each exercise of Warrants, and the Company shall not be required to issue or deliver a Certificate evidencing Warrants or certificates for Common Stock Equivalent Junior Preferred Stock unless or until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the reasonable satisfaction of the Company that such tax has been paid.

5.    Change of Control.

    5.1    Change of Control Notice.

The Company shall deliver to the Holder written notice (the "Change of Control Notice") of any proposed Change of Control (which notice shall specify the expected effective date of such Change of Control) promptly following public disclosure of such proposed Change of Control and in any event not later than fifteen (15) Business Days prior to the expected effective date of the proposed Change of Control. The Company shall not enter into an agreement with any Acquiring Person that may result in a Change of Control unless such agreement expressly requires the Acquiring Person to comply with the provisions of this Warrant. Upon the mutual written agreement of the Holder and the Company, on or before the consummation of such Change of Control, the Company shall pay to the Holder an amount of cash equal to the fair market value of the Warrant immediately prior to the Change of Control, to be determined by a qualified valuation firm selected by the Holder and reasonably acceptable to the Company, by such method as the Holder and the Company may reasonably agree. For the avoidance of doubt, in the event that the Holder and the Company agree to have the Company pay the fair market value of the Warrant as determined above, the Warrant will be redeemed upon the Company making such payment and no additional payment from the Company or the Holder shall be required in connection with such redemption. In the event that the Holder and the Company do not agree to have the Company pay the fair market value of the Warrant as determined above, the Holder thereof shall, following the occurrence of a Change of Control, automatically have equivalent rights under this Certificate with respect to the Acquiring Person from and after the effective date of the Change of Control, regardless of whether the Acquiring Person expressly assumes the Company's obligations and (i) all references to the Company in this Certificate shall be references to the Acquiring Person, (ii) all references to Common Stock and Common Stock Equivalent Junior Preferred Stock in this Certificate shall be references to the securities for which the Common Stock and Common Stock Equivalent Junior Preferred

7

Stock are exchanged in the Change of Control (or if none, the most widely-held class of voting securities of the Acquiring Person), and (iii) if the Acquiring Person is an entity other than the Company, all references to the Warrant Price in this Certificate shall be references to the Stock Adjustment Measuring Price (as defined below).

5.2     Contingent Warrant Exercise.

Between the date a proposed Change of Control is publicly disclosed or Change of Control Notice is delivered (or an event shall have occurred that would, with or without the passage of time, require the delivery of a Change of Control Notice) and the effective date of the Change of Control, each Holder at its sole option shall continue to have the right to submit to the Company a Warrant Exercise Notice in accordance with the terms and conditions hereof. In addition, each Holder at its sole option may elect to submit to the Company a special notice (a "Contingent Warrant Exercise Notice") to exercise all or part of its unexercised Warrants (including any Warrants issued in connection with a Contingent Investment Notice (as defined in the Agreement) under the Agreement) in connection with such Change of Control; in which case, notwithstanding the provisions of Section 1.4 hereof:

(a)     the effectiveness of such contingent exercise shall be conditional upon the effectiveness of the Change of Control;

(b)     such Holder shall have the right to deliver a notice to withdraw such Contingent Warrant Exercise Notice until the effective date of such Change of Control;

(c)     all references to Nasdaq in this Certificate shall be references to the principal U.S. trading market (or if the securities of the Acquiring Person are traded on a non-U.S. trading market, at the Holder's election, the principal U.S. or foreign trading market) for the securities for which the Common Stock and Common Stock Equivalent Junior Preferred Stock are exchanged in the Change of Control (or if none, the most widely held class of voting securities of the Acquiring Person), and

(d)     if such Contingent Warrant Exercise Notice shall not have been withdrawn, then on the effective date of such Change of Control, the Holder of such Warrants shall receive the same consideration, in the form of cash, securities or other assets (the "Acquisition Consideration") per share of Common Stock Equivalent Junior Preferred Stock issuable to any other holder of shares of Common Stock in connection with such Change of Control based upon the number of shares of Common Stock Equivalent Junior Preferred Stock into which such Holder's Warrants would be exercisable if such Holder had exercised such Warrants on the Business Day immediately preceding the date on which such Change of Control occurs. Upon the effective date of such Change of Control, such Holder's Warrants tendered for exercise pursuant to a Warrant Exercise Notice or Contingent Warrant Exercise Notice shall be fully exercised and shall no longer permit such Holder to exercise such Warrants into Common Stock Equivalent Junior Preferred Stock.

5.3     Definitions.

8

(a) "<u>Acquiring Person</u>" has the meaning set forth in the Agreement.

(b) "<u>Change of Control</u>" has the meaning set forth in the Agreement.

(c) "<u>Stock Adjustment Measuring Price</u>" means each of (i) the Warrant Price applicable to the Initial Warrant Amount and (ii) the Warrant Price applicable to the Additional Warrant Amount shall be adjusted by multiplying such prices in effect immediately preceding and excluding the date on which the Change of Control is consummated by a fraction,

(i) the numerator of which is the Daily Market Price of the securities for which Common Stock is exchanged in the Change of Control (or if none, the most widely-held class of voting securities of the Acquiring Person) determined as of the Business Day immediately preceding and excluding the date on which the Change of Control is consummated; and

(ii) the denominator of which is the Daily Market Price of the Common Stock of the Company determined as of the Business Day immediately preceding and excluding the date on which the Change of Control is consummated.

6. <u>Non-Circumvention.</u>

The Company hereby covenants and agrees that the Company will not, by amendment of its articles of incorporation, bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, and will at all times in good faith carry out all the provisions of this Warrant and take all action as may be required to protect the rights of the Holder. Without limiting the generality of the foregoing, the Company (i) shall not increase the par value of any shares of Common Stock Equivalent Junior Preferred Stock receivable upon the exercise of this Warrant above the Warrant Price then in effect, (ii) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock Equivalent Junior Preferred Stock upon the exercise of this Warrant, and (iii) shall, so long as the Warrants represented by this Certificate are outstanding, take all action necessary to reserve and keep available out of its authorized and unissued shares of Common Stock Equivalent Junior Preferred Stock, solely for the purpose of effecting the exercise of the Warrants represented by this Certificate, one hundred percent (100%) of the number of shares of Common Stock Equivalent Junior Preferred Stock issuable upon exercise of the Warrants represented by this Certificate then outstanding (without regard to any limitations on exercise).

7. <u>Lost or Stolen Certificate.</u>

In case this Certificate shall be mutilated, lost, stolen or destroyed, the Company may in its discretion issue in exchange and substitution for and upon cancellation of the mutilated Certificate, or in lieu of and substitution for the Certificate lost, stolen or destroyed, a new

9

Certificate of like tenor, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction of such Certificate. Applicants for a substitute Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company may prescribe.

8.     Transfer Agent.

The Company (and any successor) shall serve as agent for the Warrant under this Warrant and shall at all times maintain a register of the holders of the Warrant.

9.     Notices.

(a)    All notices and other communications under this Certificate shall be in writing and shall be delivered by either a nationally recognized overnight courier, postage prepaid, or transmitted by facsimile, in each case to the addresses as provided below:

(i)    If to the Company:

United Community Banks, Inc.
125 Highway 515 East
Blairsville, Georgia 30512
Attention:     Rex S. Schuette
Telephone:    (706) 745-2265
Facsimile:     (706) 745-9046

(ii)    If to a Holder, at the address of such Holder as listed in the Stock Register, or to such other address as the Holder shall have designated by notice similarly given to the Transfer Agent.

(b)    Any such notice or communication shall be deemed received (i) when made, if by hand delivery, and upon confirmation of receipt, if made by facsimile and in each case if such notice is received on or before 11:59 p.m. New York City time, otherwise, such notice shall be deemed to be received the following Business Day, (ii) one (1) Business Day after being deposited with a next-day courier, return receipt requested, postage prepaid or (iii) three (3) Business Days after being sent by certified or registered mail, return receipt requested, postage prepaid, in each case addressed as above (or to such other addresses as the Company or a Holder may designate in writing from time to time).

(c)    If the Company does not agree and acknowledge the delivery of any Warrant Exercise Notice under this Certificate, in each case by 11:59 p.m., New York City time, on the Business Day following the date of delivery of such notice, such non-response by the Company shall be deemed to be agreement and acknowledgment by the Company with the terms of such notice.

10

10.    Construction.

   For purposes of this Certificate, except as otherwise expressly provided or unless the context otherwise requires: (a) the terms defined in this Certificate have the meanings assigned to them in this Certificate and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender and neuter gender of such term; (b) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with U.S. generally accepted accounting principles; (c) references herein to "Articles", "Sections", "Subsections", "Paragraphs" and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Certificate, unless the context shall otherwise require; (d) a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions; (e) the words "herein", "hereunder" and other words of similar import refer to this Certificate as a whole and not to any particular provision; (f) the term "include" or "including" shall mean without limitation; (g) the table of contents to this Certificate and all section titles or captions contained in this Certificate or in any Exhibit or Schedule hereto or referred to herein are for convenience only and shall not be deemed a part of this Certificate and shall not affect the meaning or interpretation of this Certificate; (h) any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as amended, modified or supplemented from time to time, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein; and (i) references to a Person are also to its permitted successors and assigns and, in the case of an individual, to his or her heirs and estate, as applicable.

11.    Severability of Provisions.

   If any right, preference, or limitation of the Warrants set forth in this Certificate (as such Certificate may be amended from time to time) is invalid, unlawful, or incapable of being enforced by reason of any rule of law or public policy, all other rights, preferences, and limitations set forth in this Certificate (as so amended) which can be given effect without the invalid, unlawful or unenforceable right, preference, or limitation will, nevertheless, remain in full force and effect, and no right, preference, or limitation set forth in this Certificate shall be deemed dependent upon any other such right, preference, or limitation unless so expressed in this Certificate.

12.    Specific Performance.

   The Holder and the Company stipulate that the remedies at law of the parties hereto in the event of any default or threatened default by either party in the performance of or compliance with any of the terms hereof are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

11

13.    Nonperformance.

If the Company, at any time, shall fail to deliver the shares of Common Stock Equivalent Junior Preferred Stock required to be delivered to the Holder pursuant hereto for any reason other than the failure of any condition precedent to the Company's obligations hereunder or the failure by the Holder to comply with its obligations hereunder, then the Company shall (without limitation to the Holder's other remedies at law or in equity): (i) indemnify and hold the Holder harmless against any loss, claim or damage arising from or as a result of such failure by the Company (regardless of whether any of the foregoing results from a third-party claim or otherwise) and (ii) reimburse the Holder for all of its reasonable out-of-pocket expenses (which includes fees and expenses of its counsel) incurred by the Holder in connection herewith and the transactions contemplated herein (regardless of whether any of the foregoing results from a third-party claim or otherwise).

14.    Assignment.

The Holder may, in its sole discretion, freely assign, pledge, hypothecate or transfer all Warrants.

This Certificate shall not be valid unless signed by the Company.

*[Remainder of Page Left Blank Intentionally]*

IN WITNESS WHEREOF, United Community Banks, Inc. has caused this Warrant to be signed by its duly authorized officer.

Dated: April 5, 2010

UNITED COMMUNITY BANKS, INC.

By: _____
Name: Jimmy C. Tallent
Title: CEO & President

ATTEST:

Lori McKay
Secretary

**Exhibit 1**

## FORM OF WARRANT EXERCISE NOTICE

(To Be Executed Upon Exercise Of Warrants)

[DATE]

United Community Banks, Inc.
[●]
Attention:     [     ]
Telephone:    [     ]
Facsimile:     [     ]

Re:     Exercise of Warrants

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher") and the warrant certificate issued pursuant thereto (the "Certificate"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Agreement and the Certificate.

The undersigned is the registered Holder of a warrant certificate evidencing the above-referenced warrants (the "Warrants") issued by the Company and hereby elects to exercise a Warrant Amount of [●] at a Warrant Price of $[●] into [●] shares of Common Stock Equivalent Junior Preferred Stock (the "Settlement Stock"). Pursuant to the Warrants, delivery of the Warrants shall be the sole consideration deliverable to the Company in connection with such exercise. Subject to the terms and conditions of the Agreement and the Certificate, on the Warrant Closing Date the Company shall deliver the Settlement Stock to the Holder via The Depository Deposit/Withdrawal at Custodian (DWAC) system using the following account information:

Broker:
DTC#:
Account Name:
Account Number:

[FLETCHER INTERNATIONAL, LTD., by its duly
authorized investment advisor, FLETCHER ASSET
MANAGEMENT, INC.]

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

AGREED AND ACKNOWLEDGED:
UNITED COMMUNITY BANKS, INC.

By:_____
    Name:
    Title:

**Exhibit 2**

## FORM OF WARRANT DELIVERY NOTICE

[DATE]

[Fletcher International, Ltd.]
[c/o Fletcher Asset Management, Inc.]
[48 Wall Street]
[New York, NY 10005]
[Attn: Peter Zayfert]
[Facsimile:    (212) 284-4801]

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher") and the warrant certificate issued pursuant thereto (the "Certificate"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Agreement and the Certificate.

This notice confirms that Warrants have been exercised by [Fletcher] to exercise a Warrant Amount of [●] at a Warrant Price of $[●], requiring delivery by the Company to [Fletcher] of [●] shares of Common Stock Equivalent Junior Preferred Stock.

After delivery of such shares, the Warrant shall remain exercisable for a number of shares of Common Stock Equivalent Junior Preferred Stock equal to a Warrant Amount of $[●]$^1$ divided by the Warrant Price then in effect.

UNITED COMMUNITY BANKS, INC.

By: _____
Name:
Title:

---

[1]    Insert Warrant Amount equal to the Warrant Amount immediately prior to such exercise reduced by the aggregate purchase price of the shares in the preceding paragraph.

ACKNOWLEDGMENT OF INCREASE IN WARRANT AMOUNT

Reference is made to the Warrant to Purchase Shares of Common Stock of United Community Banks, Inc. (the "Warrant"), dated as of April 5, 2010, issued by United Community Banks, Inc., a Georgia corporation (the "Company"), to Fletcher International, Ltd., a company domiciled in Bermuda ("Holder"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Warrant.

The Company hereby acknowledges that on the date hereof affiliates of the Holder purchased $103,089,000 worth of assets pursuant to the Asset Purchase and Sale Agreement and agrees and acknowledges that as of the date hereof the warrant amount shall be increased by Fifteen Million Dollars ($15,000,000) to a total of Thirty Million Dollars ($30,000,000) pursuant to Section 1.1(a)(ii) of the Warrant.

IN WITNESS WHEREOF, the Company has caused this acknowledgement to be duly executed as of April 30, 2010.

UNITED COMMUNITY BANKS, INC.

By: _____
 Name: Rex S. Schuette
 Title: Executive Vice President & CFO

Exhibit 2

# WARRANTS TO PURCHASE
# SHARES OF COMMON STOCK
# OF UNITED COMMUNITY BANKS, INC.

United Community Banks, Inc., a Georgia corporation (together with its successors, the "Company"), for value received, hereby certifies that Fletcher International, Ltd., a company domiciled in Bermuda (together with its successors, "Fletcher" and Fletcher or any Person to whom Fletcher sells, exchanges, transfers, assigns, gives, pledges, encumbers, hypothecates, alienates or distributes, whether directly or indirectly, this Certificate or any right or interest herein or with respect hereto, the "Holder"), is entitled to purchase from the Company up to the Warrant Amount (as defined below) of duly authorized, validly issued, fully paid and nonassessable shares of the Company's Common Stock Equivalent Junior Preferred Stock, par value $1.00 per share, (the "Common Stock Equivalent Junior Preferred Stock"), at the then-prevailing Warrant Price (as defined below) at any time or from time to time during the Warrant Term (as defined below), all subject to the terms, conditions and adjustments set forth below in this warrant certificate (this "Certificate") and in the Securities Purchase Agreement, dated as of April 1, 2010, between the Company and Fletcher (as it may be amended from time to time, the "Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

1. Warrants.

The warrants represented hereby (the "Warrants") have been issued pursuant to the Agreement, and are subject to the terms and conditions thereof. Unless otherwise defined herein, capitalized terms used herein shall have the meanings set forth in the Agreement. A copy of the Agreement may be obtained at no cost by the Holder upon written request to the Secretary of the Company at the principal executive offices of the Company.

1.1 General; Warrant Price; Warrant Term.

(a) The Warrants entitle the Holder to purchase newly-issued shares of Common Stock Equivalent Junior Preferred Stock in accordance with Section 1.5 hereof and Section 6 of the Agreement. The warrant amount shall (i) equal Fifteen Million Dollars ($15,000,000) on the date hereof, (ii) be increased by $0.15 for each $1.00 of assets purchased pursuant to the Asset Purchase and Sale Agreement (as defined in the Agreement) up to a total increase of Fifteen Million Dollars ($15,000,000) and (iii) be increased on a dollar for dollar basis by the aggregate dollar amount of the Series C convertible preferred stock, par value $1.00 per share, of the Company (the "Preferred Stock") purchased under the Agreement in excess of Thirty Million Dollars ($30,000,000). The first Thirty Million Dollars ($30,000,000) of the warrant amount shall be referred to herein as the "Initial Warrant Amount". The warrant amount in excess of the Initial Warrant Amount shall be referred to herein as the "Additional Warrant Amount". The Additional Warrant Amount, together with the Initial Warrant Amount, shall be referred to herein as the "Warrant Amount". The Warrant Amount shall be reduced by the aggregate Warrant Price deemed paid at each Warrant Closing (as defined below). The "Warrant Price" means a price per one-hundredth (1/100th) of a share of Common Stock Equivalent Junior

Preferred Stock as of each Warrant Closing Date equal to (i) Four Dollars and Twenty-Five Cents ($4.25) with respect to the Initial Warrant Amount and (ii) Six Dollars and Two Cents ($6.02) with respect to the Additional Warrant Amount, in each case subject to adjustment as set forth herein and in the Agreement.

(b)     The Warrants may be exercised (in whole or in part) at any time or from time to time during the Warrant Term.  The "Warrant Term" shall mean the period beginning on the date hereof and ending at 11:59 p.m. New York City time on the ninth (9th) anniversary of the Stockholder Consent Date (as defined in the Agreement).

1.2     Manner of Exercise.

(a)     The Warrants may be exercised by the Holder, in whole or in part, from time to time, on any day during the Warrant Term, by delivery of a notice in substantially the form attached to this Certificate (or a reasonable facsimile thereof) duly executed by the Holder (a "Warrant Exercise Notice").

(b)     The Warrant Exercise Notice shall designate the aggregate Warrant Amount to be exercised, the Warrant Price and the number of shares of Common Stock Equivalent Junior Preferred Stock to be received upon such exercise.  The closing of each exercise (each a "Warrant Closing") shall take place (i) on the third (3rd) Business Day after and excluding the date of the Warrant Exercise Notice or (ii) on any other date upon which the exercising Holder and the Company mutually agree (the "Warrant Closing Date").

1.3     Conditions to Closing.

(a)     Conditions Precedent to Holder's Obligation to Close.  It shall be a condition to each Holder's obligation to close on each Warrant Closing Date that each of the conditions set forth in Section 12 of the Agreement is satisfied, unless waived by such Holder (which waiver may be made or not made in Holder's sole discretion, and any waiver shall apply solely to the Warrant Closing or Warrant Closings specified by such Holder and shall not obligate such Holder to make or not make any subsequent waiver).

(b)     Conditions Precedent to Company's Obligation to Close.  The obligations of the Company hereunder are subject to the performance by the Holder of its obligations hereunder and to the satisfaction (unless expressly waived in writing by the Company) of the additional conditions set forth in Section 13 of the Agreement.

(c)     Agreement to Cause Conditions to be Satisfied.  The Company with respect to Section 1.3(a) hereof and the Holder with respect to Section 1.3(b) hereof shall each use commercially reasonable efforts to cause each of the foregoing conditions to be satisfied at the earliest possible date.

(d)     Withdrawal of Notice.  If the conditions set forth in Section 1.3(a) hereof are not satisfied or waived prior to the second (2nd) Business Day following and excluding the date of the Warrant Exercise Notice (except for those conditions which by their terms can be satisfied

2

only on the Warrant Closing Date) or if the Company fails to perform its obligations on any Warrant Closing Date (including but not limited to delivery of all shares of Common Stock Equivalent Junior Preferred Stock issuable on such date) for any reason other than the Holder's failure to satisfy the conditions required by Section 1.3(b) hereof, then in addition to all remedies available to the Holder at law or in equity, such Holder may, at its sole option, and at any time, withdraw the Warrant Exercise Notice by written notice to the Company regardless of whether such condition has been satisfied or waived as of the withdrawal date and, after such withdrawal, shall have no further obligations with respect to such Warrant Exercise Notice and may submit a Warrant Exercise Notice on any future date with respect to such Warrants and the Warrant Price for the amount of such subsequent Warrant Exercise Notice equal to or less than the previously withdrawn Warrant Exercise Notice shall be the lesser of (i) the Warrant Price in the withdrawn Warrant Exercise Notice and (ii) the Warrant Price in effect as of the subsequent Warrant Exercise Notice Date.

1.4     When Exercise Effective.

Each exercise of any Warrant shall be deemed to have been effected on the Warrant Closing Date upon the deemed receipt of the relevant Warrant Price and the Person (as defined in the Agreement) or Persons in whose name or names any certificate or certificates representing the Common Stock Equivalent Junior Preferred Stock shall be issuable upon such exercise as provided in Section 1.5 hereof shall be deemed to have become the holder(s) of record thereof.

1.5     Delivery of Common Stock and Payment.

(a)     Subject to Section 1.3 hereof and Section 6 of the Agreement, on a Warrant Closing Date, the Company shall deliver an amount of duly authorized, validly issued, fully paid and non-assessable shares of Common Stock Equivalent Junior Preferred Stock (the "Settlement Stock") equal to "X" where:

$$X = [(N \times D) - (N \times P)] / P$$

N = the number of one-hundredths (1/100ths) of a share of Common Stock Equivalent Junior Preferred Stock equal to the Warrant Amount to be exercised pursuant to such Warrant Exercise Notice divided by the Warrant Price with respect to such Warrant Exercise Notice

D = Daily Market Price (as defined in the Agreement) on the third (3rd) Business Day before, and excluding, the date of the Warrant Exercise Notice

P = Warrant Price with respect to such Warrant Exercise Notice

3

(b)     The Company shall issue and deliver the Settlement Stock pursuant to Section 1.7 hereof on the relevant Warrant Closing Date. Upon receipt of the Settlement Stock on the Warrant Closing Date, (i) that amount of Warrants as specified for exercise in the Warrant Exercise Notice shall be deemed exercised and (ii) that amount of cash that would have been paid by the Holder on the relevant Warrant Closing Date if the Warrant Price specified in the Warrant Exercise Notice were paid in cash shall be deemed paid by the Holder and received by the Company.

(c)     In determining whether the limitations described in Section 6 of the Agreement have been reached, computation shall be made based on the number of shares of Settlement Stock actually issued on a Warrant Closing Date.

1.6     <u>Adjustment to Warrant Price</u>.  Notwithstanding anything herein to the contrary, if the Company at any time subdivides (by any stock split, stock dividend, recapitalization, reorganization, reclassification or otherwise) the shares of common stock, par value $1.00 per share, of the Company ("<u>Common Stock</u>") and/or Common Stock Equivalent Junior Preferred Stock into a greater number of shares, then, after the date of record for effecting each such subdivision, all measurements and references herein related to share prices (including the Warrant Price) for such securities will be proportionately decreased and all references to share numbers for such securities herein will be proportionately increased.

1.7     <u>Delivery of Common Stock and Dividend Payment</u>.

(a)     On the Warrant Closing Date, the Company at its expense (including payment by it of any applicable issue taxes) shall cause to be issued in the name of and delivered to the exercising Holder or as such Holder may direct, at the election of such Holder:

(i)     via the Depository Trust Company's Deposit and Withdrawal at Custodian (or DWAC) system the number of duly authorized, validly issued, fully paid and non-assessable shares of Common Stock Equivalent Junior Preferred Stock to which such Holder shall be entitled upon such exercise plus, in lieu of any fractional share, other than fractional shares in increments of one hundredth (1/100th) of a share, of Common Stock Equivalent Junior Preferred Stock to which such Holder would otherwise be entitled, cash in an amount equal to the same fraction of the Daily Market Price on the date of the Warrant Exercise Notice, and a certificate from the Company stating the new Warrant Amount reflecting a reduction in each of the dollar amounts in the definition of Warrant Amount, on a dollar-for-dollar basis, for each dollar deemed paid; and

(ii)     dividends or other distributions declared on the Common Stock and Common Stock Equivalent Junior Preferred Stock in an amount equal to the product of (x) the aggregate amount of all per-share dividends or distributions other than the Ordinary Cash Dividends paid on the Common Stock and Common Stock Equivalent Junior Preferred Stock multiplied by (y) the gross number of one-hundredths (1/100th) of a share of Common Stock Junior Equivalent Junior

4

Preferred Stock that would have been issuable on the relevant Warrant Closing Date if payment of the Warrant Price specified in the Warrant Exercise Notice were paid in cash (the "Dividend Payment"). To the extent that the Dividend Payment consists of cash, the Company may pay such amount (a) by wire transfer of immediately available funds to such Holder or (b) if the Daily Market Price on the date the relevant Investment Notice is delivered is greater than the Warrant Price, by delivering a number of shares of Common Stock Equivalent Junior Preferred Stock equal to the cash portion of the Dividend Payment divided by the Warrant Price. To the extent that the Dividend Payment consists of securities or other non-cash property, the Company shall deliver such securities or other non-cash property to such Holder; provided that if such securities or other non-cash property would have a reduced value if delivery is so delayed (for example only and not by way of limitation, a short-term right to purchase securities), then proper provision shall be made to deliver to Holder the sum of (i) the fair value of such securities or other non-cash property measured as of the distribution date and (ii) the appreciation, if any, in value of such securities through the date of delivery. For example only and not by way of limitation, if the Company distributes a short-term right to purchase securities to other equity holders, it shall deliver to Holder the value Holder would have received had Holder exercised such right plus the appreciation, if any, had Holder held the purchased securities through the date on which such fair value is delivered to Holder. In the event that Holder and the Company mutually agree that it would be impractical for the Company to distribute identical securities or other non-cash property to Holder, then Holder and the Company shall work together in good faith to determine a fair and equivalently valued substitute therefor. "Ordinary Cash Dividend" means all quarterly cash dividends out of capital surplus or restated earnings legally available therefore (determined in accordance with generally accepted accounting principles, consistently applied), in an amount and frequency consistent with past practice.

1.8     Extension of Warrant Term.

The Warrant Term shall be extended by one (1) Business Day for each Business Day: (i) that the Registration Statement (as defined in the Agreement) is not effective and available for the issuance of any Preferred Stock and Warrants for a period of more than ninety (90) days in the aggregate, whether continuous or non-continuous; or (ii) at any time after the One Year Anniversary Date (as defined in the Agreement) but before the date this is sixty (60) days before the expiration of the Investment Period (as defined in the Agreement), occurring during the period (x) commencing on the earlier of the day on which the Company restates or announces its intention to restate any portion of the Company Financial Statements, and (y) ending on the date on which the Company files quarterly or annual financial statements that constitute a Restatement (as defined in the Agreement) on a Form 10-K, Form 10-Q, Form 8-K or any other filing with the SEC (and if the Company makes multiple filings of a Restatement with the SEC, the last of such dates) (the "Restatement Filing Date"). If (i) the Company restates or announces its intention to restate any portion of the Company Financial Statements (as defined

5

in the Agreement) less than sixty (60) days before the expiration of the Warrant Term, (ii) the Company has restated or announced its intention to restate any portion of the Company Financial Statements and the Restatement Filing Date is not at least sixty (60) days before the expiration of the Warrant Term, or (iii) there is any Registration Failure (as defined in the Agreement) during the sixty (60) days immediately preceding the expiration of the Warrant Term, the Warrant Term shall be extended to a date that is at least sixty (60) days after the later of the Restatement Filing Date or the remediation of the failure described in clause (iii) of this Section 1.8.

2.    Reservation of Shares.

For so long as the Warrant Amount represented hereby has not been exercised in full, the Company shall at all times prior to the end of the Warrant Term reserve and keep available, free from pre-emptive rights, out of its authorized but unissued capital stock, the number of shares Common Stock Equivalent Junior Preferred Stock deliverable upon exercise of this Certificate and, after the Company has obtained the approval of the Company stockholders to increase the authorized number of shares of Common Stock, the number of shares Common Stock deliverable upon conversion of such shares of Common Stock Equivalent Junior Preferred Stock. In the event the number of shares of Common Stock, Common Stock Equivalent Junior Preferred Stock or other securities issued and issuable under this Certificate, the Agreement, the Certificate of Rights and Preferences of the Series C Convertible Preferred Stock and Certificate of Designation of Common Stock Equivalent Junior Preferred Stock of the Company exceeds the authorized number of shares of Common Stock, Common Stock Equivalent Junior Preferred Stock or other securities, the Company shall promptly take all actions necessary to increase the authorized number of shares of Common Stock, Common Stock Equivalent Junior Preferred Stock or other securities.

3.    Report as to Adjustments.

In each case of any adjustment or readjustment of the Warrant Amount, the Warrant Term, the Warrant Price or any other adjustment or readjustment pursuant to the terms of the Agreement or this Certificate, or upon the written request at any time of any Holder, the Company at its expense will promptly compute such adjustment or readjustment (the "Company Calculation") in accordance with the terms of this Certificate and the Agreement and cause the Company's Chief Financial Officer to verify such computation and prepare a report setting forth such adjustment or readjustment and showing in reasonable detail the method of calculation thereof and the facts upon which such adjustment or readjustment is based, including a statement of (i) the Warrant Amount, (ii) the Warrant Term and (iii) the Warrant Price in effect immediately prior to such adjustment or readjustment (as adjusted and readjusted, as applicable). The Company will forthwith deliver a copy of each such report to each Holder and will also keep copies of all such reports at its principal office and will cause the same to be available for inspection at such office during normal business hours by any Holder. The Holder may dispute the Company Calculation by providing its computation of such adjustment or readjustment (the "Holder Calculation") and requesting in writing that the Company's independent certified public accountants verify the Company Calculation. The Holder shall be responsible for the costs and expenses of such accountants if the difference between the computation of the adjustment or

6

readjustment by such accountants (the "Accountant Calculation") and the Holder Calculation is greater than the difference between the Accountant Calculation and the Company Calculation, and otherwise the Company shall bear such costs and expenses.

4.    Taxes.

The Company shall pay all documentary stamp taxes (if any) attributable to the issuance of Common Stock Equivalent Junior Preferred Stock upon each exercise of the Warrants by the Holder; provided, however, that the Company shall not be required to pay any tax or taxes which may be payable in respect of any transfer involved in the registration of any certificates for Common Stock Equivalent Junior Preferred Stock in a name other than that of a Holder upon each exercise of Warrants, and the Company shall not be required to issue or deliver a Certificate evidencing Warrants or certificates for Common Stock Equivalent Junior Preferred Stock unless or until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the reasonable satisfaction of the Company that such tax has been paid.

5.    Change of Control.

    5.1    Change of Control Notice.

The Company shall deliver to the Holder written notice (the "Change of Control Notice") of any proposed Change of Control (which notice shall specify the expected effective date of such Change of Control) promptly following public disclosure of such proposed Change of Control and in any event not later than fifteen (15) Business Days prior to the expected effective date of the proposed Change of Control. The Company shall not enter into an agreement with any Acquiring Person that may result in a Change of Control unless such agreement expressly requires the Acquiring Person to comply with the provisions of this Warrant. Upon the mutual written agreement of the Holder and the Company, on or before the consummation of such Change of Control, the Company shall pay to the Holder an amount of cash equal to the fair market value of the Warrant immediately prior to the Change of Control, to be determined by a qualified valuation firm selected by the Holder and reasonably acceptable to the Company, by such method as the Holder and the Company may reasonably agree. For the avoidance of doubt, in the event that the Holder and the Company agree to have the Company pay the fair market value of the Warrant as determined above, the Warrant will be redeemed upon the Company making such payment and no additional payment from the Company or the Holder shall be required in connection with such redemption. In the event that the Holder and the Company do not agree to have the Company pay the fair market value of the Warrant as determined above, the Holder thereof shall, following the occurrence of a Change of Control, automatically have equivalent rights under this Certificate with respect to the Acquiring Person from and after the effective date of the Change of Control, regardless of whether the Acquiring Person expressly assumes the Company's obligations and (i) all references to the Company in this Certificate shall be references to the Acquiring Person, (ii) all references to Common Stock and Common Stock Equivalent Junior Preferred Stock in this Certificate shall be references to the securities for which the Common Stock and Common Stock Equivalent Junior Preferred

7

Stock are exchanged in the Change of Control (or if none, the most widely-held class of voting securities of the Acquiring Person), and (iii) if the Acquiring Person is an entity other than the Company, all references to the Warrant Price in this Certificate shall be references to the Stock Adjustment Measuring Price (as defined below).

5.2     Contingent Warrant Exercise.

Between the date a proposed Change of Control is publicly disclosed or Change of Control Notice is delivered (or an event shall have occurred that would, with or without the passage of time, require the delivery of a Change of Control Notice) and the effective date of the Change of Control, each Holder at its sole option shall continue to have the right to submit to the Company a Warrant Exercise Notice in accordance with the terms and conditions hereof. In addition, each Holder at its sole option may elect to submit to the Company a special notice (a "Contingent Warrant Exercise Notice") to exercise all or part of its unexercised Warrants (including any Warrants issued in connection with a Contingent Investment Notice (as defined in the Agreement) under the Agreement) in connection with such Change of Control; in which case, notwithstanding the provisions of Section 1.4 hereof:

(a)     the effectiveness of such contingent exercise shall be conditional upon the effectiveness of the Change of Control;

(b)     such Holder shall have the right to deliver a notice to withdraw such Contingent Warrant Exercise Notice until the effective date of such Change of Control;

(c)     all references to Nasdaq in this Certificate shall be references to the principal U.S. trading market (or if the securities of the Acquiring Person are traded on a non-U.S. trading market, at the Holder's election, the principal U.S. or foreign trading market) for the securities for which the Common Stock and Common Stock Equivalent Junior Preferred Stock are exchanged in the Change of Control (or if none, the most widely held class of voting securities of the Acquiring Person), and

(d)     if such Contingent Warrant Exercise Notice shall not have been withdrawn, then on the effective date of such Change of Control, the Holder of such Warrants shall receive the same consideration, in the form of cash, securities or other assets (the "Acquisition Consideration") per share of Common Stock Equivalent Junior Preferred Stock issuable to any other holder of shares of Common Stock in connection with such Change of Control based upon the number of shares of Common Stock Equivalent Junior Preferred Stock into which such Holder's Warrants would be exercisable if such Holder had exercised such Warrants on the Business Day immediately preceding the date on which such Change of Control occurs. Upon the effective date of such Change of Control, such Holder's Warrants tendered for exercise pursuant to a Warrant Exercise Notice or Contingent Warrant Exercise Notice shall be fully exercised and shall no longer permit such Holder to exercise such Warrants into Common Stock Equivalent Junior Preferred Stock.

5.3     Definitions.

(a) "Acquiring Person" has the meaning set forth in the Agreement.

(b) "Change of Control" has the meaning set forth in the Agreement.

(c) "Stock Adjustment Measuring Price" means each of (i) the Warrant Price applicable to the Initial Warrant Amount and (ii) the Warrant Price applicable to the Additional Warrant Amount shall be adjusted by multiplying such prices in effect immediately preceding and excluding the date on which the Change of Control is consummated by a fraction,

(i) the numerator of which is the Daily Market Price of the securities for which Common Stock is exchanged in the Change of Control (or if none, the most widely-held class of voting securities of the Acquiring Person) determined as of the Business Day immediately preceding and excluding the date on which the Change of Control is consummated; and

(ii) the denominator of which is the Daily Market Price of the Common Stock of the Company determined as of the Business Day immediately preceding and excluding the date on which the Change of Control is consummated.

6.     Non-Circumvention.

The Company hereby covenants and agrees that the Company will not, by amendment of its articles of incorporation, bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, and will at all times in good faith carry out all the provisions of this Warrant and take all action as may be required to protect the rights of the Holder. Without limiting the generality of the foregoing, the Company (i) shall not increase the par value of any shares of Common Stock Equivalent Junior Preferred Stock receivable upon the exercise of this Warrant above the Warrant Price then in effect, (ii) shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock Equivalent Junior Preferred Stock upon the exercise of this Warrant, and (iii) shall, so long as the Warrants represented by this Certificate are outstanding, take all action necessary to reserve and keep available out of its authorized and unissued shares of Common Stock Equivalent Junior Preferred Stock, solely for the purpose of effecting the exercise of the Warrants represented by this Certificate, one hundred percent (100%) of the number of shares of Common Stock Equivalent Junior Preferred Stock issuable upon exercise of the Warrants represented by this Certificate then outstanding (without regard to any limitations on exercise).

7.     Lost or Stolen Certificate.

In case this Certificate shall be mutilated, lost, stolen or destroyed, the Company may in its discretion issue in exchange and substitution for and upon cancellation of the mutilated Certificate, or in lieu of and substitution for the Certificate lost, stolen or destroyed, a new

9

Certificate of like tenor, but only upon receipt of evidence reasonably satisfactory to the Company of such loss, theft or destruction of such Certificate. Applicants for a substitute Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company may prescribe.

8.    Transfer Agent.

The Company (and any successor) shall serve as agent for the Warrant under this Warrant and shall at all times maintain a register of the holders of the Warrant.

9.    Notices.

(a)    All notices and other communications under this Certificate shall be in writing and shall be delivered by either a nationally recognized overnight courier, postage prepaid, or transmitted by facsimile, in each case to the addresses as provided below:

(i)    If to the Company:

United Community Banks, Inc.
125 Highway 515 East
Blairsville, Georgia 30512
Attention:    Rex S. Schuette
Telephone:    (706) 745-2265
Facsimile:    (706) 745-9046

(ii)    If to a Holder, at the address of such Holder as listed in the Stock Register, or to such other address as the Holder shall have designated by notice similarly given to the Transfer Agent.

(b)    Any such notice or communication shall be deemed received (i) when made, if by hand delivery, and upon confirmation of receipt, if made by facsimile and in each case if such notice is received on or before 11:59 p.m. New York City time, otherwise, such notice shall be deemed to be received the following Business Day, (ii) one (1) Business Day after being deposited with a next-day courier, return receipt requested, postage prepaid or (iii) three (3) Business Days after being sent by certified or registered mail, return receipt requested, postage prepaid, in each case addressed as above (or to such other addresses as the Company or a Holder may designate in writing from time to time).

(c)    If the Company does not agree and acknowledge the delivery of any Warrant Exercise Notice under this Certificate, in each case by 11:59 p.m., New York City time, on the Business Day following the date of delivery of such notice, such non-response by the Company shall be deemed to be agreement and acknowledgment by the Company with the terms of such notice.

10

10.  Construction.

For purposes of this Certificate, except as otherwise expressly provided or unless the context otherwise requires: (a) the terms defined in this Certificate have the meanings assigned to them in this Certificate and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender and neuter gender of such term; (b) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with U.S. generally accepted accounting principles; (c) references herein to "Articles", "Sections", "Subsections", "Paragraphs" and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Certificate, unless the context shall otherwise require; (d) a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions; (e) the words "herein", "hereunder" and other words of similar import refer to this Certificate as a whole and not to any particular provision; (f) the term "include" or "including" shall mean without limitation; (g) the table of contents to this Certificate and all section titles or captions contained in this Certificate or in any Exhibit or Schedule hereto or referred to herein are for convenience only and shall not be deemed a part of this Certificate and shall not affect the meaning or interpretation of this Certificate; (h) any agreement, instrument or statute defined or referred to herein means such agreement, instrument or statute as amended, modified or supplemented from time to time, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein; and (i) references to a Person are also to its permitted successors and assigns and, in the case of an individual, to his or her heirs and estate, as applicable.

11.  Severability of Provisions.

If any right, preference, or limitation of the Warrants set forth in this Certificate (as such Certificate may be amended from time to time) is invalid, unlawful, or incapable of being enforced by reason of any rule of law or public policy, all other rights, preferences, and limitations set forth in this Certificate (as so amended) which can be given effect without the invalid, unlawful or unenforceable right, preference, or limitation will, nevertheless, remain in full force and effect, and no right, preference, or limitation set forth in this Certificate shall be deemed dependent upon any other such right, preference, or limitation unless so expressed in this Certificate.

12.  Specific Performance.

The Holder and the Company stipulate that the remedies at law of the parties hereto in the event of any default or threatened default by either party in the performance of or compliance with any of the terms hereof are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

11

13. Nonperformance.

    If the Company, at any time, shall fail to deliver the shares of Common Stock Equivalent Junior Preferred Stock required to be delivered to the Holder pursuant hereto for any reason other than the failure of any condition precedent to the Company's obligations hereunder or the failure by the Holder to comply with its obligations hereunder, then the Company shall (without limitation to the Holder's other remedies at law or in equity): (i) indemnify and hold the Holder harmless against any loss, claim or damage arising from or as a result of such failure by the Company (regardless of whether any of the foregoing results from a third-party claim or otherwise) and (ii) reimburse the Holder for all of its reasonable out-of-pocket expenses (which includes fees and expenses of its counsel) incurred by the Holder in connection herewith and the transactions contemplated herein (regardless of whether any of the foregoing results from a third-party claim or otherwise).

14. Assignment.

    The Holder may, in its sole discretion, freely assign, pledge, hypothecate or transfer all Warrants.

This Certificate shall not be valid unless signed by the Company.

*[Remainder of Page Left Blank Intentionally]*

US2008 1122407.14

IN WITNESS WHEREOF, United Community Banks, Inc. has caused this Warrant to be signed by its duly authorized officer.

Dated: April 5, 2010

UNITED COMMUNITY BANKS, INC.

By: _____
Name: Jimmy C. Tallent
Title: CEO & President

ATTEST:

_____
Secretary

**Exhibit 1**

## FORM OF WARRANT EXERCISE NOTICE

(To Be Executed Upon Exercise Of Warrants)

[DATE]

United Community Banks, Inc.
[●]
Attention:    [\_\_\_\_]
Telephone:   [\_\_\_\_]
Facsimile:    [\_\_\_\_]

        Re:    Exercise of Warrants

Ladies and Gentlemen:

        Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher") and the warrant certificate issued pursuant thereto (the "Certificate"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Agreement and the Certificate.

        The undersigned is the registered Holder of a warrant certificate evidencing the above-referenced warrants (the "Warrants") issued by the Company and hereby elects to exercise a Warrant Amount of [●] at a Warrant Price of $[●] into [●] shares of Common Stock Equivalent Junior Preferred Stock (the "Settlement Stock"). Pursuant to the Warrants, delivery of the Warrants shall be the sole consideration deliverable to the Company in connection with such exercise. Subject to the terms and conditions of the Agreement and the Certificate, on the Warrant Closing Date the Company shall deliver the Settlement Stock to the Holder via The Depository Deposit/Withdrawal at Custodian (DWAC) system using the following account information:

        Broker:
        DTC#:
        Account Name:
        Account Number:

[FLETCHER INTERNATIONAL, LTD., by its duly authorized investment advisor, FLETCHER ASSET MANAGEMENT, INC.]

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


AGREED AND ACKNOWLEDGED:
UNITED COMMUNITY BANKS, INC.

By:_____
    Name:
    Title:

**Exhibit 2**

## FORM OF WARRANT DELIVERY NOTICE

[DATE]

[Fletcher International, Ltd.]
[c/o Fletcher Asset Management, Inc.]
[48 Wall Street]
[New York, NY 10005]
[Attn: Peter Zayfert]
[Facsimile:    (212) 284-4801]

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher") and the warrant certificate issued pursuant thereto (the "Certificate"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Agreement and the Certificate.

This notice confirms that Warrants have been exercised by [Fletcher] to exercise a Warrant Amount of [●] at a Warrant Price of $[●], requiring delivery by the Company to [Fletcher] of [●] shares of Common Stock Equivalent Junior Preferred Stock.

After delivery of such shares, the Warrant shall remain exercisable for a number of shares of Common Stock Equivalent Junior Preferred Stock equal to a Warrant Amount of $[●][1] divided by the Warrant Price then in effect.

UNITED COMMUNITY BANKS, INC.

By: _____
Name:
Title:

---

[1]    Insert Warrant Amount equal to the Warrant Amount immediately prior to such exercise reduced by the aggregate purchase price of the shares in the preceding paragraph.

## ACKNOWLEDGMENT OF INCREASE IN WARRANT AMOUNT

Reference is made to the Warrant to Purchase Shares of Common Stock of United Community Banks, Inc. (the "Warrant"), dated as of April 5, 2010, issued by United Community Banks, Inc., a Georgia corporation (the "Company"), to Fletcher International, Ltd., a company domiciled in Bermuda ("Holder"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Warrant.

The Company hereby acknowledges that on the date hereof affiliates of the Holder purchased $103,089,000 worth of assets pursuant to the Asset Purchase and Sale Agreement and agrees and acknowledges that as of the date hereof the warrant amount shall be increased by Fifteen Million Dollars ($15,000,000) to a total of Thirty Million Dollars ($30,000,000) pursuant to Section 1.1(a)(ii) of the Warrant.

IN WITNESS WHEREOF, the Company has caused this acknowledgement to be duly executed as of April $30$, 2010.

UNITED COMMUNITY BANKS, INC.

By: _____
    Name: Rex S. Schuette
    Title: Executive Vice President & CFO

Exhibit 3

## SUPPLEMENTAL CERTIFICATE OF RIGHTS AND PREFERENCES
## OF
## SERIES C CONVERTIBLE PREFERRED STOCK
## OF
## UNITED COMMUNITY BANKS, INC.

Pursuant to the authority vested in the Board of Directors (the "Board") by the Restated Articles of Incorporation of United Community Banks, Inc. (the " Corporation "), as amended (the " Articles of Incorporation "), the Board does hereby supplement the Certificate of Rights and Preferences of Series C Convertible Preferred Stock of United Community Banks, Inc. (the " Certificate ") by adding the following thereto:

For purposes of clarification, if the Company at any time subdivides or combines (by, as applicable, any stock split, reverse stock split, stock dividend, other reclassification, recapitalization, reorganization or otherwise) the shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock into a greater or lesser number of shares, as the case may be, then, after the date of record for effecting each such transaction, all measurements and references herein related to Conversion Price and Redemption Price will be proportionately decreased or increased, respectively, and all references to share numbers for such securities herein will be proportionately increased or decreased, respectively, to reflect the effect of any such transaction.

In addition, notwithstanding anything in the Certificate to the contrary, if the Company at any time combines (by any reverse stock split, recapitalization, reorganization, reclassification or otherwise) the shares of Common Stock and/or Common Stock Equivalent Junior Preferred Stock into a smaller number of shares, then, after the date of record for effecting each such transaction, all measurements and references herein related to share prices for such securities will be proportionately increased and all references to share numbers for such securities herein will be proportionately decreased.

Exhibit 4

# FILB CO-INVESTMENTS LLC

June 25, 2012

**By Facsimile and FedEx**
United Community Banks, Inc.
125 Highway 515 East
Blairsville, Georgia 30512
Attention: Rex S. Schuette
Telephone: (706) 745-2265
Facsimile: (706) 745-9046

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "Agreement" or "SPA") dated as of April 1, 2010, and amended June 11, 2010, by and between United Community Banks, Inc. ("UCBI") and Fletcher International, Ltd. ("Fletcher"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

Pursuant to Section 19(b) of the Agreement, Fletcher has assigned to FILB Co-Investments LLC ("FILBCI") certain rights under and relating to the Agreement including: (1) Fletcher's right under the Agreement to purchase shares of Series C Convertible Preferred Stock (the "Series C Preferred") from UCBI, together with rights associated with the Series C Preferred; (2) the Additional Warrant Amount, as defined in the Warrants to Purchase Shares of Common Stock of United Community Banks, Inc., as amended by the Amendment to Warrants to Purchase Shares of Common Stock of United Community Banks, Inc.; and (3) amounts due Fletcher from UCBI under the Agreement for UCBI's Registration Failure.

Under the Agreement, FILBCI has the contractual right to purchase, from time to time, in whole or in part, up to 65,000 shares of Series C Preferred for $1,000 per share. SPA §1(a). FILBCI also has the right to redeem each Series C Preferred share for a contractually-specified number of shares of UCBI Common Stock or Common Stock Equivalent Junior Preferred Stock. SPA, Annex B § 6(b)(ii). Under the express terms of the SPA, each share of Series C Preferred is convertible into 190.4762 shares of UCBI Common Stock, determined by dividing the "Stated Value" of $1,000 by the "Redemption Price" of $5.25, with fractional shares to be paid out in cash. SPA, Annex B §§ 2, 6(b)(ii). Upon redemption of the full 65,000 shares of Series C Preferred, FILBCI would be entitled to 12,380,952 shares of UCBI Common Stock, plus a fractional share payment.

We understand that UCBI has publicly taken the position that it does not intend to honor its contractual obligations under the SPA. Specifically, despite the fact that the Agreement specifies a Redemption Price of $5.25 (Annex B, § 2), with no provision for adjustment in the event of a reverse stock split, UCBI has stated in public filings, including its Form 10-K for the fiscal year ended December 31, 2011 and Post-Effective Amendment No. 5 to Form S-1 on Form S-3 dated March 16, 2012, that the applicable Redemption Price of Series C Preferred stock is

$26.25. UCBI has also purported to unilaterally amend the Certificate of Rights and Preferences of Series C Preferred Stock without written consent, in contravention of § 19(i) of the Agreement and in violation of UCBI's contractual undertaking to abide by the Series C Certificate "attached [to the SPA] as Annex B." SPA § 1(e)(xvi), 9(e).

UCBI's actions and statements call into serious question whether UCBI will perform its obligations under the Agreement and under governing New York law. *See, e.g., Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 738 N.Y.S.2d 658 (2001). FILBCI hereby demands immediate assurances from UCBI, that UCBI will perform its obligations under the Agreement by (1) delivering to FILBCI 65,000 shares of Series C Preferred stock upon receipt of an Investment Notice under Annex A to the SPA and payment of $65,000,000; and (2) redeeming the 65,000 shares of Series C Preferred into 12,380,952 shares of Common Stock, plus a cash fractional share payment under the SPA, upon receipt of a Redemption Notice under Annex H to the SPA.

FILBCI reserves all rights with respect to the matters addressed herein.

> FILB Co-Investments LLC,
> by its Managing Member FIAL SPV 1 Ltd.
>
> By: _Rob M McMahon_
>
> Name: Rob McMahon
> Title:  Director
> Tel:  (345) 814-9008
> Fax:  (345) 949-8529
> Email: (Rob.McMahon@ky.ey.com)

cc:  James W. Stevens

# Exhibit 5



**KILPATRICK TOWNSEND**

ATTORNEYS AT LAW



KILPATRICK TOWNSEND & STOCKTON LLP
www.kilpatricktownsend.com

Suite 2800, 1100 Peachtree Street
Atlanta, GA 30309-4528
t 404 815 6500  f 404 815 6555

direct dial 404 815 6270
direct fax 404 541 3400
JStevens@KilpatrickTownsend.com

June 29, 2012

<u>Via Email</u>

Mr. Douglas J. Pepe
Gregory P. Joseph Law Offices LLC
485 Lexington Avenue, 30 Floor
New York, NY 10017

Dear Doug:

As you know, we represent United Community Banks, Inc. (the "Company"). We are responding, on behalf of the Company, to the letters and other information you sent to the Company earlier this week and explaining why the Company has decided not to sign the tolling agreement with FILB Co-Investments LLC ("FILB") with respect to the rights and obligations under that that certain Securities Purchase Agreement, dated April 1, 2010 and as amended June 11, 2010 (the "Agreement") that it asserts were transferred to it by Fletcher International, Ltd. ("Fletcher"). Among those rights, FILB claims it has the right to invest in Series C Preferred Stock of the Company (the "Preferred Stock") pursuant to the Agreement as well as the right to receive warrants to purchase common stock equivalent preferred stock of the Company that would be issuable if Preferred Stock was purchased under the Agreement (the "Warrant").

First, we want to confirm here our prior communication to you that the "Investment Period" under the Agreement ends at 11:59 p.m. New York City time on July 3, 2012. If your client believes it has the right to make such an investment in Preferred Stock during the Investment Period, it may proceed in whatever manner it believes is appropriate pursuant to the terms and conditions of the Securities Purchase Agreement. The Company will respond as applicable..

Additionally, we want to clarify for you the substantive rights that a purchaser of any Preferred Stock would have if it acquired Preferred Stock. While we do not believe the rights to acquire the Preferred Stock are "near worthless" as the Grand Court of the Cayman Islands stated the Louisiana pension funded had said in the judgment ordering the liquidation of FIA Leveraged Fund (the "Judgment"), we believe that the court was right in concluding that there is no currently meaningful value in these rights due to the difference in the current market price of the Company's common stock relative to the $26.25 "Redemption Price".

Although it should be clear to you and your client that the decline in the market value of the common stock is what has caused these rights to lose value, your client has now apparently adopted Fletcher's baseless argument that somehow the Company's June 17, 2011 common stock reclassification in the form of a 1-for-5 reverse stock split, or recombination, increased the value of those rights. That argument is without merit. The stock reclassification had no impact on the value of the right to purchase Preferred Stock under the Agreement or the right to purchase common stock equivalent preferred stock under the Warrant. The reverse stock split was a value-neutral transaction for all holders of the Company's securities and rights to purchase the Company's securities. The intent of the transaction was

US2008 3635280 2

to increase the market price of the common stock to make it more attractive to a broader range of investors, which the Company hopes in time will enhance the liquidity of the holders of the Company's common stock and the value of that stock and all securities convertible into that stock.

We are certainly willing to work constructively with you. However, any argument that the Company's common stock reclassification created a windfall for the holders of derivative securities acquired pursuant to rights under the Agreement is demonstrably frivolous. On the one hand, you would argue that the Agreement and designation for the Preferred Stock are silent regarding the impact of a reverse stock split and that, as a result, the otherwise obvious intent of the parties can and should be ignored. On the other hand, while neither the Agreement nor the designation for the Preferred Stock give Fletcher the right to approve any changes to the designations to conform to the intent of the Agreement, you argue that such an approval right can and should be read into such documents and thereby create an unintended and outrageous windfall.

Reiss v. Financial Performance Corp. does not support the proposition that the omission of a term in one clause of an agreement where it might possibly have appeared creates an inference that the omission was intended, requiring an interpretation of the entire contract consistent with such an inference. In the Reiss case, the agreement between the parties failed to address a reverse stock split. Here, the Agreement is a complicated document, supplemented by contemporaneous documents, and its intent cannot be derived by focusing on a single clause in isolation. Read without blinders, the Agreement addresses the reverse stock split, and a "gotcha" windfall is the figment of a desperate, guileful imagination, as the Cayman Islands Grand Court recognized.

The definition of "Common Stock" in the Preferred Stock designations makes it clear that the Preferred Stock is convertible into the Company's common stock as it existed on April 1, 2010 and "any Capital Stock for or into which such common stock hereafter is exchanged, converted, reclassified or recapitalized by the Company." Thus, unlike Reiss, the language unambiguously states that the Preferred Stock that was formerly convertible into 1 share of April 1, 2010 common stock at the $5.25 "Redemption Price" is now convertible into 1/5 of a share of June 17, 2011 common stock.

In addition, there is nothing in the Agreement that prohibits the Company from changing the designations of the Preferred Stock, including Sections 1(e)(xvi), 9(e) or 19(i) thereof. In fact, the only restrictions on the Company's ability to change the designations are found in Section 5 of the designations, which grants holders of the Preferred Stock certain limited voting rights, none of which have been implicated.

We trust that you understand our concern that Fletcher might try to use the value-neutral reverse stock split to argue for an unintended windfall. That concern led us to adopt a supplement to the Preferred Stock designation to clarify the state of affairs and avoid any attempt to take such a position. Accordingly, at the time the Company reclassified each share of common stock into 1/5 of a share of common stock, it also supplemented the designation for the Preferred Stock to clarify that the transaction would result in a proportional adjustment to "Redemption Price" and "Conversion Price" of the Preferred Stock. That was a conforming change within our contractual rights following the reverse stock split. That supplement was first disclosed in April 2011, and, to its credit, Fletcher has never objected to it.

We also note that you are claiming a right to amounts due from the Company to Fletcher due to a purported "Registration Failure" under the Agreement. The Company is familiar with the Registration Failure provisions of the Agreement and, in fact, previously paid Fletcher in full in accordance with such

provisions when a failure occurred between March 24, 2011 and March 28, 2011. As the Company previously told Fletcher when it vaguely raised this issue to the Company last month without any further explanation, the Company's required Registration Statement for Fletcher's benefit has been effective and available for the issuance of securities to Fletcher (if it had chosen to exercise any of its rights) since March 29, 2011. As a result, there has been no Registration Failure since that date. I am sure we can clarify the issue further if you will give us additional information about what action or inaction on the Company's part that you or Fletcher believe constituted a Registration Failure.

You should also be aware that we consider Fletcher to be in breach of various provisions of the Agreement, including Sections 19(b) and 19(k). Because the breaches of Section 19(b) and Section 19(k) are each of a nature that they are incapable of being cured, the conditions precedent to any of the Company's obligations under the Agreement and the Warrant are incapable of being satisfied.

Notwithstanding the foregoing, we will honor any valid investment notice received during the "Investment Period" at the current $26.25 Redemption Price, subject to the terms and conditions of the Agreement, including Sections 3 and 13. As we are sure you know, the Investment Period terminates on July 3, 2012 and an amount equal to 5% of the "Aggregate Investment Commitment" that has not been satisfied by such date will be due on July 5, 2012.

The Company reserves all rights with respect to the matters addressed herein.

Sincerely,

James W. Stevens

cc:    Rex Schuette, United Community Banks, Inc.
       Brad Miller, United Community Banks, Inc.
       Eric Seiler, Friedman Kaplan Seiler & Adelman LLP
       Steve Hudson, Kilpatrick Townsend & Stockton, LLP

Exhibit 6

INVESTMENT NOTICE

June 25, 2012

**By Facsimile and FedEx**
United Community Banks, Inc.
125 Highway 515 East
Blairsville, Georgia 30512
Attention: Rex S. Schuette
Telephone: (706) 745-2265
Facsimile: (706) 745-9046

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher").[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement. FILBCI hereby elects to make an Investment on the date, at a price per share and in the amount set forth below.

In accordance with the terms of the Agreement, the Investment Price shall be One Thousand Dollars ($1,000) per share of Preferred Stock and the Closing Date of such Investment shall be June 28, 2012, which is three Business Days after the date of this letter. On the Closing Date, the Company shall register on its books and records the issuance of 76 shares of Preferred Stock to FILBCI upon receipt of payment of Seventy-Six Thousand Dollars ($76,000), made on behalf of FILBCI by wire transfer. On the Closing Date, the Company shall deliver to FILBCI a certificate representing 76 shares of Preferred Stock to the following recipients: FILBCI c/o Douglas J. Pepe: (i) by Overnight Delivery: 485 Lexington Avenue, 30th Floor, New York, NY 10017; (ii) copy by email: dpepe@josephnyc.com; and (iii) copy by facsimile (212-407-1284); and a copy to: FILBCI c/o Rob Rob McMahon: (i) by Overnight Delivery: Ernst & Young Ltd., 62 Forum Lane, Camana Bay, Box 510, Grand Cayman KY1-1106, Cayman Island; (ii) by email (Rob.McMahon@ky.ey.com); and (iii) by facsimile (1-345-949-8529).

FILB Co-Investments LLC,
by its Managing Member FIAL SPV 1 Ltd.

By:    _Nal M McMahon_
Name: Rob McMahon
Title: Director

cc:    James W. Stevens

---

[1]    As amended June 11, 2010, and assigned by Fletcher to FILB Co-Investments LLC ("FILBCI"). The address of FILBCI for purposes of the registration of the issuance of Preferred Stock referred to above is FILBCI c/o Rob McMahon: Ernst & Young Ltd., 62 Forum Lane, Camana Bay, Box 510, Grand Cayman KY1-1106, Cayman Island.

# Exhibit 7

# FILB Co-Investments LLC

June 29, 2012

**By Facsimile**
United Community Banks, Inc.
125 Highway 515 East
Blairsville, Georgia 30512
Attention: Rex S. Schuette
Telephone: (706) 745-2265
Facsimile: (706) 745-9046

> ### Re: Securities Purchase Agreement dated as of April 1, 2010, and amended June 11, 2010 (the "Agreement")

To Whom It May Concern:

This certificate, issued on behalf of FILB Co-Investments LLC ("FILBCI"), confirms to the best of FILBCI's knowledge that:

a. (i) the representations and warranties made by Fletcher International, Ltd. ("Fletcher") (and, as relevant, FILBCI as Fletcher's assignee) in paragraphs (a), (b) and (d) of Section 7 of the Agreement are true and correct (except those representations and warranties which address matters only as of a particular date, which were true and correct as of such date); and (ii) all other representations and warranties made by Fletcher in the Agreement (and, as relevant, FILBCI as Fletcher's assignee) are true and correct in all material respects (except those representations and warranties which address matters only as of a particular date, which were true and correct as of such date); and

b. Fletcher (and, as relevant, FILBCI as Fletcher's assignee) has complied fully with all the covenants and agreements in the Agreement.

FILB Co-Investments LLC,
by its Managing Member FIAL SPV 1 Ltd.

By: _____

Name: Rob McMahon
Title: Director
Tel: (345) 814-9008
Fax: (345) 949-8529

cc: James W. Stevens

# Exhibit 8

PREFERRED STOCK REDEMPTION NOTICE

June 29, 2012

**By Facsimile and FedEx**
United Community Banks, Inc.
125 Highway 515 East
Blairsville, Georgia 30512
Attention: Rex S. Schuette
Telephone: (706) 745-2265
Facsimile: (706) 745-9046

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement (the "Agreement") dated as of April 1, 2010 by and between United Community Banks, Inc. (the "Company") and Fletcher International, Ltd. ("Fletcher").[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

FILBCI hereby elects to redeem 76 shares of Preferred Stock into 14,476 shares of Common Stock and no shares of Common Stock Equivalent Junior Preferred Stock at a Redemption Price (as defined in the Certificate of Rights and Preferences) equal to $5.25. In accordance with Section 6 of the Certificate of Rights and Preferences, such shares of Common Stock or Common Stock Equivalent Junior Preferred Stock shall be delivered to FILBCI on July 3, 2012, by 12:00 p.m. New York City time in certificated form at the address specified below and by facsimile copy:

> FILB Co-Investments LLC
> c/o Gregory P. Joseph Law Offices LLC
> Attn: Samuel Fraidin
> 485 Lexington Avenue, 30th Floor
> New York, NY 10017
> Telephone: (212) 407-1200
> Fax: (212) 407-1273

> FILB Co-Investments LLC,
> by its Managing Member FIAL SPV 1 Ltd.

> By:  _Rob McMahon_
> Name: Rob McMahon
> Title:  Director

cc:   James W. Stevens

---

[1]   As amended June 11, 2010, and assigned by Fletcher to FILB Co-Investments LLC ("FILBCI"). FILBCI's address is FILBCI c/o Rob McMahon, Ernst & Young Ltd., 62 Forum Lane, Camana Bay, Box 510, Grand Cayman KY1-1106, Cayman Islands.

Exhibit 9

**From:** Stevens, James <JStevens@kilpatricktownsend.com>
**Sent:** Friday, June 29, 2012 5:43 PM
**To:** Douglas J. Pepe
**Cc:** Jeffrey H. Zaiger; Samuel N. Fraidin; 'Seiler, Eric'; 'Rubinstein, Jason C.'; Brad Miller (brad_miller@ucbi.com); Hudson, Steve
**Subject:** RE: Investment Notice

Doug,

I cannot confirm at this time whether or not the bank has received any funds from your client.  In any event, if and when they arrive, we will return them.  Our client does not believe it has an obligation to consummate the transaction your client proposed.

**James Stevens**
**Kilpatrick Townsend & Stockton LLP**
Suite 2800 | 1100 Peachtree Street | Atlanta, GA  30309-4528
office 404 815 6270 | cell 404 405 2305 | fax 404 541 3400
jstevens@kilpatricktownsend.com | My Profile | vCard

---

**From:** Douglas J. Pepe [mailto:dpepe@JOSEPHNYC.COM]
**Sent:** Friday, June 29, 2012 4:56 PM
**To:** Stevens, James
**Cc:** Jeffrey H. Zaiger; Samuel N. Fraidin
**Subject:** Investment Notice

James:  further to the June 25, 2012 Investment Notice (attached), I've enclosed a copy of our officer's certificate, which has also been sent by Fax.  I have also confirmation that the wire transfer has been sent to UCBI.  At your convenience, please confirm that the shares will be delivered according to the attached notice and that I will receive UCBI's other deliverables under the SPA.  I also enclose a Preferred Stock Redemption Notice, which has been sent by facsimile.  I will be in touch to discuss the logistics and closing of the redemption.  Best regards, Doug Pepe

Douglas J. Pepe
Gregory P. Joseph Law Offices LLC
485 Lexington Avenue, 30 Floor
New York, NY 10017
212-407-1230
http://www.josephnyc.com

---

This email is sent by a law firm and may contain information that is privileged and confidential.  If you are not the intended recipient, please delete the email and any attachments and notify us immediately.

Confidentiality Notice:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This transmission, and any attachments, may contain confidential attorney-client privileged information and attorney work product. If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. Please contact us immediately by return e-mail or at 404 815 6500, and destroy the original transmission and its attachments without reading or saving in any manner.

***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# Exhibit 10

## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (the "Subscription Agreement") is entered into this 13th day of February, 2012, by an between Fletcher International, Ltd., a company domiciled in Bermuda (together with its successors, "FILB") and FILB Co-Investments LLC, a limited liability company organized under the laws of the State of Delaware (together with its successors, "FILBCI").

**WHEREAS,** FILB has agreed to assign as payment for subscription to FILBCI and FILBCI has agreed to accept from FILB, in exchange for $136,135,806 to be paid to FILB with 136,135.806 FILBCI Shares, each having a Net Asset Value of $1,000 per share as of February 13, 2012, the following associated rights and obligations, having a total aggregate value of $136,135,806:

i. The specific rights and obligations designated immediately below in subsections (a), (b) and (c) that FILB holds pursuant to the Securities Purchase Agreement by and between United Community Banks, Inc. ("UCBI") and Fletcher International, Ltd. dated as of April 1, 2010, as amended by the Amendment to Securities Purchase Agreement dated as of June 11, 2010, (attached hereto in "Annex A");

    a. The right to purchase shares of Series C convertible preferred stock for an aggregate purchase price of Sixty-Five Million Dollars and all associated rights and obligations under such agreement and such amendment (the "Investment Right").

    b. Warrants with respect to the Additional Warrant Amount, as such terms are defined in the Warrants to Purchase Shares of Common Stock of United Community Banks, Inc., as amended by the Amendment to Warrants to Purchase Shares of Common Stock of United Community Banks, Inc. (the "Additional Warrants").

    c. An amount of $606,667 owed to FILB by UCBI due to a Registration Failure, as defined in the Securities Purchase Agreement, accruing over a period of 28 days.

For the avoidance of doubt, the Initial Warrant Amount, as such term is defined in the Warrants to Purchase Shares of Common Stock of United Community Banks, Inc. as amended by the Amendment to Warrants to Purchase Shares of Common Stock of United Community Banks, Inc. (the "Initial Warrant Amount") is not transferred or assigned by FILB to FILBCI.

**WHEREAS,** FILBCI is an affiliate of both FILB and FILB's Investment Advisor, Fletcher Asset Management, Inc. (collectively, "Fletcher"), and thus an appropriate and valid entity under the aforementioned Securities Purchase Agreement to receive the aforementioned securities.

Notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall be construed as a waiver or assignment by any Warrant Holder of any right, term, condition or adjustment in the Warrant Certificate and the Securities Purchase Agreement

dated as of April 1, 2010 between Fletcher International, Ltd. and United Community Banks, Inc.

This Subscription Agreement shall be governed and construed in accordance with laws of the State of New York without regard to conflicts of law principles.

**IN WITNESS HEREOF,** the parties hereto have caused this Subscription Agreement to be executed in their names as of the date first written above

Signature Page Follows

FLETCHER INTERNATIONAL, LTD.

By: _____
Name: Stewart Turner
Title: Director

By: _____
Name: Floyd Saunders
Title: Director


FILB CO-INVESTMENTS LLC
By its Sole Member
FLETCHER INTERNATIONAL, LTD.

By: _____  2-22-12
Name: Teddy Stewart
Title: Director

By: _____
Name: Floyd Saunders
Title: Director

Signature Page to Subscription Agreement

# Exhibit 11

## CROSS RECEIPT

FILB CO-INVESTMENTS LLC ("FILBCI"), a limited liability company organized under the laws of the State of Delaware, hereby acknowledges that it will receive on the Settlement Date (as defined below) from FLETCHER INTERNATIONAL, LTD. ("FILB"), a company domiciled in Bermuda, items (i)(a) – (c) below, having a total aggregate value of $136,135,806, in exchange for 136,135.806 FILBCI Shares having a total aggregate value of $136,135,806:

i.     The specific rights and obligations designated immediately below in subsections (a), (b) and (c) that FILB holds pursuant to the Securities Purchase Agreement by and between United Community Banks, Inc. and Fletcher International, Ltd. dated as of April 1, 2010, as amended by the Amendment to Securities Purchase Agreement dated as of June 11, 2010, (attached hereto in "Annex A");

a.     The right to purchase shares of Series C convertible preferred stock for an aggregate purchase price of Sixty-Five Million Dollars and all associated rights and obligations under such agreement and such amendment (the "Investment Right").

b.     Warrants with respect to the Additional Warrant Amount, as such terms are defined in the Warrants to Purchase Shares of Common Stock of United Community Banks, Inc., as amended by the Amendment to Warrants to Purchase Shares of Common Stock of United Community Banks, Inc. (the "Additional Warrants").

c.     An amount of $606,667 owed to FILB by UCBI due to a Registration Failure, as defined in the Securities Purchase Agreement, accruing over a period of 28 days.

For the avoidance of doubt, the Initial Warrant Amount, as such term is defined in the Warrants to Purchase Shares of Common Stock of United Community Banks, Inc. as amended by the Amendment to Warrants to Purchase Shares of Common Stock of United Community Banks, Inc. (the "Initial Warrant Amount") is not transferred or assigned by FILB to FILBCI.

FILBCI hereby acknowledges: 1) that to the full extent permissible it hereby acquires and assumes all the investment and other rights, benefits, restrictions and obligations accompanying the above referenced securities; and 2) that it hereby agrees to perform any and all acts necessary to effectuate the purchase of the above referenced securities, and to perform all acts in the future in connection therewith.

The Settlement Date of this transaction shall be any date mutually agreed upon by FILB and FILBCI.

FILB Co-Investments Signature Page

FILB-CO-INVESTMENTS LLC
By its Managing Member
FLETCHER INTERNATIONAL, LTD.

By: _____
Name: Teddy Stewart
Title: Director
Date: 2·22·12

By: _____
Name: Floyd Saunders
Title: Director
Date:

FILB hereby acknowledges that it will receive on the Settlement Date from FILBCI 136,135.806 shares of FILBCI having a Net Asset Value of $1,000 per share and a total aggregate value of $136,135,806 as of February 13, 2012.

FILB hereby acknowledges 1) that it hereby transfers to and assigns to FILBCI all the investment and other rights, benefits, restrictions and obligations accompanying the above referenced securities; and 2) that it hereby agrees to perform any and all acts necessary to effectuate the sale of the above referenced securities, and to perform all the acts in the future in connection therewith.

FLETCHER INTERNATIONAL, LTD.

By: _____

Name: Stewart Turner
Title: Director
Date: 2/22/12

By: _____

Name: Floyd Saunders
Title: Director
Date:

Cross Receipt Page 3 of 3

Exhibit 12

## CERTIFICATE OF DESIGNATION
## OF
## COMMON STOCK EQUIVALENT JUNIOR PREFERRED STOCK
## OF
## UNITED COMMUNITY BANKS, INC.

Pursuant to Section 14-2-602 of the
Georgia Business Corporation Code

United Community Banks, Inc., a corporation organized under the laws of the State of Georgia (the "Corporation"), does hereby certify that:

1. At a meeting duly convened and held on March $2\underline{6}$, 2010, the Board of Directors of the Corporation (the "Board") duly adopted the following resolutions authorizing the issuance and sale by the Corporation of a series of the Corporation's preferred stock, $1.00 par value per share, to be known as the Common Stock Equivalent Junior Preferred Stock:

> "**RESOLVED,** that the powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Corporation's Common Stock Equivalent Junior Preferred Stock, including those established by the Board and the number of authorized shares thereof, are authorized and approved as set forth in the Certificate of Designation attached hereto as Exhibit A, which is incorporated herein and made a part of these resolutions by reference."

2. Attached hereto, and thereby made a part hereof, is such Exhibit A from the Board's resolution designating the Common Stock Equivalent Junior Preferred Stock.

**IN WITNESS WHEREOF**, this Certificate of Designation is executed on behalf of the Corporation by its duly authorized officer this $3\underline{1}$ day of March, 2010.

UNITED COMMUNITY BANKS, INC.

By: _____
Name: Jimmy C. Tallent
Title: CEO · President

CORPORATIONS DIVISION
SECRETARY OF STATE

2010 MAR 31 PM 5:40

## CERTIFICATE OF DESIGNATION
### OF
## COMMON STOCK EQUIVALENT
## JUNIOR PREFERRED STOCK
### OF
## UNITED COMMUNITY BANKS, INC.

Pursuant to the authority vested in the Board of Directors (the "Board") by the Restated Articles of Incorporation of United Community Banks, Inc. (the "Corporation"), as amended (the "Articles of Incorporation"), the Board does hereby designate, create, authorize and provide for the issue of a series of preferred stock, $1.00 par value per share, which shall be designated as "Common Stock Equivalent Junior Preferred Stock" (the "Junior Preferred Stock"), consisting of 1,000,000 shares having the following powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations:

**Section I.    Definitions**

"Acquiring Person" has the meaning specified in Section VI(c).

"Applicable Conversion Rate" means the Initial Conversion Rate, subject to adjustment pursuant to Section II(b), as applicable, for any such event occurring subsequent to the initial determination of such rate.

"Board" has the meaning specified in the preamble.

"Articles of Incorporation" has the meaning specified in the preamble.

"Capacity Amendment" means an amendment to the Articles of Incorporation increasing the number of shares of Common Stock that the Corporation is authorized to issue to more than 100,000,000.

"Change of Control" has the meaning specified in Section VI(b).

"Common Dividend Equivalent Amount" has the meaning specified in Section III(a).

"Common Stock" means the Common Stock, $1.00 par value per share, of the Corporation.

"Conversion Date" means, with respect to a share of Junior Preferred Stock, the date on which such share is converted into Common Stock.

"Convertible Holder" means a Holder, other than the initial Holder or an affiliate thereof, who acquires one or more shares of Junior Preferred Stock following a Permitted Transfer.

"Conversion Notice" shall mean the notice given by a Convertible Holder to the Corporation, specifying the number of shares of Junior Preferred Stock to be converted into Common Stock and certifying that such Person is a Convertible Holder.

"Corporation" has the meaning specified in the preamble.

"Exchange Property" has the meaning specified in Section VI(a).

"Holder" means a Person in whose name any shares of Junior Preferred Stock are registered, which may be treated by the Corporation as the absolute owner of such shares for all purposes.

"Initial Conversion Rate" means, for each share of Junior Preferred Stock, one hundred (100) shares of Common Stock.

"Issue Date" means the date that the Junior Preferred Stock is first issued.

"Junior Preferred Stock" has the meaning specified in the preamble.

"Junior Stock" shall mean any class of capital stock or series of Preferred Stock of the Corporation established by the Board after the Issue Date, the terms of which do not expressly provide that such class or series ranks senior to or on parity with the Junior Preferred Stock as to dividend rights or rights upon the liquidation, winding-up or dissolution of the Corporation.

"Liquidation Event" has the meaning specified in Section V(a).

"Parity Stock" shall mean any class of capital stock or series of Preferred Stock established by the Board after the Issue Date, the terms of which expressly provide that such class or series will rank on parity with the Junior Preferred Stock as to dividend rights or rights upon the liquidation, winding-up or dissolution of the Corporation.

"Permitted Transfer" means a sale or other transfer (i) to an affiliate of the initial Holder or to the Corporation; (ii) in a widespread public distribution; (iii) in transfer in which no transferee (or group of associated transferees) would receive 2 percent or more of any class of voting securities of the Corporation; or (iv) to a transferee that would control more than 50 percent of the voting securities of the Corporation without any transfer from the initial Holder.

"Person" means a legal person, including any individual, corporation, estate, partnership, joint venture, association, joint-stock company, limited liability company or trust.

"Record Date" means, with respect to any dividend, distribution or other transaction or event in which the holders of the Common Stock (or other applicable security) have the right to receive any cash, securities or other property or in which the Common Stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of the Common Stock (or other applicable security) entitled to receive such cash, securities or other property (whether such date is fixed by the Board or a duly authorized committee of the Board or by statute, contract or otherwise).

"Senior Stock" shall mean each class of capital stock or series of Preferred Stock established by the Board after the Issue Date, the terms of which expressly provide that such class or series will rank senior to the Junior Preferred Stock as to dividend rights or rights upon the liquidation, winding-up or dissolution of the Corporation.

"Stockholder Approval" means the requisite approval by the stockholders of the Corporation of the Capacity Amendment.

"Transfer Agent" shall mean the Corporation's duly appointed transfer agent, registrar, redemption, conversion and dividend disbursing agent for the Junior Preferred Stock and transfer agent and registrar for any Common Stock issued upon conversion of the Junior Preferred Stock, or any successor duly appointed by the Corporation.

2

**Section II. Conversion**

(a) No share of Junior Preferred Stock (or fraction thereof) may be converted into Common Stock unless held by a Convertible Holder. Each share of Junior Preferred Stock (or fraction thereof) held by a Convertible Holder shall be convertible at any time following the Stockholder Approval into a number of shares of Common Stock equal to the product of (i) the fraction of a share of Junior Preferred Stock converted and (ii) the Applicable Conversion Rate in effect on the Conversion Date, plus cash in lieu of any fractional shares of Common Stock pursuant to Section II(c)(iv). For all purposes with respect to the conversion of Junior Preferred Stock, references herein to "Common Stock" shall include and mean any cash, securities or other property (including payments of cash in lieu of fractional shares of Common Stock) that may be due upon such conversion and references to "Junior Preferred Stock" shall include and mean any fractional shares thereof.

(b) Adjustments to Conversion Rate. If, at any time while Junior Preferred Stock remains outstanding, (i) the Corporation issues to holders of the Common Stock as a class shares of Common Stock or other securities of the Corporation as a dividend or distribution on the Common Stock, or (ii) the Corporation effects a share split or share combination of the Common Stock, (each, an "Adjustment Event"), then the Corporation shall adjust the Initial Conversion Rate or Applicable Conversion Rate, as applicable, or other terms of the Junior Preferred Stock in effect immediately prior to such event so that each Holder of shares of Junior Preferred Stock thereafter surrendered for conversion shall be entitled to receive the number of shares of Common Stock that such Holder would have owned or would have been entitled to receive upon or by reason of any of the events described above, had such shares of the Junior Preferred Stock been converted into shares of Common Stock immediately prior to the occurrence of such event. An adjustment made pursuant to this Section II(b) shall become effective retroactively (x) in the case of any such dividend or distribution, to the day immediately following the close of business on the Record Date for the determination of holders of Common Stock entitled to receive such dividend or distribution or (y) in the case of any such subdivision, split, combination or reclassification, to the close of business on the day upon which such corporate action becomes effective.

(c) Shares of Junior Preferred Stock shall be converted into shares of Common Stock in accordance with the following procedures:

(i) At all times after the Stockholder Approval, a Convertible Holder may exercise a conversion right by the delivery of a Conversion Notice to the office of the Transfer Agent during normal business hours and (if so required by the Corporation or the Transfer Agent) an instrument of transfer, in form satisfactory to the Corporation and to the Transfer Agent, duly executed by such Convertible Holder or his duly authorized attorney, and funds in the amount of any applicable transfer tax (unless provision satisfactory to the Corporation is otherwise made therefor), if required pursuant to Section II(c)(iii).

(ii) As promptly as practicable after the delivery of a Conversion Notice and the payment in cash of any amount required by the provisions of Sections 2(c)(i) and 2(c)(iii), the Corporation will deliver or cause to be delivered at the office of the Transfer Agent to or upon the written order of the Convertible Holder, certificates or a confirmation of book-entry transfer of shares representing the number of fully paid and

3

non-assessable shares of Common Stock issuable upon such conversion, issued in such name or names as the Convertible Holder may direct. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of the delivery of the Conversion Notice, and all rights of the Convertible Holder shall cease with respect to such shares of Junior Preferred Stock at such time and the Person or Persons in whose name or names the shares of Common Stock issued upon conversion are to be issued shall be treated for all purposes as having become the record holder or holders of such shares of Common Stock at such time; provided, however, that any delivery of a Conversion Notice and payment on any date when the stock transfer books of the Corporation shall be closed shall constitute the Person or Persons in whose name or names the shares of Common Stock are to be issued as the record holder or holders thereof for all purposes immediately prior to the close of business on the next succeeding day on which such stock transfer books are open.

(iii)     The issuance of shares of Common Stock upon conversion of shares of Junior Preferred Stock shall be made without charge for any stamp or other similar tax in respect of such issuance. However, if any such shares to be issued upon conversion are to be issued in a name other than that of the Holder of the share or shares of Junior Preferred Stock converted, the person or persons requesting the issuance thereof shall pay to the Corporation the amount of any tax which may be payable in respect of any transfer involved in such issuance, or shall establish to the satisfaction of the Corporation that such tax has been paid.

(iv)     No fractional shares of Common Stock or scrip shall be issued upon conversion of shares of Junior Preferred Stock. If more than one share of Junior Preferred Stock shall be surrendered for conversion at any one time by the same Holder, the number of full shares of Common Stock issuable upon conversion thereof shall be computed on the basis of the aggregate number of shares of Junior Preferred Stock so surrendered. Instead of any fractional shares of Common Stock that would otherwise be issuable upon conversion of any shares of Junior Preferred Stock, the Corporation shall pay to the Holder an amount in cash in respect of such fractional interest equal to the value of such fractional interest based on the closing sales price of the Common Stock on such national securities exchange or automated quotation system on which the Common Stock is then listed or authorized for quotation or, if the Common Stock is not so listed or authorized for quotation, an amount determined in good faith by the Board to be the fair value of the Common Stock at the close of business on the business day immediately preceding the applicable Conversion Date.

(v)     At all times after the Stockholder Approval, the Corporation shall be required to reserve or keep available, out of its authorized but unissued Common Stock, or have sufficient authorized Common Stock to cover, the shares of Common Stock deliverable upon the conversion of the Junior Preferred Stock  The Corporation shall take all action necessary so that all shares of Common Stock that may be issued upon conversion of shares of Junior Preferred Stock will upon issue be validly issued, fully paid and nonassessable, and free from all liens and charges in respect of the issuance or delivery thereof.

4

(d) From and after a Conversion Date, dividends hereunder shall no longer accrue with respect to shares of Junior Preferred Stock converted on such date, and such converted shares of Junior Preferred Stock shall cease to be outstanding, subject to the rights of Holders of such Junior Preferred Stock to receive any previously accrued and unpaid dividends on such shares and any other payments to which they are otherwise entitled pursuant to Section III or Section VI.

## Section III. Dividend Rights

(a) From and after the Issue Date, (i) Holders shall be entitled to receive, when, as and if declared by the Board or any duly authorized committee of the Board, but only out of assets legally available therefor, all dividends or other distributions in the form of cash or assets (other than shares of Common Stock) declared and paid or made in respect of the shares of Common Stock, at the same time and on the same terms as holders of Common Stock, in an amount per one-hundredth of a share of Junior Preferred Stock equal to the product of (A) the Applicable Conversion Rate then in effect and (B) any per share dividend or other distribution in the form of cash or assets (other than shares of Common Stock) declared and paid or made in respect of each share of Common Stock (the "Common Equivalent Dividend Amount"), and (ii) no cash dividend or other cash distribution shall be declared and paid or made in respect of Common Stock unless the Board or any duly authorized committee of the Board declares and pays to Holders of the Junior Preferred Stock, at the same time and on the same terms as holders of Common Stock, the Common Equivalent Dividend Amount per one-hundredth of a share of Junior Preferred Stock. Notwithstanding any provision in this Section III(a) to the contrary, Holders of the Junior Preferred Stock shall not be entitled to receive any dividend or other distribution in the form of cash or assets (other than shares of Common Stock) paid or made with respect to the Common Stock after the Issue Date (x) if the Record Date for determination of holders of Common Stock entitled to receive such dividend or distribution occurs prior to the Issue Date, or (y) with respect to shares of Junior Preferred Stock converted on or prior to such Record Date.

(b) Each dividend or other distribution pursuant to Section III(a) above will be payable to Holders of record of Junior Preferred Stock as they appear in the records of the Corporation at the close of business on the Record Date for the corresponding dividend or distribution to the holders of shares of Common Stock.

(c) To the extent the Corporation declares dividends on the Junior Preferred Stock and Common Stock but does not make full payment of such declared dividends, the Corporation will allocate the dividend payments on a pro rata basis among the holders of shares of Junior Preferred Stock and the holders of Common Stock so that the amount of dividends actually paid per share on the Junior Preferred Stock and Common Stock shall in all cases bear to each other the same ratio as the then Applicable Conversion Rate. The foregoing right shall not be cumulative and shall not in any way create any claim or right in favor of Holders in the event that dividends have not been declared or paid in respect of any prior calendar quarter.

(d) Holders of Junior Preferred Stock shall not be entitled to any dividends, whether payable in cash, securities or other property, on the Junior Preferred Stock other than dividends (if any) declared and payable on Junior Preferred Stock as specified in this Section III and dividends of Common Stock or other securities of the Corporation pursuant to Section II(b).

5

(e)     Notwithstanding any provision in this Certificate of Designation to the contrary, Holders of Junior Preferred Stock shall not be entitled to receive any dividends with respect to any such shares converted into Common Stock, except to the extent that any such dividends have been declared by the Board or any duly authorized committee of the Board (and the Record Date for such dividend occurs) after the Issue Date and prior to the applicable Conversion Date of such shares.

## Section IV.     Voting

(a)     Shares of Junior Preferred Stock shall have no voting rights except as set forth in Section IV(b) or as otherwise required by Georgia law from time to time. In exercising the voting rights set forth in Section IV(b), each Holder shall be entitled to one vote for each share of Junior Preferred Stock held by such Holder.

(b)     So long as any shares of Junior Preferred Stock remain outstanding, unless a greater percentage shall then be required by law, the Corporation shall not, without the affirmative vote or written consent of the Holders (voting or consenting separately as one class) of at least a majority of the outstanding shares of Junior Preferred Stock, amend, alter or repeal or otherwise change (including in connection with any merger, consolidation or other similar transaction) any provision of the Articles of Incorporation, including this Certificate of Designation, if the amendment, authorization or repeal would significantly and adversely affect the rights or preferences of the Junior Preferred Stock. Notwithstanding the foregoing, except as otherwise required by law, the Corporation may, without the consent of any Holder, authorize, increase the authorized amount of, or issue shares of Senior Stock or Parity Stock, and in taking such actions, the Corporation shall not be deemed to have significantly adversely affected the existing terms of the Junior Preferred Stock.

## Section V.     Liquidation

(a)     In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, whether voluntary or involuntary, which occurs while any Junior Preferred Stock remains outstanding (each a "Liquidation Event"), Holders of shares of Junior Preferred Stock shall, subject to the prior rights of any holders of Senior Stock, be entitled to receive and be paid out of the assets of the Corporation available for distribution to its stockholders, for each such share (or fraction thereof), a liquidating distribution in an amount equal to that received by holders of the Common Stock for each share of Common Stock into which such share of Junior Preferred Stock (or fraction thereof) was convertible at the Applicable Conversion Rate immediately prior to such Liquidation Event.

(b)     If, in any distribution described in Section V(a) above, the assets of the Corporation or proceeds thereof are not sufficient to pay in full the amounts payable with respect to all outstanding shares of Junior Preferred Stock and the corresponding amounts payable with respect to the Common Stock or any other Parity Stock as to such distribution, Holders of Junior Preferred Stock and the holders of Common Stock or any other Parity Stock shall share ratably in any such distribution in proportion to the full respective distributions to which they are entitled.

(c)     For purposes of this Section V, neither the sale, conveyance, exchange or transfer (for cash, shares of stock, securities or other consideration) of all or substantially all of the property and assets of the Corporation (other than in connection with the voluntary or involuntary liquidation, winding up or dissolution of the Corporation) nor the merger,

consolidation or any other business combination transaction of the Corporation into or with any other corporation or Person shall be deemed to be a voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Corporation.

(d)     In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the Corporation shall, within ten (10) days after the date the Board approves such action, or at least twenty (20) days prior to any stockholder's meeting called to approve such action, if applicable, or within twenty (20) days after the commencement of any involuntary proceeding, whichever is earlier, give each Holder initial written notice of the proposed action. Such initial written notice shall describe the material terms and conditions of such proposed action.

## Section VI.    Adjustments for Change of Control

(a)     Upon the occurrence of a Change of Control (as defined herein) while any shares of Junior Preferred Stock remain outstanding, each share of Junior Preferred Stock (or fraction thereof) outstanding immediately prior to such Change of Control shall, without the consent of Holders, become convertible into the types and amounts of securities, cash, and other property that is or was receivable in such Change of Control by a holder of the number of shares of Common Stock into which such share of Junior Preferred Stock (or fraction thereof) was convertible immediately prior to such Change of Control (such securities, cash, and other property, the "Exchange Property"); provided, however, that if receipt of the Exchange Property would cause the Holder to the Holder to acquire control of a bank, as "control" is defined in Section 2(a)(2) of the Bank Holding Company Act of 1956, as amended, and the implementing regulations of the Board of Governors of the Federal Reserve System, require the Holder to file a Change in Bank Control Act notice or require the Holder to make any similar regulatory filing, proper provision shall be made for such Holder to receive shares of non-voting securities in lieu of any voting securities included in the Exchange Property, the terms of which non-voting securities shall be as nearly equivalent as practicable to those of the Junior Preferred Stock.

(b)     A "Change of Control" shall mean:

(i)     an acquisition of more than fifty percent (50%) of the equity securities of the Corporation (measured by vote or value) by means of merger or other form of corporate reorganization in which outstanding shares of the Corporation are exchanged for securities or other consideration issued, or caused to be issued, by the Acquiring Person (as defined below) or its Parent, Subsidiary or Affiliate (each as defined in Rule 12b-2 of the Exchange Act);

(ii)     a sale or other disposition of all or substantially all of the assets of the Corporation (on a consolidated basis) in a single transaction or series of related transactions;

(iii)     any tender offer, exchange offer, stock purchase or other transaction or event or series of related transactions or events by or involving the Corporation in which a single entity or group becomes the direct or indirect owner of more than fifty percent (50%) of the equity securities of the Corporation (measured by vote or value);

(iv)     a capital reorganization or reclassification of the Common Stock or other securities.

Notwithstanding anything contained herein to the contrary, a change in the state of incorporation of the Corporation shall not in and of itself constitute a Change of Control.

7

(c)     "Acquiring Person" means, in connection with any Change of Control any of the following, at the Holder's election, (i) the continuing or surviving Person of a consolidation or merger with the Corporation (if other than the Corporation), (ii) the transferee of all or substantially all of the properties or assets of the Corporation, (iii) the corporation consolidating with or merging into the Corporation in a consolidation or merger in connection with which the Common Stock is changed into or exchanged for stock or other securities of any other Person or cash or any other property, (iv) the entity or group acting in concert acquiring or possessing the power to cast the majority of the eligible votes at a meeting of the Corporation's stockholders at which directors are elected, or, (v) in the case of a capital reorganization or reclassification, the Corporation, or (vi) at the Holder's election, any Person that (x) controls the Acquiring Person directly or indirectly through one or more intermediaries, (y) is required to include the Acquiring Person in the consolidated financial statements contained in such Person's Annual Report on Form 10 K (if such Person is required to file such a report) or would be required to so include the Acquiring Person in such Person's consolidated financial statements if they were prepared in accordance with U.S. generally accepted accounting principles and (z) is not itself included in the consolidated financial statements of any other Person (other than its consolidated subsidiaries).

(d)     If holders of shares of Common Stock have the opportunity to elect the form of consideration to be received in a Change of Control, the Holders of Junior Preferred Stock shall be entitled to receive the same election.

(e)     The Corporation (or any successor) shall, within 20 days of the occurrence of any Change of Control or, if earlier, the date on which similar notice is given to holders of Common Stock, provide written notice to the Holders of such occurrence and of the type and amount of the cash, securities or other property that constitutes the Exchange Property. Failure to deliver such notice shall not affect the operation of this Section VI.

### Section VII.   Reports as to Adjustments

Whenever the number of shares of Common Stock into which the shares of Junior Preferred Stock are convertible is adjusted as provided in Section II(b), the Corporation shall, as soon as is reasonable practicable, compute such adjustment and furnish to the Holders a certificate of the Corporation, setting forth the number of shares of Common Stock into which each share of Junior Preferred Stock (or fraction thereof) is convertible as a result of such adjustment, a brief statement of the facts requiring such adjustment, the computation thereof and when such adjustment will become effective.

### Section VIII.  Transfer Restrictions

Shares of Junior Preferred Stock may not be transferred to any Person other than pursuant to a Permitted Transfer, and any attempt to transfer one or more shares of Junior Preferred Stock (or fraction thereof) to a Person other than pursuant to a Permitted Transfer shall be void and of no effect.

### Section IX.   Exclusion of Other Rights

Except as may otherwise be required by law, shares of Junior Preferred Stock shall not have any powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations, other than those specifically set forth herein (as this Certificate of

Designation may be amended from time to time) and in the Articles of Incorporation. The shares of Junior Preferred Stock shall have no preemptive or subscription rights.

## Section X.     Severability of Provisions

If any powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock set forth in this Certificate of Designation (as this Certificate of Designation may be amended from time to time) is invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock set forth in this Certificate of Designation (as so amended) which can be given effect without the invalid, unlawful or unenforceable powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock shall, nevertheless, remain in full force and effect, and no powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock herein set forth shall be deemed dependent upon any other such powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations of the Junior Preferred Stock unless so expressed herein.

## Section XI.     Rank

Notwithstanding anything set forth in the Articles of Incorporation or this Certificate of Designation to the contrary, the Board or any authorized committee of the Board, without the vote of Holders of the Junior Preferred Stock, may authorize and issue additional shares of stock ranking junior or senior to, or on parity with, the Junior Preferred Stock as to dividends and the distribution of assets upon any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation or any other powers, preferences, participation and other special rights, qualifications, limitations, restrictions and other designations.

## Section XII.   No Redemption

The Corporation may not, at any time, redeem the outstanding shares of the Junior Preferred Stock, except upon the unanimous consent of the Holders of all outstanding shares of Junior Preferred Stock.

## Section XIII.  Repurchases

Subject to the limitations imposed herein, the Corporation may purchase and sell shares of Junior Preferred Stock (or fraction thereof) from time to time to such extent, in such manner, and upon such terms as the Board or any duly authorized committee of the Board may determine.

## Section XIV.  No Sinking Fund

Shares of Junior Preferred Stock are not subject to the operation of a sinking fund or any similar provisions.

## Section XV. Notices

All notices, requests and other communications to a Holder of Junior Preferred Stock shall be in writing (including facsimile transmission) and shall be given at the address of such Holder as shown on the books of the Corporation. A Holder of Junior Preferred Stock may waive any

notice required hereunder by a writing signed before or after the time required for notice or the action in question. Notice shall be deemed given on the earlier of the date received or three business days after the date such notice is mailed by first-class mail, postage prepaid.